# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN FERRELL, et al., | Case No. 1:19-cv-00332-LJO-SAB |
| Plaintiffs, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT |
| v. | |
| BUCKINGHAM PROPERTY MANAGEMENT, | |
| Defendant. | (ECF No. 19) |
| | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

Plaintiffs Kevin Ferrell and Cheryl Baker bring this action on behalf of themselves and others similarly situated against Defendant Buckingham Property Management, alleging various wage and hour violations under California state law, and claims under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"). Currently before the Court is Plaintiffs' motion for preliminary approval of a class action settlement and certification of the class for purposes of settlement. (ECF No. 19.) The Court, having reviewed the record, found this matter suitable for decision without oral argument under Local Rule 230(g), and the previously scheduled hearing set on January 15, 2020, was vacated. (ECF No. 23.) Having considered the moving papers, the declarations and exhibits attached thereto, as well as the Court's file, the Court issues the following findings and recommendations recommending granting the motion for preliminary approval of settlement and conditionally certifying the class for purposes of settlement.

# I.

## BACKGROUND

### A.    Factual Background

Defendant specializes in property management of residential real estate and manages thousands of units in the State of California. (Mot. Prelim. Approval Class Action Settle. ("Mot.") 10, ECF No. 19; Decl. Rosemary Lynch ("Lynch Decl.") ¶¶ 2, 4, ECF No. 19-5, Ex. A.)[1]  Plaintiff Kevin Ferrell ("Ferrell") was employed by Defendant as a non-exempt Maintenance/Painting Technician, and Plaintiff Cheryl Baker ("Baker") was employed by Defendant as a non-exempt Community Manager. (Mot. 10; Decl. Kevin Ferrell ("Ferrell Decl."), ¶ 2, ECF No. 19-4; Decl. Cheryl Baker ("Baker Decl.") ¶ 2, ECF No. 19-3.) Plaintiffs' principal allegations are that Defendant has violated the California Labor Code and the FLSA by, *inter alia*, failing to properly pay minimum and overtime wages, failing to provide compliant meal and rest periods or pay associated premiums, failing to timely pay wages upon termination, failing to provide compliant wage statements, failing to maintain requisite payroll records, and failing to reimburse necessary business-related expenses. (Mot. 10.) Plaintiffs contend that Defendant's conduct constitutes unfair business practices under the California Business and Professions Code and gives rise to penalties under the Private Attorneys General Act of 2004, California Labor Code § 2698, *et seq.* ("PAGA"). (Mot. 10.) As a result, Plaintiffs contend that they and the "Class Members" and "Proposed FLSA Collective Members" are entitled, *inter alia*, unpaid wages, penalties including but not limited to those available under the PAGA, and attorneys' fees. (Mot. 10.)

Defendant denies any liability of any kind associated with the claims and allegations, and further denies that Plaintiffs, the Class Members, or Proposed FLSA Collective Members are entitled to any relief. (Mot. 10.) Defendant also denies that this case is appropriate for class or representative treatment for any other purpose other than the proposed settlement. Defendant has obtained release agreements and arbitration agreements for several Class Members. (Mot. 10;

---

[1]  All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

Lynch Decl. ¶¶ 7-8, Exs. B, C.)

This action proceeds on Plaintiffs' first amended complaint filed with the state court on March 5, 2019. (First Am. Compl. ("FAC"), ECF No. 1-17.) The FAC brings the following causes of actions: (1) violation of California Labor Code §§ 510 & 1198 for unpaid overtime; (2) violation of California Labor Code §§ 226.7 & 512(a) for unpaid meal premiums; (3) violation of California Labor Code § 226.7 for unpaid rest period premiums; (4) violation of California Labor Code §§ 1194, 1197, & 1197.1 for unpaid minimum wages; (5) violation of California Labor Code §§ 201 & 202 for final wages not timely paid; (6) violation of California Labor Code § 204 for wages not timely paid during employment; (7) violation of California Labor Code § 226(a) for non-compliant wage statements; (8) violation of California Labor Code § 1174(d) for failure to keep requisite payroll records; (9) violation of California Labor Code § 1198 for unpaid reporting time pay; (10) violation of California Labor Code §§ 2800 & 2802 for unreimbursed business expenses; (11) violation of California Business and Professions Code §§ 17200, *et seq.*; (12) violation of the Fair Labor Standards Act, 29 U.S.C. § 207 for unpaid overtime; (13) violation of the Fair Labor Standards Act, 29 U.S.C. § 207 for unpaid minimum wages; and (14) violation of the California Labor Code Private Attorneys General Act of 2004. (Id.)

**B.    Procedural History**

On August 8, 2014, Plaintiff Ferrell filed a putative class action against Defendant in the Los Angeles Superior Court, on behalf of himself and all current and former California-based non-exempt individuals employed by Defendant since August 8, 2011. (Mot. 10; Decl. Edwin Aiwazian ("Aiwazian Decl.") ¶ 10, ECF No. 19-1.)

On December 4, 2014, the Los Angeles Superior Court entered an order approving the parties' stipulation to transfer venue to Fresno County and the action was transferred to the Superior Court for the County of Fresno. (Mot. 11.) After engaging in discovery and investigation of the claims and defenses, on January 27, 2016, the parties engaged in a private mediation with Paul Grossman, "a well-respected mediator experienced in handling complex wage-and-hour matters." (Mot. 11; Aiwazian Decl. ¶ 11.) The parties reached a settlement with the aid of the mediator's evaluations and proposal. (Id.)

On February 22, 2017, Plaintiffs filed a motion for preliminary approval of settlement, that was denied without prejudice by the Fresno County Superior Court. (Mot. 11; Aiwazian Decl. ¶ 11.) On May 18, 2018, Plaintiffs filed a renewed motion for preliminary approval of settlement that was also denied without prejudice by the Fresno County Superior Court. (Id.)

On March 5, 2019, pursuant to the stipulation of the parties and an order granting leave thereon, Plaintiff filed the first amended and operative complaint in this action. (Mot. 11.) On March 11, 2019, Defendant removed this action to this court, the United States District Court for the Eastern District of California, under 28 U.S.C. §§ 1331, 1441, and 1446. (Mot. 11.)

The parties engaged in additional negotiations regarding settlement, and ultimately reached a settlement to address points of concern raised by the Fresno County Superior Court. (Mot. 11; Aiwazian Decl. ¶ 11.) The changes included, but were not limited to: (1) narrowing the class to "Property Employees" only, who like the named Plaintiffs, predominately worked on properties managed by Defendant and thus had more common experiences and claims; (2) adding a claim under the FLSA and allocating separate settlement amounts for FLSA and class claims; and (3) guaranteeing a higher minimum distribution floor for the class settlement amount. (Id.) On November 25, 2019, Plaintiffs filed the motion for preliminary approval of the proposed class settlement agreement and for certification of the class for purposes of settlement that is currently before the Court for consideration. (ECF No. 19.) On November 26, 2019, the Court issued a minute order resetting the hearing on the motion for January 15, 2020, and on January 13, 2020, the Court vacated the hearing after finding this matter suitable for decision without oral argument under Local Rule 230(g). (ECF Nos. 20, 23.)

## II.

## LEGAL STANDARD

The Ninth Circuit has recognized a strong judicial policy favoring settlement, particularly of complex class actions. Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992). Nevertheless, especially where settlement occurs prior to class certification, courts must scrutinize the proposed settlement to ensure the propriety of class certification and the fairness of the proposed settlement. Staton v Boeing, 327 F.3d 938, 952 (9th Cir. 2003).

## A.  Certification of the Class

To certify a class, a party must demonstrate that all of the prerequisites of Rule 23(a), and at least one of the requirements of Rule 23(b) of the Federal Rules of Civil Procedure have been met.  Wang v. Chinese Daily News, Inc., 737 F.3d 538, 542 (9th Cir. 2013).  This requires courts to "conduct a 'rigorous analysis' to determine whether the party seeking class certification has met the prerequisites of Rule 23."  Wright v. Linkus Enterprises, Inc., 259 F.R.D. 468, 471 (E.D. Cal. 2009).

Under Rule 23(a), the four requirements that must be met for class certification are: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims for defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class."  Fed. R. Civ. P. 23(a)(1)-(4); Wright, 259 F.R.D. at 471.  Under Rule 23(b), a plaintiff must establish one of the following conditions is present: (1) that there is a risk of inconsistent adjudications from separate actions that would result in incompatible standards of conduct for the party opposing the class or would be dispositive of the interests of members not parties to the actions or would substantially impair their ability to protect their interests; (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole; or (3) the court finds questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other methods of adjudicating the controversy.  Fed. R. Civ. P. 23(b)(1)-(3); Wright, 259 F.R.D. at 471-72.  In considering subsection three (3), "matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A)-(D).

///

**B. Court Approval of Class Settlement Agreements**

Federal Rule of Civil Procedure 23(e)(2) mandates that any settlement in a class action may only be approved by the court after finding that the settlement is fair, reasonable, and adequate after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2)(A)-(D). The role of the district court in evaluating the fairness of the settlement is not to assess the individual components, but to consider the settlement as a whole. Lane v. Facebook, Inc., 696 F.3d 811, 818-19 (9th Cir. 2012) reh'g denied 709 F.3d 791 (9th Cir. 2013). In reviewing a proposed settlement, the court represents those class members who were not parties to the settlement negotiations and agreement. In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig., 295 F.R.D. 438, 448 (C.D. Cal. 2014).

### III.

### THE PROPOSED SETTLEMENT AGREEMENT

The Court will now outline the relevant terms of the proposed settlement agreement (the "Agreement," ECF No. 19-1 at 26), that Plaintiffs have submitted for preliminary approval.

**A. The Class and Proposed FLSA Collective for Settlement Purposes**

For settlement purposes only, Plaintiffs state in their moving papers that the parties agree to certification of the following class consisting of approximately 803 individuals: "All current and former non-exempt Property Employees of Defendant within the State of California from

August 10, 2010 to the date the Settlement is preliminarily approved by the Court ('Class Members' or 'Class')." (Mot. 12.) Class Members who submit a timely and valid "Class Claim Form," which will be mailed after preliminary approval of the settlement and approval of the Class, will be bound by the settlement agreement and receive a share of the "Class Settlement."

For settlement purposes only, the Plaintiffs state in their moving papers that the parties agree to conditional certification of the "Proposed FLSA Collective" consisting of: "all current and former Property Employees of Defendant within the State of California during the period from August 8, 2010 to the date on which the Settlement is preliminarily approved by the Court ('Settled Period')." (Mot. 12.) Proposed FLSA Collective Members who submit a timely and valid "FLSA Opt-In Form," which will be mailed after preliminary approval, will be bound by the "FLSA Settlement" and receive their share of the FLSA Settlement. (Mot. 12.)

The Court notes that the Agreement itself provides a somewhat different definition of Class, defined as: "all current and former Property Employees of Defendant within the State of California during the Settled Period." (Agreement ¶ 3.) The Agreement also contains a somewhat different definition of Proposed FLSA Collective: "all current and former Property Employees of Defendant within the State of California during the Settled Period." (Agreement ¶ 49.) The Agreement also provides a definition of Property Employees defined as: "non-exempt employees with the following job positions during the Settled Period: Area Relief Manager, Assistant Community Manager, Community Manager, Contact Assistant Manager, Grounds Keeper, Janitor, Maintenance Technician, Porter, Residential Service Coordinator, and Security." (Agreement ¶ 48.)

The proposed order appears to combine the essential substantive terms, including the definition of Property Employees, and this is what the Court shall utilize for purposes of certifying the Class and Proposed FLSA Collective:

> All current and former Property Employees of Defendant within the State of California from August 8, 2010 to the date this Order is signed by the Court ("Settled Period"). "Property Employees" means non-exempt employees with the following job positions during the Settled Period: Area Relief Manager, Assistant Community Manager, Community Manager, Contact Assistant Manager, Grounds Keeper, Janitor, Maintenance Technician, Porter, Residential Service Coordinator, and Security.

(ECF No. 19-6 at 3.)

**B.    The Monetary Settlement Amounts**

Defendant will pay a "Maximum Settlement Amount" of up to $600,000.00 on a claims-made basis.  (Mot 12; Agreement ¶¶ 34, 62.)  The "Net Settlement Amount" is the amount remaining after deducting the following from the Maximum Settlement Amount: (1) attorneys' fees of up to thirty-five percent (35%) of the Maximum Settlement Amount, for a total of $210,000.00, plus reimbursement of litigation costs and expenses up to $35,000.00, for a total of up to $245,000.00 (the "Fees and Costs Award") to "Class/Collective Counsel"; (2) "Incentive Awards" of up to $3,000.00 each to Plaintiffs Kevin Ferrell and Cheryl Baker for a total of $6,000.00; (3) $3,750.00 to the Labor Workforce and Development Agency ("LWDA") for its share of the "PAGA Settlement Amount"; and (4) "Settlement Administration Costs," currently estimated to be $16,000.00.  (Mot. 12-13; Agreement ¶¶ 19, 28, 33, 34, 36, 58.)  Additionally, a twenty-five percent (25%) portion of the PAGA Settlement Amount allocated to aggrieved employees ($1,250.00 of a total $5,000.00), will remain part of the Net Settlement Amount. (Mot. 13; Agreement ¶ 15.)

Assuming that the allocations toward these payments are paid in full, the Net Settlement Amount that will be available for distribution to Class Members who submit timely and valid Class Claim Forms ("Claimants"), and Proposed FLSA Collective Members who submit timely and valid FLSA Opt-In Forms ("FLSA Collective Members"), is estimated to be $329,250.00. (Mot. 13; Aiwazian Decl. ¶ 17.)  Ninety-five percent (95%) of the Net Settlement Amount, inclusive of the Employee's PAGA portion, will be allocated to the Class Settlement and available to be distributed to Claimants ("Class Settlement Amount"), and the remaining five percent (5%) of the Net Settlement Amount will be allocated to the FLSA Settlement and distributed to FLSA Collective Members ("FLSA Settlement Amount").  (Mot. 13.)

The Class Settlement Amount is estimated to be $312,787.50, and will be distributed to Claimants based upon the number of weeks they worked as Property Employees during the Settled Period ("Workweeks").  (Mot. 13; Agreement ¶ 44.)  At least sixty-three percent (63%) of the Class Settlement Amount will be distributed to Claimants (the "Minimum Distribution

Floor"). (Mot. 13; Agreement ¶¶ 35, 67.) In the event that less than sixty-three percent (63%) of the Class Settlement Amount is claimed by Claimants, each Claimant's share will be proportionately increased on a *pro rata* basis based on their number of Workweeks. (Mot. 13; Agreement ¶¶ 67, 69(a).) Any amount of the Class Settlement Amount over the Minimum Distribution Floor that is not claimed by the Claimants ("Remainder") will be used to pay Defendant's share of payroll taxes and contributions in connection with the wages portion of "Estimated Class Settlement Shares" and "Estimated FLSA Settlement Shares" ("Employers Taxes"), and the remaining amount (if any) will be retained by Defendant. (Mot. 13; Agreement ¶ 67.)

The FLSA Settlement Amount, which is five percent (5%) of the Net Settlement Amount, or approximately $16,462.50, will be distributed to FLSA Collective Members based upon their Workweeks compared to the number of Workweeks of all FLSA Collective Members. (Mot. 13.) The entire FLSA Settlement Amount will be paid out to FLSA Collective Members. (Mot. 13; Agreement ¶ 69(b).)

## C. Calculation of Estimated Class Settlement Shares

The "Settlement Administrator" will calculate each Class Member's Estimated Class Settlement Share by: (1) calculating the total number of Workweeks worked by each Class Member (Agreement ¶¶ 59, 71, 76); (2) dividing the Class Settlement Amount by the total number of Workweeks worked by all Class Members to yield the "Initial Class Workweek Amount" (Agreement ¶ 69(a)(i)); (3) multiplying the Initial Class Workweek Amount by each Class Member's total number of individual Workweeks to determine their Estimated Class Settlement Share (Agreement ¶ 69(a)(ii)); (4) if the Estimated Class Settlement Shares that are actually claimed by Claimants equal less than the Minimum Distribution Floor, the Estimated Class Settlement Shares will be proportionately increased for each Claimant so that the total of all Estimated Class Settlement Shares equals no less than the Minimum Distribution Floor (Agreement ¶ 69(a)(iii)); and (5) Estimated Class Settlement Shares will be subject to reduction for the employee's share of taxes and withholdings with respect to the portion of the payment that is deemed wages, and the payment to a Claimant that is net of these taxes and withholdings

is the "Individual Class Payment" (Agreement ¶ 69(a)(iii)-(iv)).  (Mot. 14.)

### D.    Calculation of Estimated FLSA Settlement Shares

The Settlement Administrator will calculate each Proposed FLSA Collective's Estimated FLSA Settlement Share and each "Individual FLSA Payment" by: (1) dividing the FLSA Settlement Amount by the total number of Workweeks worked by the Proposed FLSA Collective to yield the "Initial FLSA Workweek Amount" (Agreement ¶ 69(b)(i)); (2) multiplying the Initial FLSA Workweek Amount by each FLSA Collective Member's individual number of Workweeks to determine their Estimated FLSA Settlement Share (Agreement ¶ 69(b)(ii)); (3) if the amount claimed by the FLSA Collective Members is less than the FLSA Settlement Amount, the Settlement Administrator will increase each Estimated FLSA Settlement Share proportionally so that the sum of all Estimated FLSA Settlement Shares equals the FLSA Settlement Amount, and the final amount distributable to each FLSA Collective Member is the "Individual FLSA Payment" (Agreement ¶ 69(b)(iii)).  (Mot. 14.)

### E.    Taxes

Individual Class Payments will be allocated as one-third wages and two-thirds penalties, interest, and non-wage damages.  (Mot. 14; Agreement ¶ 85.)  Individual FLSA Payments will be allocated as one-third wages and two-thirds penalties and non-wage damages.  (Id.)  The wages portion of these payments will be reported on an IRS From W-2, and the portions allocated to interest and penalties will be reported on an IRS Form-1099.  (Id.)

The Employer Taxes will be paid from the Remainder.  (Mot. 14; Agreement ¶¶ 16, 31, 52, 62(a).)  If the Remainder is not sufficient to cover all the Employer Taxes Defendant will pay an additional amount sufficient to cover the Employer Taxes.  (Mot. 14; Agreement ¶ 62(a).)

### F.    Range of Estimated Settlement Shares for Class Settlement

The Net Settlement Amount is currently estimated to be $329,250.00.  (Mot. 15; Aiwazian Decl. ¶ 17.)  Assuming a Class Settlement Amount of $312,787.50 (95% of $329,250.00), and a 100% claims rate, the range of Estimated Class Settlement Shares that individual Class Members could be credited with, based on their respect number of Workweeks ranges from $111.21 for a six-month period of Workweeks, to $1,779.36 for an eight-year period

of Workweeks:

  • 6 months: [($312,787.50 ÷ 73,127 total workweeks) x 26 Workweeks] = $111.21

  • 1 year: [($312,787.50 ÷ 73,127 total workweeks) x 52 Workweeks] = $222.42

  • 2 years: [($312,787.50 ÷ 73,127 total workweeks) x 104 Workweeks] = $444.84

  • 3 years: [($312,787.50 ÷ 73,127 total workweeks) x 156 Workweeks] = $667.26

  • 4 years: [($312,787.50 ÷ 73,127 total workweeks) x 208 Workweeks] = $889.68

  • 6 years: [($312,787.50 ÷ 73,127 total workweeks) x 312 Workweeks] = $1,334.52

  • 8 years: [($312,787.50 ÷ 73,127 total workweeks) x 416 Workweeks] = $1,779.36

(Mot. 15.)

### G.  Range of Estimated Settlement Shares for FLSA Collective

Based on the current estimated Net Settlement Amount of $329,250.00, the FLSA Settlement Amount of $16,462.50 (5% of the Net Settlement Amount), and a 100% opt-in rate, the range of Estimated FLSA Settlement Shares that individual Proposed FLSA Collective Members could be credited with, based on their respective number of Workweeks, ranges from $5.85 for a six-month period of Workweeks, to $93.65 for an eight-year period of Workweeks:

  • 6 months: [($16,462.50 ÷ 73,127 total workweeks) x 26 Workweeks] = $5.85

  • 1 year: [($16,462.50 ÷ 73,127 total workweeks) x 52 Workweeks] = $11.71

  • 2 years: [($16,462.50 ÷ 73,127 total workweeks) x 104 Workweeks] = $23.41

  • 3 years: [($16,462.50 ÷ 73,127 total workweeks) x 156 Workweeks] = $35.12

  • 4 years: [($16,462.50 ÷ 73,127 total workweeks) x 208 Workweeks] = $46.83

  • 6 years: [($16,462.50 ÷ 73,127 total workweeks) x 312 Workweeks] = $70.24

  • 8 years: [($16,462.50 ÷ 73,127 total workweeks) x 416 Workweeks] = $93.65

(Mot. 15.)

### H.  Settlement Opt-Out and Objection Procedures

Class Members who wish to opt out from the Class Settlement must submit a written letter to the Settlement Administrator requesting to be excluded from the Class Settlement ("Request for Exclusion"). (Mot. 15; Agreement ¶¶ 53, 77.) The Request for Exclusion must: (a) state the case name and number; (b) contain the name, address, telephone number, signature,

and last four digits of the Social Security Number of the Class Member; (c) clearly state that the Class Member does not wish to be included in the Class Settlement; and (d) be returned to the Settlement Administrator, postmarked or fax-stamped within sixty (60) calendar days from the initial mailing of the "Notice Packet" (the "Response Deadline"). (Mot. 15; Agreement ¶¶ 53-54.) In the event of a re-mailed Notice Packet, the Response Deadline will be extended ten (10) calendar days. (Mot. 15; Agreement ¶ 54.)

Class Members who have not opted out of the Class Settlement ("Participating Class Member(s)"), may object to the Class Settlement by filing a "Notice of Objection" with the Court and serving copies upon counsel for the parties no later than the Response Deadline. (Mot. 16; Agreement ¶ 81.) A Notice of Objection must include: (a) the case name and number of the action; (b) the objector's full name, address, and telephone number; (c) a statement indicating the individual objects to the Class Settlement and an explanation of the legal and factual grounds for the objection; and (d) copies of any papers, briefs, or other documents upon which the objection is based. (Mot. 16; Agreement ¶¶ 37, 81.)

## I.     Scope of the Class Release

The "Class Released Claims" that are the subject of the Settlement are "Released Claims" which do not arise under the FLSA. The Released Claims are:

> Any and all claims, charges, complaints, obligations, promises, agreements, suits, rights, costs, losses, liens, penalties, fines, wages, liquidated damages, restitutionary amounts, interest, punitive damages, controversies, liabilities, debts, demands, money owed, guarantees, expenses, back wages, attorneys' fees and costs, damages, actions or causes of action, of any nature, under state, federal, or local law, that were made or could have been made based on the facts alleged in the pleadings filed in the Action, which includes claims for failure to pay minimum, overtime, regular, and reporting time wages (California Labor Code, §§ 510, 1194, and 1198, and the Fair Labor Standards Act, 29 U.S.C. § 207), failure to provide compliant meal periods and associated premium pay (California Labor Code §§ 512 and 226.7), failure to provide compliant rest periods and associated premiums (California Labor Code § 226.7), failure to timely pay wages upon termination (California Labor Code §§ 201-203), failure to timely pay wages during employment (California Labor Code § 204), failure to provide accurate, itemized wage statements (California Labor Code § 226), failure to keep requisite payroll records (California Labor Code § 1174(d)), failure to reimburse business expenses (California Labor Code § 2800 and 2802), civil penalties under the Private Attorneys General Act (California Labor Code § 2698, *et seq.)* based on the aforementioned, and unfair business practices (California Business & Professions Code § 17200, *et. seq.*) based on the aforementioned, arising during

the Settled Period, excluding claims for workers' compensation benefits or any of claims that may not be released by law.

(Mot. 16; Agreement ¶¶ 8, 50.)

Upon the "Effective Date,"[2] Plaintiffs and all Participating Class Members will release all Class Released Claims with respect to all of the "Released Parties." (Mot. 16; Agreement ¶¶ 8, 50, 51, 79.) Plaintiffs have also provided a general release of all claims with a waiver of California Civil Code § 1542. (Mot. 16; Agreement ¶ 90.)

### J. The FLSA Released Claims

The "FLSA Released Claims" are those that are the subject of the Settlement and are Released Claims which arise under the FLSA. (Mot. 16; Agreement ¶¶ 25, 50.) Proposed FLSA Collective Members who submit a valid FLSA Opt-In Form (i.e., FLSA Collective Members), will be bound by the FLSA Settlement. (Mot. 16; Agreement ¶¶ 23, 78.) As of the Effective Date, Plaintiffs and all FLSA Collective Members will be deemed to have released any and all FLSA Released Claims with respect to all of the Released Parties. (Mot. 16; Agreement ¶¶ 78, 80.)

### IV.

### ANALYSIS AND DISCUSSION

District courts review class action settlements in two stages. First, as here, plaintiffs file a motion described as a motion for preliminary approval, along with a motion to certify the class for purposes of settlement if certification has not occurred. If the district court grants preliminary approval and certifies the class, class members are then notified and given an opportunity to object to the settlement or opt-out of the settlement. See Cotter v. Lyft, Inc., 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016). Thereafter, plaintiffs typically file a motion for final approval, and after a final fairness hearing and considering any objections to the settlement, the district court determines whether to grant final approval. Id.

Even where a proposed settlement is unopposed, the Court must fully examine whether

---

[2] The Effective Date is defined as: "the later of: (a) if no appeal is filed, the date that is thirty-five (35) calendar days after the date of entry of the Final Order, or (b) if the Final Order is appealed, the date on which any reviewing court issues a decision, the time for further appeal has expired, and the trial court has regained jurisdiction." (Agreement ¶ 14.)

the proposed settlement class satisfies Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation. <u>Wright</u>, 259 F.R.D. at 472 (citing <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1019 (9th Cir.1998)). The Ninth Circuit and Supreme Court have emphasized that Rule 23(e) governing settlement is an additional, not a superseding requirement, and thus "just because a settlement appears to be fair, reasonable, and adequate under Rule 23(e) does not mean a class has met the certification requirements of Rule 23(a) and (b)." <u>In re Online DVD-Rental Antitrust Litig.</u>, 779 F.3d 934, 942 (9th Cir. 2015) (citing <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 620–21 (1997)).

This action is currently at the first stage where the Court shall consider whether preliminary approval of the proposed settlement is appropriate, and whether the class should be certified for purposes of settlement only. The Court now turns to determine whether certification of the class is appropriate for purposes of settlement.

### A. Certification of the Class for Purposes of Settlement

As discussed above, the proposed order appears to combine the essential substantive terms from the Agreement, including the definition of Property Employees, and this is what the Court shall utilize for purposes of certifying the Class and Proposed FLSA Collective:

> All current and former Property Employees of Defendant within the State of California from August 8, 2010 to the date this Order is signed by the Court ("Settled Period"). "Property Employees" means non-exempt employees with the following job positions during the Settled Period: Area Relief Manager, Assistant Community Manager, Community Manager, Contact Assistant Manager, Grounds Keeper, Janitor, Maintenance Technician, Porter, Residential Service Coordinator, and Security.

(ECF No. 19-6 at 3.)

#### 1. Numerosity

Numerosity is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no absolute number or cut-off for determining numerosity, and the specific facts of each case may be examined. <u>Schwarm v. Craighead</u>, 233 F.R.D. 655, 660 (E.D. Cal. 2006); <u>Cervantez v. Celestica Corp.</u>, 253 F.R.D. 562, 569 (C.D. Cal. 2008). "A reasonable estimate of the number of purported class members satisfies the numerosity requirement of Rule 23(a)(1)." <u>In re Badger Mountain Irr. Dist. Sec. Litig.</u>, 143

F.R.D. 693, 696 (W.D. Wash. 1992); see also Cervantez, 253 F.R.D. at 569 ("Courts have not required evidence of specific class size or identity of class members to satisfy the requirements of Rule 23(a)(1).")

As of December 31, 2018, the proposed class consisted of approximately 803 individuals. (Mot. 27; Lynch Decl. ¶ 6.) The Court finds the proposed class of 803 members satisfies the numerosity requirement as joinder of such members is impracticable. See Celano v. Marriott Int'l, Inc., 242 F.R.D. 544, 549 (N.D. Cal. 2007) (noting "courts generally find that the numerosity factor is satisfied if the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer."); Cervantez, 253 F.R.D. at 569 ("Courts have held that numerosity is satisfied when there are as few as 39 potential class members.")

### 2. Commonality

Commonality is satisfied where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Ninth Circuit has stated that Rule 23(a)(2) is construed permissively and that "[a]ll questions of fact and law need not be common to satisfy the rule." Staton v. Boeing Co., 313 F.3d 447, 462 (9th Cir. 2002) (quoting Hanlon, 150 F.3d at 1019). Indeed, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Id. "[T]he key inquiry is not whether the plaintiffs have raised common questions," but "whether class treatment will 'generate common answers apt to drive the resolution of the litigation.' " Arredondo v. Delano Farms Co., 301 F.R.D. 493, 503 (E.D. Cal. Feb. 21, 2014) (citations omitted). Commonality is not required for all of the claims. It may sufficient if there is one single issue common to the proposed class. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 359 (2011) (stating that even a single common question will satisfy Rule 23(a)(2)); True v. American Honda Motor Co., 749 F.Supp.2d 1052, 1064 (C.D. Cal. 2010); Haley v. Medtronic, Inc., 169 F.R.D. 643, 648 (C.D. Cal. 1996) ("Indeed, for the commonality requirement to be met, there must only be one single issue common to the proposed class."); see also In re Paxil Litig., 212 F.R.D. 539, 549 (C.D. Cal. 2003) (noting that "the commonality requirement is interpreted to

require very little").

Plaintiffs argue that "the Class Members seek remedies under wage-and-hour laws for violations arising from common, uniform, and systematic practices which applied to all Class Members during the Settled Period." (Mot. 27.) Plaintiffs' principal allegations are that Defendant has violated the California labor laws and the FLSA by, *inter alia*, failing to properly pay minimum and overtime wages, failing to provide compliant meal and rest periods or pay associated premiums, failing to timely pay wages upon termination, failing to provide compliant wage statements, failing to maintain requisite payroll records, and failing to reimburse necessary business-related expenses. (Mot. 10.) Plaintiffs cite multiple paragraphs of the Aiwazian declaration in support of establishing commonality. (Mot. 27; Aiwazian Decl. ¶¶ 11, 28, 34, 39, 47, 54, 59.) However, the declaration ends at paragraph 28, and even paragraphs 11 and 28 do not clearly support the arguments to establish commonality. No other declaration contains paragraphs corresponding to these numbers. Nonetheless, given the permissive standards for establishing commonality, the Court has found sufficient support in the moving papers overall, and particularly in the representative Plaintiffs' declarations, which the Court will now summarize the relevant portions of.

Plaintiff Cheryl Baker was employed as a non-exempt Community Manager for a period of weeks in October of 2013, as well as from November of 2013 until August of 2015. (Baker Decl. ¶ 2.) Kevin Ferrell was employed as a non-exempt Maintenance/Painting Technician from November 2011 until August of 2012. (Ferrell Decl. ¶ 2.) Both Baker and Ferrell received a monthly salary, an overtime per-hour rate, and both lived in apartments on-site and were attributed as receiving a certain amount of "Apartment Value" during their employment term. (Baker Decl. ¶ 2; Ferrell Decl. ¶ 2.)

Baker's job duties included showing and leasing units, responding to tenant inquiries and requests, communicating with other employees to determine how to respond to tenant inquiries, assisting in collecting rent, making bank deposits, tracking delinquent rents, inspecting and tidying the premises, running errands, and responding to emergencies. (Baker Decl. ¶ 4.) Ferrell's job duties are described similarly and include communicating with other employees to

determine how to respond to tenant inquiries, inspecting and tidying the premises, responding to tenant inquiries and requests, performing repairs and maintenance-related tasks, running errands such as picking up supplies and driving to the bank, and responding to emergencies. (Ferrell Decl. ¶ 4.) Baker and Ferrell both state that the Defendant's policies, practices, and procedures required then to maintain a high-level of customer service at all times. (Id.; Ferrell Decl. ¶ 4.) During the employment, Baker and Ferrell both state they "worked closely with other non-exempt employees, and we all, *inter alia*, responded to tenant and/or prospective tenant inquiries and requests, communicated with other employees to determine how to respond to tenant requests and inquiries, ran errands (e.g., to pick up supplies and go to the bank), inspected and tidied the premises, and responded to emergencies, among other tasks." (Baker Decl. ¶ 5; Ferrell Decl. ¶ 5.) Baker states she was required to perform work off-the-clock before the start of her shift and after the end of the shift, including responding to tenant requests, communicating with other employees to determine how to respond to requests, inspecting and tidying the premises, showing and leasing units, and responding to emergencies. (Baker Decl. ¶ 6.) Ferrell makes an identical allegation, although the duties do not include showing and leasing units, but rather include performing repair and maintenance-related tasks instead. (Ferrell Decl. ¶ 6.)

Specifically, both Ferrell and Baker argue they were required to carry a cell phone 24/7 pursuant to a memorandum policy, and that they lived on-site where they were regularly approached by tenants before or after scheduled hours requesting assistance,[3] and they were not always compensated for such work outside of scheduled hours. (Baker Decl. ¶ 6; Ferrell Decl. ¶ 6.) Overtime had to be preauthorized and therefore Baker and Ferrell were not permitted to record the hours worked early, late, or other times outside of scheduled hours. (Baker Decl. ¶ 7; Ferrell Decl. ¶ 7.) Baker and Ferrell also claim they were unable to take timely, uninterrupted breaks and rest periods due to the heavy workload, need to take work-related phone calls, and responding to emergencies (Baker Decl. ¶ 8.) As for Baker, this was impacted by the

---

[3] While almost identically described, Ferrell provides one example of a task requested outside of a normal shift, namely helping tenants when locked out of their apartments, while Baker provides no specific example in this section.

company's customer service expectations and the need to respond to inquiries from tenants and prospective tenants, and inspecting/tidying the premises. (Baker Decl. ¶ 8.) As for Ferrell, maintenance requests impacted the ability to take full break periods. (Ferrell Decl. ¶ 8.) At times, breaks were interrupted, short, or missed entirely due to work needs and they were not compensated. (Baker Decl. ¶ 8; Ferrell Decl. ¶ 8.) During their employment, Baker and Ferrell incurred business-related expenses that were not reimbursed such as from using a personal vehicle for work-related purposes, and from purchasing and maintaining work attire required under the dress code policy. (Baker Decl. ¶ 9; Ferrell Decl. ¶ 9.)

The facts and legal issues underlying this action are sufficiently similar for the Class Members. Therefore, given the permissive standard under the rule, the Court finds that Plaintiffs have demonstrated commonality as they have sufficiently shown that they suffered common injuries that are capable of resolution on a class-wide basis. See Wal-Mart Stores, Inc., 564 U.S. at 350; Millan v. Cascade Water Servs., Inc., 310 F.R.D. 593, 612 (E.D. Cal. 2015).

3.    Typicality

Rule 23 also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under the rule's permissive standard, claims "need not be substantially identical," but are typical if the representative's claims are "reasonably co-extensive with those of the absent class members." Parsons v. Ryan, 754 F.3d 657, 685 (9th Cir. 2014) (quoting Hanlon, 150 F.3d at 1020). Typicality is based on the "nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." Parsons, 754 F.3d at 685 (quoting Hanon v. Dataproducts, 976 F.2d at 508). Typicality tests "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Id. The requirements of commonality and typicality occasionally merge, and "[b]oth  serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Parsons, 754 F.3d at

685 (quoting <u>Wal-Mart Stores, Inc.</u>, 564 U.S. at 349 n.5).

Plaintiffs argue that the typicality requirement is satisfied here because the cause of the injury is the same, and the injury claimed by the named plaintiffs is similar to that of the unnamed class members. (Mot. 19.) The named Plaintiffs emphasize that their claims are typical of those among the Class Members, and although some factual differences may exist, the claims arise from the same events or course of conduct and are based on the same legal theories. (Mot. 19.) Plaintiffs argue that named Plaintiffs Ferrell and Baker both worked predominantly on site, as do all of the "Property Employees" they seek to represent as class representatives. (<u>Id.</u>; Ferrell Decl. ¶ 2; Baker Decl. ¶2; Agreement ¶ 48.)

The Court is not overly swayed by Plaintiffs' argument that all Property Employees worked predominately "on-site," as the fact that both Ferrell and Baker *lived* on-site seems to be a more significant factor that impacted their allegations of off-clock work and missed breaks than the simple fact that employees *worked* at the same locations. The Plaintiffs have not provided an abundance of information concerning the other types of employees contained in the definition of Property Employees, such as Contact Assistant Manager, Grounds Keeper, Janitor, Porter, Residential Service Coordinator, and Security, and whether these positions encompassed living on-site, or were subject to the same requirements for policies such as those related to carrying cell phones or dress code policies. Nonetheless, for purposes of preliminary certification and settlement, Plaintiffs have sufficiently demonstrated there are claims that are typical to the class. <u>See</u> <u>Millan</u>, 310 F.R.D. at 605 (finding typicality satisfied based on the presence of at least one shared claim, the failure to pay overtime claim, and noting "[a]lthough potentially different in extent and frequency from the putative class members, Plaintiff appears to have suffered the same injury—under payment for overtime—as the putative class.")[4] The Court finds that the

---

[4] The Court shares a similar concern as the <u>Millan</u> court: "The Court is concerned about the lack of information regarding the injuries that putative class members may have suffered. If putative class members suffered broader injuries than the named plaintiff, the compensation awarded may not justify the scope of the release. In other words, putative class members may be releasing claims that they are not compensated for by the settlement award. However, for purposes of preliminary certification, the Court has seen no indication that the named plaintiff's injuries are atypical of the class." <u>Millan v. Cascade Water Servs., Inc.</u>, 310 F.R.D. 593, 606 n.8 (E.D. Cal. 2015). However here, given Baker and Ferrell lived on-site and likely had more duties subject to potential break and overtime violations than other Property Employees, the concern is somewhat flipped in this regard.

typicality requirement has been met.

    4.    <u>Adequacy of Representation</u>

The Court must ensure "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In determining whether the named plaintiffs will adequately represent the class, the courts must resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970, 985 (9th Cir. 2011) (quoting <u>Hanlon</u>, 150 F.3d at 1020). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." <u>Ellis</u>, 657 F.3d at 985 (citing <u>Molski v. Gleich</u>, 318 F.3d 937, 955 (9th Cir.2003)). Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members." <u>Amchem Prod.</u>, 521 U.S. at 626 (internal quotations and citations omitted). This factor also tends to merge with the commonality and typicality criteria of Rule 23. <u>Id.</u> at 626 n.20.

The named Plaintiffs here ague their interests align with the other Class Members as all of them were employed by Defendant within the state of California, and the claims are typical as the Class Members are confined to a limited group of similarly situated employees (encompassed within defined term "Property Employees"), during the Settled Period. (Mot . 28; Baker Decl. ¶ 2; Ferrell Decl. ¶ 2; Agreement ¶ 48.)

Notwithstanding the concerns expressed regarding commonality and typicality discussed above, Plaintiffs share common injuries and possess the same interest as the unnamed class members. Plaintiffs do not appear to have any interests that are antagonistic to the class. Further, based on review of the submitted declarations, the Court finds Plaintiffs' counsel have demonstrated that they have sufficient experience handling employment class actions and complex wage-and-hour litigation. (Aiwazian Decl. ¶ 3-7; Davis Decl. ¶¶ 3-10.)

Accordingly, the Court finds that Plaintiffs have demonstrated they will adequately and fairly protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

5.     Rule 23(b) Criteria

Plaintiffs must also meet one of the three subdivisions of Rule 23(b) to certify the class. Fed. R. Civ. P. 23(b). Plaintiffs argue the proposed class meets the requirements of Rule 23(b)(3). Under Rule 23(b)(3) a class action may proceed where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Matters pertinent to this determination include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). The fact that the parties have reached a settlement is relevant to consideration of these factors and when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems [under Rule 23(b)(3)(D)], for the proposal is that there be no trial." Amchem Prod., 521 U.S. at 620. However, "other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." Id.

Plaintiffs argue that the class is sufficiently cohesive to warrant certification for settlement purposes, as common questions of fact and law affecting Class Members predominate over any questions that may affect only individual members. (Mot. 29.) In this regard, Plaintiffs emphasize that Defendant's alleged failure to properly pay Class Members for all hours worked and to provide compliant meal and rest periods are alleged to arise from Defendant's uniform policies, practices, and procedures. (Mot. 29; Aiwazian Decl. ¶¶ 28, 34, 39.)[5] Plaintiffs also argue that class resolution is superior to other available methods for the fair and efficient

---

[5] Again, Plaintiffs cite to certain paragraphs of the Aiwazian Declaration that do not exist as filed.

adjudication of the controversy as the individual resolution of class member claims would be uneconomical given the relatively small amount of damages for individuals, and thus class resolution is a superior method to pursue recovery. (Mot. 29.)

Given the common claims pertaining to the Class Members as current and former Property Employees subject to the same employer policies, the Court finds questions of law or fact common to class members predominate over any questions affecting only individual members. Given the difficulties of pursuing individual claims in this context, "the class members' interests in individually controlling the prosecution or defense of separate actions" is outweighed by the "desirability . . . of concentrating the litigation of the claims" in this forum, and there is no indication of other litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(A)-(C). The Court need not weigh potential difficulties in managing the class action given the parties have reached settlement. Amchem Prod., 521 U.S. at 620. Therefore, the Court also finds that a class action is the superior method for adjudicating the claims in this action.

Accordingly, the Court finds Plaintiffs have sufficiently met the requirements of Rule 23(b)(3), and recommends the class be certified for purposes of settlement.

### B. Certification of the FLSA Collective Actions

Plaintiffs also request that this matter be certified as a collective action under the FLSA. (Mot. 29-30.) The FLSA provides the right of an employee to represent similarly situated employees in a suit against their employer for the failure to pay minimum wage or overtime compensation. 29 U.S.C. § 216(b). Unlike a class action under Rule 23, to participate in the collective action, an employee is required to give his consent in writing to become a party. 29 U.S.C. § 216(b); see Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989) (rights in a collective action under the FLSA are dependent on the employee receiving accurate and timely notice about the pendency of the collective action, so that the employee can make informed decisions about whether to participate). "If an employee does not file a written consent, then that employee is not bound by the outcome of the collective action." Edwards v. City of Long Beach, 467 F.Supp.2d 986, 989 (C.D. Cal. 2006).

Determining whether a collective action is appropriate is within the discretion of the district court. Leuthold v. Destination Am., Inc., 224 F.R.D. 462, 466 (N.D. Cal. 2004). However, "[n]either the FLSA, nor the Ninth Circuit, has defined the term 'similarly situated' for purposes of certifying a collective action." Nen Thio v. Genji, LLC, 14 F.Supp.3d 1324, 1340 (N.D. Cal. 2014). While it is unclear what standard should be used to determine if the employees are similarly situated under the FLSA, given that the employee consents to participating in the FLSA actions, courts do find that "[t]he requisite showing of similarity of claims under the FLSA is considerably less stringent than the requisite showing under Rule 23 of the Federal Rules of Civil Procedure." Hill v. R+L Carriers, Inc., 690 F.Supp.2d 1001, 1009 (N.D. Cal. 2010) (citation and quotation marks omitted); accord Millan, 310 F.R.D. at 607.

Courts in the Ninth Circuit have generally utilized a two-step approach to determine whether to allow the collective action to proceed. Tijero v. Aaron Bros., Inc., 301 F.R.D. 314, 323 (N.D. Cal. 2013); Millan, 310 F.R.D. at 607. Initially, the court determines whether the potential class members should receive notice of the action based on a finding that the plaintiffs are "similarly situated." Id. "At this initial stage, plaintiffs can satisfy their burden to show that they are 'similarly situated' by making substantial allegations, supported by declarations or discovery, that the putative class members were together the victims of a single decision, policy, or plan." Nen Thio., 14 F.Supp.3d at 1340 (internal citations and quotation marks omitted). Such determination is "based on a fairly lenient standard, and typically results in conditional certification." Id. The second certification decision is usually made at the close of discovery when the defendant brings a motion to decertify the class and the "courts apply a stricter standard for similarly situated employees and review several factors, including whether individual plaintiffs' claims involve disparate factual or employment settings; the various defenses available to the defendant which appear to be individual to each plaintiff; as well as fairness and procedural considerations." Id. at 1341.

The Court finds that the Proposed FLSA Collective Members appear to be similarly situated because their alleged injuries arise from Defendant's policies and practices with regard to overtime pay, meal and rest periods, and minimum wages. Under the FLSA's lenient

standard the first step has been met. As Defendant will not seek decertification of the class, the Court need not consider the second step. See Millan, 310 F.R.D. at 607 ("As this Court now considers a settlement agreement, it is clear that Defendant will not seek decertification of the class conditionally certified for purposes of settlement. Absent an argument that the parties are not similarly situated, this Court need not look to the second step at all.").

Accordingly, the Court recommends that the matter be certified as a collective action under the FLSA.

**C.    Whether the Proposed Settlement is Fair, Reasonable, and Adequate**

As stated above, Federal Rule of Civil Procedure 23(e)(2) mandates that any settlement in a class action may only be approved by the court after finding that the settlement is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2)(A)-(D); Hanlon, 150 F.3d at 1026.

The role of the district court in evaluating the fairness of the settlement is not to assess the individual components, but to consider the settlement as a whole. Lane v. Facebook, 696 F.3d at 818-19. "Assessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the

24

experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." Hanlon, 150 F.3d at 1026 (citing Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1375 (9th Cir. 1993)).

"To determine whether a settlement falls within the range of possible approval, a court must focus on substantive fairness and adequacy, and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." Lusby v. Gamestop, Inc., 297 F.R.D. 400, 415 (N.D. Cal. 2013) (quoting In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007)). "If the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing." In re Tableware Antitrust Litigation, 484 F. Supp. 2d at 1079 (quoting Manual for Complex Litigation, Second § 30.44 (1985)).

When the settlement takes place before formal class certification, as it has in this instance, settlement approval requires a "higher standard of fairness." Lane v. Facebook, Inc., 696 F.3d at 819 (quoting Hanlon, 150 F.3d at 1026). This more exacting review of class settlements reached before formal class certification is required to ensure that the class representatives and their counsel do not receive a disproportionate benefit "at the expense of the unnamed plaintiffs who class counsel had a duty to represent." Id. As recently emphasized by the Ninth Circuit, this requires courts to apply "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)." Roes, 1-2 v. SFBSC Mgmt., LLC, 944 F.3d 1035, 1043 (9th Cir. 2019) (quoting In re Bluetooth, 654 F.3d at 946). When reviewing a district court's final approval of a settlement negotiated prior to certification, the Ninth Circuit ensures the district court: (1) comprehensively explored all factors; (2) has given a reasoned response to all non-frivolous objections; (3) adequately developed the record to support its final approval decision; and (4) "looked for and scrutinized any subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." Roes, 944 F.3d at 1043 (quoting Allen v. Bedolla, 787 F.3d 1218, 1223 (9th

Cir. 2015)).

1. <u>The Class Representatives and Counsel have Adequately Represented the Class and the Proposal was Negotiated at Arm's Length</u>

Some courts have stated, and Plaintiffs argue, that "[a]n initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." <u>Harris v. Vector Mktg. Corp.</u>, No. C-08-5198 EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) (citation omitted); <u>see also</u> <u>Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.</u>, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair," and "[g]reat weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.") (internal quotations and citations omitted). However, the Ninth Circuit has recently emphasized that this is not a valid presumption, particularly where settlement is negotiated prior to class certification:

> Nowhere in the final approval order, however, did the district court cite or otherwise acknowledge our longstanding precedent requiring a heightened fairness inquiry prior to class certification. To the contrary, the district court declared that, "[w]here a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a *presumption that the settlement is fair and reasonable*." (Emphasis added.) But such a presumption of fairness is not supported by our precedent, and the district court cites no Ninth Circuit case which adopted this standard. Particularly in light of the fact that we not only have never endorsed applying a broad presumption of fairness, but have actually required that courts do the opposite—by employing extra caution and more rigorous scrutiny—when it comes to settlements negotiated prior to class certification, the district court's declaration that a presumption of fairness applied was erroneous, a misstatement of the applicable legal standard which governs analysis of the fairness of the settlement.

<u>Roes</u>, 944 F.3d at 1049. Thus, the Court's review does not begin with a presumption of fairness based on apparent arms-length negotiations. Nonetheless, it is still a factor in determining whether the proposed settlement is fair, reasonable, and adequate.

Plaintiffs emphasize the parties have actively litigated this case since August of 2014, and that Class/Collective Counsel conducted a thorough investigation into the facts of the case, including, *inter alia*, interviews with Plaintiffs and many Class Members, and review of thousands of pages of data and documents including: (1) Plaintiffs' and Class Members'

employment records, including detailed time and pay records; (2) Defendant's Employee Handbook which contains policies and procedures pertaining to meal and rest periods, timekeeping requirements, dress code standards, overtime, and reimbursements; (3) class-wide data regarding class-size, number of workweeks, pay periods, and terminations; (4) Defendant's arbitration agreement; (5) Defendant's standard employment agreement; (6) Defendant's new employee checklist; (7) job descriptions for various positions; (8) Defendant's memorandum pertaining to cell phones; (9) Defendant's mileage expense report form; (10) Defendant's Employee Handbook Acknowledgement form; (11) Defendant's Business Mileage Reimbursement Policy; (12) a list of all current and former properties managed by Defendant; (13) agendas from internal meetings; (14) emails and internal memoranda; and (15) numerous other documents regarding Defendant's employment policies, practices, and procedures. (Mot. 18-19; Aiwazian Decl. ¶¶ 11-14.) Class counsel deposed Defendant's Person Most Knowledgeable (the President), over the course of two days, as well as Defendant's Regional Director and a Class Member. (Id.) Both sides propounded and responded to multiple sets of written discovery requests. (Id.) The parties engaged in a Belaire-West notice administration,[6] by which Class/Collective Counsel obtained the contact information of Class Members who did not opt-out of the disclosure of their information. (Id.)

Plaintiffs contend the data and documents produced and reviewed allowed Class/Collective Counsel to prepare damages/valuation models in preparation for mediation and settlement negotiations, to determine the potential value and strength of the claims, as well as to estimate the potential claim of each Class Member. (Mot. 19; Aiwazian Decl. ¶¶ 25-28.) Significantly, the parties reached settlement after reviewing the above discussed data and documents and then participating in a mediation conducted by Paul Grossman, "a well-respected mediator experienced in handling complex wage-and-hour matters, and extensive negotiations thereafter." (Mot. 19; Aiwazian Decl. ¶ 11.) During the negotiations, the parties exchanged

---

[6] A Belaire-West notice is where putative class members are provided with a written notice informing them of the lawsuit and giving them an opportunity to opt-out of contact by plaintiffs' counsel. See Austin v. Foodliner, Inc., No. 16CV07185HSGDMR, 2018 WL 1168694, at *1 (N.D. Cal. Mar. 6, 2018); Belaire-W. Landscape, Inc. v. Superior Court, 149 Cal. App. 4th 554, 557-58 (2007).

27

information and discussed various factors, including the risks and delays of further litigation, proceeding with class and collective certification, the law relating to the claims, the evidence, the possibility of appeals, the risks to recovery, and significantly, the "continued employment of current-employee Class Members in light of Defendant's limited financial resources and precarious financial circumstances." (Mot. 19-20; Aiwazian Decl. ¶ 12; Lynch Decl. ¶¶ 10-13.) Plaintiffs state that while they disagree over the merits and certifiability of Plaintiffs' claims, the parties agree that the settlement is fair, reasonable, and adequate, as well as in the best interest of the Class and Proposed FLSA Collective Members, in light of all known facts and circumstances. (Mot. 20.)

As for the class representatives, the Court has reviewed the declarations of Baker and Ferrell concerning the work and efforts they have put forth. Both Ferrell and Baker affirm they spent considerable time investigating law firms and class-actions prior to choosing counsel. (Ferrell Decl. ¶ 10; Baker Decl. ¶ 10.) Since becoming involved in the case, Baker and Ferrell indicate they spent over fourteen (14) and fifteen (15) hours, respectively, meeting with attorneys and assisting with the litigation, reviewing and collecting documents. (Baker Decl. ¶ 11; Ferrell Decl. ¶ 11.) Baker and Ferrell further declare they spent ten (10) and thirteen (13) additional hours, respectively, working with the attorneys on strategy and discovery, and an additional seven (7) and nine (9) hours, respectively, reviewing and working on the settlement agreement. (Id. at ¶¶ 12-13.)

Based on review of the course of litigation in this matter, the mediation,[7] the counsel's declarations describing settlement and valuation of the claims,[8] and the class representative's work, the Court finds that the class representatives and counsel have adequately represented the

---

[7] The assistance of a mediator in negotiating the settlement supports a determination that the settlement was negotiated at arm's length and is non-collusive. See Millan, 310 F.R.D. at 613 (stating participation in mediation supports determination that settlement process was not collusive); Villegas v. J.P. Morgan Chase & Co., No. CV 09-00261 SBA EMC, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (stating that the fact settlement was reached following two sessions with a private mediator experienced in wage and hour class action "tend[ed] to support the conclusion that the settlement process was not collusive."); Satchell v. Fed. Express Corp., No. C 03 2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").

[8] The Court discusses the valuation of the claims in the following section.

class and the proposal was negotiated at arm's length and these factors weigh in favor of finding the settlement agreement is fair, reasonable, and adequate.

2.    <u>Whether the Relief Provided the Class is Adequate</u>

In determining whether the relief provided to the class is adequate, the Court is to take into account: "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(i)-(iv).

**a.    The Costs, Risks, and Delay of Trial and Appeal**

The Agreement provides for a Maximum Settlement Amount of $600,000.00 and a minimum distribution floor of 63%, whereby a minimum of 63% of the Class Settlement Amount will be distributed to Claimants, and the entire FLSA Settlement Amount will be distributed to the FLSA Collective Members. Plaintiffs contend the amount is reasonable considering the risks relating to certification, liability, and the ability to recover monetary relief on a class-wide, collective, or representative basis. (Mot. 20-21)[9] Plaintiffs also emphasize settlement now guarantees a monetary recovery in a relatively short period of time compared to waiting additional years for the same or possibly no recovery if this matter proceeds to trial. (Mot. 20.)

Through investigation, collection, and review of data and information, Plaintiffs argue Class/Collective Counsel was able to calculate the value of the claims and monetary recovery that could potentially be awarded, and used this information in negotiating a settlement that fairly compensated the Class Members and FLSA Collective Members. (Mot. 20-21.) Counsel considered the potential risks and rewards inherent in any case and particularly this one, and counsel performed a damages and valuation analysis based on the sampling of time and pay data

---

[9]  In their briefing, Plaintiffs again repeatedly cite to paragraphs of the Aiwazian declaration that do not exist, citing paragraphs up to number 80, where the declaration ends at paragraph 28. (Mot. 20-21, citing Aiwazian Decl. ¶¶ 12, 25-80.) It is not clear if this is due to Plaintiffs' counsel utilizing boilerplate language from another matter. Nonetheless, the Court is able to find support for the arguments within the declaration, particularly as to the calculation and devaluation of the potential claims. (Aiwazian Decl. ¶¶ 25-28.)

provided by Defendant. (Mot. 21; Aiwazian Decl. ¶¶ 16, 25.)

The Court has reviewed the damages and valuation analysis. (Aiwazian Decl. ¶ 25(a)-(l).) Counsel appears to have generally discounted the claims in a nearly uniform manner by reducing the value of each claim in three steps: (1) discounting the value of each claim by either 50% or 75% to account for risks associated with obtaining and maintaining certification, without any explanation for the differing discount between the claims; then (2) further discounting the value of each claim by either 50% or 75% to account for the risks associated with succeeding on the merits and establishing liability, again with no explanation for the differing discounts between the claims; and then (3) discounting the value of each claim by either 50%, 60%, or 75% to account for the risks associated with proving the extent of damages and obtaining an award thereof. (Aiwazian Decl. ¶ 25(a)-(k).) As for the PAGA claim, the calculation deviates in that: (1) the first discount is for 50% for the risks in proving manageability; (2) the second discount is for 33% to account for the risks associated with succeeding on the merits and establishing liability; and (3) the third discount is for 75% to account for the risks associated with obtaining an award of civil penalties and the Court's discretion in reducing civil penalties. (Id. at ¶ 25(l).)

Applying these discounts, the claims valuations were reduced as follows: (a) the failure to pay overtime wages under California Labor Code § 510 from $1,026,334.45 to $102,633.45; (b) the FLSA overtime claim from $901,945.24 to $45,097.26; (c) the failure to pay minimum wages under California Labor Code from $684,103.09 to $42,756.44; (d) the failure to pay minimum wages under FLSA from $601,189.72 to $18,787.18; (e) the failure to provide compliant meal periods from $1,368,206.17 to $171,025.77; (f) the failure to provide compliant rest periods from $1,368,206.17 to $42,756.44; (g) the failure to timely pay wages after termination from $1,634,505.60 to $51,078.30; (h) the failure to provide compliant wage statements from $2,207,800.00 to $34,496.88; (i) the failure to maintain payroll records from $401,500 to $25,093.75; (j) the failure to reimburse necessary business expenses from $146,254 to $9,140.88; (k) the failure to pay reporting time pay from $684,103.09 to $21,378.22; and (l) the PAGA claim from $329,000 to $27,553.75. (Id. at ¶ 25(a)-(l).)

The Court is concerned with the significant reductions from the original valuation calculations. As for the claims overall, the original valuation totals $11,353,147.53,[10] and the discounted valuation totals $591,798.32,[11] representing approximately 5.2% of the original valuation.[12] The Maximum Settlement Amount of $600,000.00 based on this discounted valuation, is approximately 5.3% of the original valuation.[13] After deducting attorneys' fees proposed at 35% of the Maximum Settlement Amount, costs, and other amounts described above, the Class Settlement Amount is estimated to be $312,787.50. (Mot. 13; Agreement ¶ 44.) The FLSA Settlement Amount is $16,462.50, and therefore the total maximum estimated payout to the Class Members and the FLSA Collective is approximately $329,250.00.[14] This is less than 3% of the original valuation.[15] Further, the Class Settlement Amount, separate from the FLSA settlement amount that will be paid in total no matter the amount of opt-ins, is subject to a 63% minimum distribution floor, and thus potential recovery may be diminished further.

The FLSA overtime claim has been discounted to approximately 5% of the original valuation,[16] and the FLSA minimum wage claim has been discounted to approximately 3% of the original valuation.[17] Significantly, the FLSA settlement amount under the proposed agreement is $16,462.50, and therefore as proposed, encompasses only 1% of the original $1,503,134.96 valuation for the FLSA claims.[18]

---

[10]  $1,026,334.45 + $901,945.24 + $684,103.09 + $601,189.72 + 1,368,206.17 + 1,368,206.17 + 1,634,505.60 + $2,207,800.00 + $401,500 + $146,254.00 + $684,103.09 + $329,000.00 = $11,353,147.53. (Aiwazian Decl. ¶ 25(a)-(l).)

[11]  $102,633.45 + 45,097.26 + $42,756.44 + $18,787.18 + $171,025.77 + $42,756.44 + $51,078.30 + $34,496.88 + $25,093.75 + $9,140.88 + $21,378.22 + $27,553.75 = $591,798.32. (Aiwazian Decl. ¶ 25(a)-(l).)

[12]  $591,798.32 ÷ $11,353,147.53 = 0.0521.

[13]  $600,000.00 ÷ $11,353,147.53 = 0.0528.

[14]  $312,787.50 + $16,462.50 = $329,250.00.

[15]  $329,250.00 ÷ $11,353,147.53 = 0.0290.

[16]  $45,097.26 ÷ $901,945.24 = 0.0499.

[17]  $18,787.18 ÷ 601,189.72 = 0.0313.

[18]  $16,462.50 ÷ $1,503,134.96 = 0.0101.

"To determine whether a settlement 'falls within the range of possible approval' a court must focus on 'substantive fairness and adequacy,' and 'consider plaintiffs' expected recovery balanced against the value of the settlement offer.' " Collins v. Cargill Meat Sols. Corp., 274 F.R.D. 294, 302 (E.D. Cal. 2011) (quoting In re Tableware Antitrust Litig., 484 F.Supp.2d at 1080). While Plaintiffs put forth various reasoning for these steep discounts, (Aiwazian Decl. ¶ 22-28), counsel has not *exhaustively* explained the reasoning for the discounts, particularly as to the individual claims themselves. The Court highlights that given the amount the valuation has been discounted, some courts may not find such evidence sufficient, even at the preliminary approval stage. See Hunt v. VEP Healthcare, Inc., No. 16-CV-04790-VC, 2017 WL 3608297, at *1 (N.D. Cal. Aug. 22, 2017) (Where proposed settlement of $1.41 million only amounted to 4.3% of estimated $32.85 million estimated exposure, the court denied preliminary approval because if "defendant is to receive a discount of this magnitude, there must be good reasons why . . . those reasons must be explained thoroughly at the preliminary approval stage . . . [and] Plaintiffs' counsel has not come close to providing the information a court would need to decide whether a discount of this magnitude is appropriate [as the motion only] makes abstract gestures to the uncertainties of litigation, rather than offering a careful analysis of the claims and the strength or weakness of any potential defenses.")[19]; Eddings v. DS Servs. of Am., Inc., No. 15-CV-02576-VC, 2016 WL 3390477, at *1 (N.D. Cal. May 20, 2016) (where value of settlement was asserted to be approximately 75% to 90% of the total unpaid overtime and over 50% of the total unpaid overtime and meal and rest premium pay, the court found it "need[ed] more than this

---

[19]   The parties here also have used the financial difficulties of the Defendant as an additional reason for the discounted valuations, partially to protect current employees from losing their job, in addition to being a reason for the necessity of funding the settlement in installment payments. (Aiwazian Decl. ¶ 26; Lynch Decl. ¶¶ 10-14.) Thus, also relevant to the justification given here, the Hunt court rejected the argument that defendant was experiencing financial difficulties noting and finding: "Courts should view such assertions with great caution, as employers tend to make threats about inability to pay more often than they are actually unable to pay. Therefore, if this sort of assertion is to be the basis for approval of a discounted class settlement, it must be supported with detailed evidence. Plaintiffs' counsel has not done that here. There is one conclusory paragraph in a declaration from plaintiffs' counsel, with parallel language in the proposed settlement, stating that VEP claims to be experiencing financial difficulty and that an accountant hired by plaintiffs' counsel agrees with that claim. [citations] Such conclusory assertions are not enough—there should be a much stronger showing before a defendant's financial hardship is taken into account." Hunt, No. 16-CV-04790-VC, 2017 WL 3608297, at *1. The information provided here is more substantial than averred to in Hunt, but the parties are forewarned that more evidence, perhaps with support by an accountant's analysis, may be necessary to address the valuation at the hearing for final approval.

type of bare assertion [as] [p]laintiffs seeking preliminary approval should show their work by explaining the relative value of their claims in significant detail [and] in a wage-and-hour case . . . plaintiffs should show or estimate how many employees were allegedly shortchanged, calculate and explain to the Court the amount by which typical employees were allegedly shortchanged on an hourly or daily basis, and show or estimate the number of hours or days the employees were allegedly shortchanged [and the] parties [did not] give[] the Court enough information to evaluate the strengths and weaknesses of the plaintiffs' case [but rather] list[ed] legal issues that this case might present and positions that the defendants might take, but [didn't] analyze those issues or evaluate the strength or weakness of defendants' positions [and a] party moving for preliminary approval should cite case law and apply it to explain why each claim or defense in the case is more or less likely to prove meritorious.").

Nonetheless, the Court finds counsel's explanations sufficient for purposes of preliminary approval, taken in the context of the risks of continued litigation and settlement as a whole, with the caveat that more extensive explanation and support for the discounting may be needed to demonstrate fairness at the final approval hearing. "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair," and "[i]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco, 688 F.2d 615, 628 (9th Cir. 1982); In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000) (same); City of Detroit v. Grinnell Corp., 495 F.2d 448, 455 (2d Cir. 1974) ("In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."), abrogated by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000).

While on the lower end of approved settlements, the amount is not, on its face, outside the bounds or range of reasonableness.[20] For purposes of preliminary approval, and again with

---

[20] See Thomas v. Cognizant Tech. Sols. U.S. Corp., No. SACV111123JSTANX, 2013 WL 12371622, at *6 (C.D. Cal. June 24, 2013) (granting final approval in wage and hour action where settlement encompassed between 4.4%

and 5% of the maximum estimated liability figure); In re Uber FCRA Litig., No. 14-CV-05200-EMC, 2017 WL 2806698, at *5 (N.D. Cal. June 29, 2017) (granting preliminary approval of settlement of Fair Credit Reporting Act claims which encompassed as low as 0.75% to 7.5% of maximum valuation if willful violations were proved at trial); In re AT & T Corp., 455 F.3d 160, 170 (3d Cir. 2006) (in securities fraud case, affirming class settlement approval where settlement was only 4% of original valuation, which was devalued after summary judgment); Rinky Dink Inc v. Elec. Merch. Sys. Inc., No. C13-1347 JCC, 2015 WL 11234156, at *4–5 (W.D. Wash. Dec. 11, 2015) (granting preliminary approval of settlement of $1,250,000 where "potential exposure under the negligence standard can easily exceed $90,000,00," which is approximately 1.4% of the liability, based partially on proffered argument that defendant could not pay a large settlement, with caveat that "in their Final Approval Brief, the parties must present concrete facts in support of the assertion that they were 'fully informed' and could thereby reasonably conclude that it was doubtful whether Defendants would be able to pay a higher judgment."); Stovall-Gusman v. W.W. Granger, Inc., No. 13-CV-02540-HSG, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (granting final approval in wage and hour action where total settlement amount represented approximately 10% of potential value, and net settlement amount represented 7.3% of valuation); Ma v. Covidien Holding, Inc., No. SACV 12-02161-DOC, 2014 WL 360196, at *5 (C.D. Cal. Jan. 31, 2014) (granting preliminary approval of wage and hour settlement for 9.1% as within "range of reasonableness"); In re MyFord Touch Consumer Litig., No. 13-CV-03072-EMC, 2019 WL 1411510, at *10 (N.D. Cal. Mar. 28, 2019) (granting preliminary approval of settlement of consumer warranty claims for approximately 6% of valuation); Thompson v. Costco Wholesale Corp., No. 14-CV-2778-CAB-WVG, 2017 WL 1957552, at *8 (S.D. Cal. May 11, 2017) (granting preliminary approval of settlement reflecting approximately 10% of exposure, based on Court's experience with wage and hour class actions but stating at "the final approval hearing, the Court will give careful consideration to any objections from class members (or the lack thereof) when determining whether final approval is warranted."); Deaver v. Compass Bank, No. 13-CV-00222-JSC, 2015 WL 4999953, at *10 (N.D. Cal. Aug. 21, 2015) (granting preliminary approval of wage and hour settlement representing 10.7% of liabilities and also noting concerns better addressed at final approval following claims administration process); In re Pool Prod. Distribution Mkt. Antitrust Litig., 310 F.R.D. 300, 316 (E.D. La. 2015) (granting preliminary approval of settlement of 2.5% of valuation in antitrust action, as "best-case scenario"); Schuler v. Medicines Co., No. CV 14-1149 (CCC), 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (granting final approval in securities class action where settlement reflected approximately 4% of estimated recoverable damages); Balderas v. Massage Envy Franchising, LLC, No. 12-CV-06327 NC, 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014) (granting preliminary approval of settlement of claims regarding failure to reimburse business expenses where gross settlement represented approximately 8% of liability and net settlement represented 5%, as within range of possible approval based on risks and expense of continued litigation, with caveat that "at the final approval hearing, the parties must be prepared to present evidence that the Court's calculation of the percentage of the maximum recovery is incorrect, or to explain why the especially low recovery is warranted based on the circumstances of this case."); Martin v. Sysco Corp., No. 116CV00990DADSAB, 2019 WL 3253878, at *5 (E.D. Cal. July 19, 2019) (while granting preliminary approval of settlement encompassing approximately 11% of total value of meal and rest break claims, adding caveat that "the court does not presently have material before it sufficient to make a reasoned determination of whether the settlement amount proposed in the Agreement is adequate [but] [r]ather than denying preliminary approval of the Agreement in its entirety, however, the court finds that the most prudent course is to raise the issue for the parties' awareness and invite them to provide additional argument and evidence in preparation for the final fairness hearing [as] [i]t may well be that in light of the serious litigation risks faced by plaintiff and the class, settlement at such a dollar amount is warranted in this case."); Cooley v. Indian River Transp. Co., No. 1:18-CV-00491, 2019 WL 316634, at *8 (E.D. Cal. Jan. 24, 2019) (granting preliminary approval of wage and hour settlement at approximately 11% of liability and despite concerns regarding attorney's fees award); Singh v. Roadrunner Intermodal Servs., LLC, No. 115CV01497DADBAM, 2018 WL 2412325, at *7 (E.D. Cal. May 29, 2018) (granting preliminary approval of wage and hour settlement for approximately 12% of liability), modified, No. 115CV01497DADBAM, 2018 WL 4382202 (E.D. Cal. Sept. 13, 2018); Custom LED, LLC v. eBay, Inc, No. 12-CV-00350-JST, 2013 WL 6114379, at *3 (N.D. Cal. Nov. 20, 2013) (granting preliminary approval with range of recovery from 1.8% for one subclass, to 16% for another subclass of eBay sellers); Hendricks v. Starkist Co, No. 13-CV-00729-HSG, 2016 WL 5462423, at *5 (N.D. Cal. Sept. 29, 2016) (granting final approval in consumer class action and noting that while "[t]he $12,000,000 settlement amount, while constituting only a single-digit percentage of the maximum potential exposure, is reasonable given the stage of the proceedings and the defenses asserted in this action."), aff'd sub nom. Hendricks v. Ference, 754 F. App'x 510 (9th Cir. 2018); Villegas v. J.P. Morgan Chase & Co., No. CV 09-00261 SBA EMC, 2012 WL 5878390, at *6–7 (N.D. Cal. Nov. 21, 2012) (preliminarily approving settlement of approximately 15% of valuation despite concerns of such discount, noting the risks of pursuing trial and that counsel acknowledged that some of Plaintiff's claims were not as viable as they had originally

the caveat that more extensive explanation and support for the discounting from the original valuations may be needed for final approval, given the proffered strengths and weaknesses of the claims and defenses, the costs and risks of pursuing this litigation through trial, and the benefit of recovery now versus potentially no recovery, the Court finds the proposed recovery falls within the range of possible approval and taken as a whole, weighs toward finding the Agreement fair, reasonable, and adequate and in the best interests of the Class Members in light of all known facts and circumstances.[21]

### b.    The Effectiveness of the Proposed Method of Distributing Relief

The Court is to consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). The Court has reviewed the Class Claim Form that Class Members must submit. It is one page and laid out in an easy to understand layout. (ECF No. 19-1 at 84-87.) Further, each Class Member's Class Claim Form and FLSA Opt-In Form will come prepopulated stating the number of Workweeks and Estimated Class Settlement Share or Estimated FLSA Settlement Share. (Mot. 31.) The method of processing claims also includes a procedure for claimants to dispute the presumptive number of Workweeks. As discussed in detail further below herein, the Court finds the method of notice and follow-up reminders are sufficient to provide the best notice practicable under the circumstances. Considering these facts, the Court finds the proposed method of distributing relief is effective, and weighs toward finding the Agreement is fair, reasonable and adequate.

---

envisioned, fact that parties agreed to reduce proposed attorney's fees proportion from 33% to 25%, and further stating that "[a]t any rate, issues concerning the amount of the settlement are better resolved at the final approval hearing," as after claims process is completed the parties and court are in better position to accurately calculate the value of settlement.).

[21] In evaluating the fairness of the proposed settlement amount, the Court has also reviewed the scope of the release of Defendant's liability, summarized in greater detail above, supra Section III(I-J). While the release appears somewhat broad (Agreement ¶¶ 8, 50), it is permissible because it only encompasses claims that are based on the same facts underlying the claims asserted in the operative complaint, and does not release factually unrelated claims. See Hesse v. Sprint Corp., 598 F.3d 581, 590 (9th Cir. 2010) ("A settlement agreement may preclude a party from bringing a related claim in the future even though the claim was not presented and might not have been presentable in the class action, but only where the released claim is based on the identical factual predicate as that underlying the claims in the settled class action.") (internal quotations and citations omitted); Collins, 274 F.R.D. at 303 ("These released claims appropriately track the breadth of Plaintiffs' allegations in the action and the settlement does not release unrelated claims that class members may have against defendants."). Further, the release of FLSA claims only applies to those who opt-in to the collective. (Agreement ¶¶ 23, 25, 50, 78, 80.)

The Ninth Circuit has emphasized that courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011). The Ninth Circuit has identified that the following aspects may be such signs of collusion: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." Id. (internal citations and quotation marks omitted).

First, counsel seeks an award of attorneys' fees in the amount of thirty-five percent (35%) of the Maximum Settlement Amount. This amount is not per se excessive, and as the Court discusses in the next section, the Court is not likely to approve an amount over the Ninth Circuit's benchmark of twenty-five percent (25%) absent a showing that counsel achieved extraordinary results or otherwise prove they are entitled to such an amount. Given the Court's inclination to reduce the fee award, the Court finds it significant that the Agreement explicitly provides that should the Court approve a fee award of less than thirty-five percent, the difference "shall become part of the Net Settlement Amount." (Agreement ¶ 63(d).) Of further significance, the Agreement no longer contains an express clear sailing agreement. The state court previously voiced concerns with the previous settlement agreement's fee provision which expressly stated that "Defendant will not oppose" an award of up to thirty-five percent (35%). (ECF No. 1-10 at 62, 213.) The Agreement now does not contain such language. (Agreement ¶¶ 19; 63.)

Turning to the reversionary aspect of the Agreement, Plaintiffs argue that the reversion to employer is fair in this case because this is not the case where there is a risk that Defendant will retain funds that correspond to an injury suffered by a Class Member, as the claims process allows all employees who claim an injury to recovery, and only those amounts that do not correspond to any injuries (i.e. unclaimed amounts) will revert to Defendant. Plaintiffs also

argue the reversion is fair because: (1) there is a high Minimum Distribution Floor of 63% of the Class Settlement Amount;[22] (2) the parties have agreed to take steps to increase participation in the settlement, including by causing Notice Packets to be mailed to each Class Member and then following up with those who do not respond by sending reminder post cards; (3) the Class Notice fully informs Class Members about the potential for unclaimed Class Settlement Amounts to be retained by Defendant; (4) reversion was a factor during mediation and settlement negotiations which was the product of arms' length non-collusive negotiations agreed upon by Plaintiffs and Class/Collective Counsel. (Mot. 23.)

Weighing these considerations, the Court finds the reversion provision to be within the bounds of reasonableness. See Glass v. UBS Fin. Servs., Inc., 331 F. App'x 452, 456 (9th Cir. 2009) (approving reversion clause that allowed any reduction in attorney's fees to revert to defendant)[23]; Hightower v. JPMorgan Chase Bank, N.A., No. CV111802PSGPLAX, 2015 WL 9664959, at *2, 6 (C.D. Cal. Aug. 4, 2015) (approving final approval of settlement agreement with reversion clause and 65% minimum distribution floor with amounts not awarded as attorney's fees funneling back to net settlement amount and noting that while the "reversion clause certainly makes the Court suspicious, but in this instance, after reviewing the respective positions of the Parties, and considering the many weaknesses of Plaintiffs' case, the Court is persuaded that the reversion clause does not make the Settlement Agreement unfair nor does it show collusion among the parties."); Davis v. Brown Shoe Co., Inc., No. 113CV01211LJOBAM, 2015 WL 6697929, at *6 (E.D. Cal. Nov. 3, 2015) (recommending final approval where defendant retained approximately 58% of the unclaimed funds as class members were adequately notified of retention of unclaimed funds and had opportunity to participate, and

---

[22] The Court notes that following denial of the proposed settlement by the state court, the parties have now raised the minimum distribution floor from 50% to 63%. (ECF No. 1-16 at 8; 1-10 at 61-62.) The Court finds this enhancement to be a significant change in favor of the Class Members.

[23] Again, of significance here, the Agreement provides that in "the event the Court approves a lesser Fees and Costs Award than Class/Collective Counsel request, the difference between (i) the amount requested by Class/Collective Counsel and (ii) the amount actually awarded by the Court shall become part of the Net Settlement Amount." (Agreement ¶ 63(d).) While such reduction in attorney's fees may ultimately revert back to Defendant, it will not if sufficient claim forms are returned.

no objections were filed, citing four cases in the Eastern District of California where reversions were approved in amounts ranging from 45% to 75% of the net settlement funds); Garcia v. City of King City, No. 14-CV-01126-BLF, 2017 WL 363257, at *9 (N.D. Cal. Jan. 25, 2017) (reversion approved in part because product of arm's length, non-collusive negotiations and assistance of magistrate judge in settlement negotiations); Minor v. FedEx Office & Print Servs., Inc., No. C09-1375 TEH, 2013 WL 503268, at *4 (N.D. Cal. Feb. 8, 2013) (finding reversion clause not "inherently inadequate" for purposes of preliminary approval where there was a minimum distribution floor of 45%, a contention that reversion was essential for defendant to agree to settlement, and parties anticipated a relatively high claim rate).[24]

Significantly as well, courts have voiced concern where portions of settlement funds relating to FLSA claims revert back to the defendant. See Millan, 310 F.R.D. at 612 (noting "that where a statute's objectives include deterrence, as does the FLSA's, it would contradict these goals to permit the defendant to retain unclaimed funds," and denying preliminary approval in part because the settlement agreement failed to separate the settlement fund based on the FLSA claims and because the unclaimed FLSA portion was part of the reversion to defendant) (internal quotations and citations omitted). Here, although the portion of the settlement allocated to the FLSA claim is relatively small compared to the total portion (5%), it does not revert back to Defendant. (Mot. 13; Agreement ¶ 69(b).)

Considering all of the factors discussed above, the Court finds the claims-made process is fair, reasonable and adequate. See Nur v. Tatitlek Support Servs., Inc., No. 15CV00094SVWJPRX, 2016 WL 3039573, at *3 (C.D. Cal. Apr. 25, 2016) (approving claims-made settlement with reversion of funds to the employer, and listing sixteen (16) cases wherein courts approved claims-made settlements with reversion of the unclaimed funds to the employer, described as "only a small sample" of such cases).

---

[24] Plaintiffs cite Dyer v. Wells Fargo Bank, N.A., 303 F.R.D. 326, 330 (N.D. Cal. 2014), in support of their argument that the reversion clause is fair. However, in Dyer, the court was unconcerned with the reversion because it was not a typical reversion clause "in which money allocated to a class member, but unclaimed by her, reverts to the Defendant," but rather was one where the funds reverted back to defendant corresponding to those members who opted out of the class. 303 F.R.D. at 331 n.1. Therefore, the case does not strengthen Plaintiffs' position here where the reversion corresponds to funds unclaimed by Class Members.

1 ///

2 **c.      The Terms of the Proposed Award of Attorney's Fees**

3      In assessing the whether the relief provided the class is adequate, the Court is to consider

4 "the terms of any proposed award of attorney's fees, including timing of payment." Fed. R. Civ.

5 P. 23(e)(2)(C)(iii).  Here, the Agreement provides that Class/Collective Counsel may petition the

6 Court for attorney's fees up to thirty-five percent (35%) of the Maximum Settlement Amount

7 ($210,000.00 of $600,000.00), and up to $35,000.00 for reimbursement of actual litigation costs

8 and expenses.  (Agreement ¶ 19.)

9      Federal Rule 23(h) provides that "[i]n a certified class action, the court may award

10 attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."

11 The Ninth Circuit has affirmed the use of two separate methods of calculating attorney's fees,

12 depending upon the case.  Hanlon, 150 F.3d at 1029.  "In 'common-fund' cases where the

13 settlement or award creates a large fund for distribution to the class, the district court has

14 discretion to use either a percentage or 'lodestar method.' " Id.  In the Ninth Circuit, courts

15 typically utilize twenty-five percent of the common fund as the "benchmark" for a reasonable fee

16 award, with adjustments provided there is adequate explanation in the record for any special

17 circumstances that justify departure.  In re Bluetooth, 654 F.3d at 942.  The usual range for

18 common fund attorney fees are between twenty to thirty percent.  Vizcaino v. Microsoft Corp.,

19 290 F.3d 1043, 1047 (9th Cir. 2002).

20      The "lodestar" method is typically used where the benefit received by the class is

21 primarily injunctive in nature, and therefore, monetary benefit is not easily calculated.  In re

22 Bluetooth, 654 F.3d at 941.  The "lodestar" approach calculates attorney fees by multiplying the

23 number of hours reasonably expended by a reasonable hourly rate.  Gonzalez v. City of

24 Maywood, 729 F.3d 1196, 1202 (9th Cir. 2013); Camacho v. Bridgeport Fin., Inc., 523 F.3d 973,

25 978 (9th Cir. 2008).  Since the benefit to the class is easily calculated in a common find case,

26 courts may award a percentage of the common fund rather than engaging in a "lodestar" analysis

27 to determine the reasonableness of the fee request.  In re Bluetooth, 654 F.3d at 942.  When

28 applying the percentage of the common fund method in calculating attorney fees, courts use the

"lodestar" method as a crosscheck to determine the reasonableness of the fee request.  See

Vizcaino, 290 F.3d at 1050.  "This amount may be increased or decreased by a multiplier that

reflects any factors not subsumed within the calculation, such as 'the quality of representation,

the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk

of nonpayment.' "  Adoma v. Univ. of Phoenix, Inc., 913 F. Supp. 2d 964, 981 (E.D. Cal. 2012)

(quoting In re Bluetooth, 654 F.3d at 942).

Plaintiffs are forewarned that the Court will not grant an upward departure from the 25%

"benchmark" for a reasonable fee award unless, at final approval, Plaintiffs present compelling

evidence supporting such a departure.  This case appears to be relatively straight forward case and

lacks a complexity which may justify a higher than benchmark rate, and presently, counsel have

not demonstrated the achievement of exceptional results that would justify a departure, particularly

in light of the steep discounts from the original valuations discussed above.  However, counsel can

and should show otherwise at the final settlement proceeding if a greater rate is sought.  In this

regard, Class/Collective Counsel state that in advance of the final approval hearing, they will file

an appropriate motion and submit supporting evidence and documents.

Therefore, given the award can be determined at the final approval hearing, given there is

no longer any express clear sailing agreement, and given any reduction in the award will revert

back to the funds available for the Class Members,[25]  the Court finds this aspect of the agreement

is fair, reasonable, and adequate for purposes of preliminary approval.  See Millan, 310 F.R.D. at

613 (despite concerns regarding the anticipated request for attorney's fees based on one-third of

the net settlement fund despite the twenty-five percent (25%) benchmark, stating "the Court need

not resolve this matter at the preliminary approval stage, since the propriety of the fee request is

an issue that can be determined at the Final Fairness Hearing," and that "Plaintiffs' counsel

should be mindful of this issue and should be prepared to present a lodestar calculation in

---

[25]  As discussed in the previous section, given the Court is disinclined to approve an amount over the Ninth Circuit's benchmark of twenty-five percent (25%), the Court finds it significant that the Agreement explicitly provides that should the Court approve a fee award of less than thirty-five percent, the difference "shall become part of the Net Settlement Amount."  (Agreement ¶ 63(d).)  Of further significance, the Agreement no longer contains an express clear sailing agreement after the state court previously voiced concerns with the previous settlement agreement's fee provision which expressly stated that "Defendant will not oppose" an award of up to thirty-five percent (35%).  (ECF No. 1-10 at 62, 213.)  The Agreement now does not contain such language.  (Agreement ¶¶ 19; 63.)

40

connection with their motion for attorneys' fees and for final approval.").

**d.    Any Agreement Required to be Identified under Rule 23(e)(3)**

The Court is to consider any agreement required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C)(iv).  "The parties seeking approval must file a statement identifying any agreement made in connection with the proposal."  Fed. R. Civ. P. 23(e)(3).  The parties have identified no such agreement and the Court is not aware of any such agreement.

### 3.    The Proposal Treats Class Members Equitably Relative To Each Other

The Court is also to consider whether "the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  In determining this, the Court determines whether the settlement "improperly grant[s] preferential treatment to class representatives or segments of the class."  In re Tableware Antitrust Litig., 484 F. Supp. 2d at 1079.  In assessing the appropriateness of class representative enhancements or incentive payments, the Court may consider factors such as the actions the plaintiffs took to protect the interests of the class, the degree to which the class has benefitted, the amount of time and effort the plaintiff expended in pursuing litigation, and any notoriety or personal difficulties encountered by the representative plaintiff.  Khanna v. Intercon Sec. Systems, Inc., No. 2:09-cv-2214 KJM EFB, 2014 WL 1379861, at *10 (E.D. Cal. Apr. 8, 2014); Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 257 (E.D. Penn. 2011); see also Staton, 327 F.3d at 975-77 (9th Cir. 2003).  "Incentive awards are particularly appropriate in wage-and-hour actions where plaintiffs undertake a significant 'reputational risk' by bringing suit against their former employers."  Bellinghausen v. Tractor Supply Co., 306 F.R.D. 245, 267 (N.D. Cal. 2015) (citation omitted).

Based on the settlement proposal, Individual Class Payments and Individual FLSA Payments will be calculated on a *pro rata* basis based upon the number of Workweeks. (Agreement ¶¶ 69(a)-(b).)  The Court finds this is a presumptively reasonable manner of equitably treating the Class Members for purposes of preliminary approval.

Further, the incentive awards appear to be reasonable.  Ferrell and Baker are allotted to each receive an incentive awards of $3,000.00, for a total of $6,000.00 to the class representatives, in addition to receiving their Individual Class Payments and Individual FLSA

1  Payments. Of significance is the extensive declared amount of time and work the class

2  representatives have put forth in assisting with this litigation as discussed above. (Ferrell Decl.

3  ¶¶ 10-13; Baker Decl. ¶ 10-13.) The Court finds that $3,000.00 each is reasonable compensation

4  for the services provided by the class representatives in this action given the risks that they took

5  in representing the class and the time spent adjudicating this action.

6  Accordingly, the Court finds this factor demonstrates the Agreement is fair, reasonable

7  and adequate, and weighs in favor of preliminary approval of the settlement.

8  **D.     The Proposed Class Notice and Settlement Administration**

9  For proposed settlements under Rule 23, "the court must direct notice in a reasonable

10 manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); see

11 also Hanlon, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement

12 under Rule 23(e)."). For a "class certified under Rule 23(b)(3)— or upon ordering notice under

13 Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)—the

14 court must direct to class members the best notice that is practicable under the circumstances,

15 including individual notice to all members who can be identified through reasonable effort." Fed.

16 R. Civ. P. 23(c)(2)(B). The notice may be by one or more of the following methods: United States

17 mail, electronic means, or other appropriate means. Id. The "notice must clearly and concisely state

18 in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class

19 certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance

20 through an attorney if the member so desires; (v) that the court will exclude from the class any

21 member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the

22 binding effect of a class judgment on members under Rule 23(c)(3)." Id. A class action settlement

23 notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert

24 those with adverse viewpoints to investigate and to come forward and be heard." Churchill Vill.,

25 LLC v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004) (internal quotations and citations omitted).

26 Plaintiffs argue, and the Court agrees that the substance of the Notice Packet is sufficient in

27 that it provides information on: (1) the nature of the lawsuit; (2) the definition of the Class and

28 Proposed FLSA Collective; (3) the terms of the settlement; (4) information regarding the hybrid

nature of the action and the claims involved in the action; (5) the scope of the Class Released Claims and the FLSA Released Claims; (6) the binding effect of the settlement; (7) the consequences of opting into the FLSA Collective to participate in the FLSA Settlement and receive payment; and (8) the allocations for Fees and Costs Awards, Incentive Awards, and Settlement Administration Costs. (Mot. 30.) Further, each Class Member's Class Claim Form and FLSA Opt-In Form will state the number of Workweeks and Estimated Class Settlement Share or Estimated FLSA Settlement Share. (Mot. 31.) The Notice Packet also summarizes the proceedings and will provide the date, time, and place of the Final Approval Hearing. (Id.) Finally, the Court also agrees that the notice provides a brief, neutral explanation of the case from the perspective of both parties; recognizes that the Court has not granted final approval of the settlement; and sets forth the procedures and deadlines governing the submission of Class Claim Forms, FLSA Opt-In Forms, Requests for Exclusion, Notices of Objections, and disputes regarding the number of Workweeks credited to Class Members and Proposed FLSA Collective Members. (Mot. 31.)

The parties have selected Simpluris, Inc. ("Simpluris") as the Settlement Administrator to handle the notice and administration of the settlement. Simpluris will format, print, and mail a Notice Packet to each Class Member and Proposed FLSA Collective Member; will receive, review, and process Claim Forms, FLSA Opt-In Forms, Requests for Exclusion, and written disputes regarding Workweeks; calculate Estimated Class Settlement Shares, Estimated FLSA Settlement Shares, Individual Class Payments, and Individual FLSA Payments; will withhold applicable taxes and withholdings; prepare and transmit necessary tax documentation and filings; and transmit all required payments. (Mot. 32; Agreement ¶ 71.) Settlement Administration Costs are currently estimated not to exceed $16,000.00, and will be paid out of the Maximum Settlement Amount.

As for ensuring the greatest number of Class Members will receive notice, all Class Members will be identified by Defendant through a review of its business records, and after receiving the "Class List" regarding each Class Member and Proposed FLSA Collective Member, the Settlement Administrator will mail a Notice Packet to each of them. (Mot. 31; Agreement ¶¶ 72, 73.) Within fourteen (14) calendar days following preliminary approval,

Defendant will provide Simpluris with a Class List. (Agreement ¶¶ 6, 72.) Within ten (10) calendar days of receipt of the Class List, Simpluris will mail a Notice Packet to each Class Member and Proposed FLSA Collective Member. (Agreement ¶ 73(a).) Prior to mailing the Notice Packets, Simpluris will attempt to locate updated addresses by a search of the National Change of Address Database or other similar service, such as Experian. (Id.) If a Notice Packet is returned as undeliverable, Simpluris will promptly re-mail it to a forwarding address, if provided, or to an updated address obtained from a skip-trace search. (Agreement ¶ 73(a)-(b).)

Between twenty (20) and thirty (30) calendar days after initially mailing the Notice Packet, Simpluris will mail a reminder postcard to all Class Members and/or Proposed FLSA Collective Members who have not yet submitted both a Class Claim Form and FLSA Opt-In Form. (Agreement ¶ 73(c).) Class Claim Forms and FLSA Opt-In Forms must be mailed or faxed to Simpluris, post-marked or fax-marked by the Response Deadline or, in the event of a re-mailed Notice Packet, within ten (10) calendar days from the original Response Deadline. (Agreement ¶ 54.) If a defective Class Claim Form and/or FLSA Opt-In Form is submitted, Simpluris will notify the Class Member and/or Proposed FLSA Collective Member of the deficiency within three (3) business days of receipt of the defective form, and the individual will have until the Response Deadline, or fifteen (15) calendar days from the date of the cure letter, whichever is later, to submit a corrected form. (Agreement ¶ 75(b).)

Requests for Exclusion must be submitted by the Response Deadline, or in the event of a re-mailed Notice Packet, within ten (10) calendar days of the original Response Deadline. (Agreement ¶ 77.) Disputes regarding Workweeks must be submitted, post-marked or fax-stamped, by the Response Deadline. (Agreement ¶ 76.) Notices of Objection must be filed with the Court and served on counsel for the parties by the Response Deadline. (Id.)

All settlement checks issued will remain valid and negotiable for one hundred and eighty (180) calendar days from the date of issuance, and thereafter the checks will be cancelled, and the funds associated with any cancelled checks will be transmitted to Legal Aid at Work, a non-profit legal services organization that advocates for the job-related rights of workers in California. (Agreement ¶ 83.)

The Court finds the notice and the method of delivery is appropriate and appears to be the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). However, the Court highlights that in a recent case, the Ninth Circuit held the single mailed notice, along with the placement of information posters in the buildings where employees worked, was not the best practicable under the circumstances, finding "it particularly problematic that, despite concerns that former employees in particular might be difficult to reach by mail, the settlement provided no other means of reaching former employees," and "when at least 12% of the mailed notices were ultimately determined to be undeliverable—meaning those class members had not received notice—still no additional means of notice reasonably calculated to reach those class members was attempted." Roes, 944 F.3d at 1046. The class members were former and current employees in adult entertainment clubs, and "[a]lthough the mailed notice was supplemented with posters that were hung in the defendant night clubs, those posters were likely to be seen only by class members who were still working at the nightclubs, and those class members are also the precise group of people for whom the defendants likely had a current address such that mail notice could successfully be effected." Id. Further, "[a]s to those former employees for whom the claims administrator *was* able to identify a valid address, the lack of reminder notices is particularly relevant, given that the posters would serve no function." Id. at 1047. The Ninth Circuit held that "[i]n sum, the notice process was not 'reasonably calculated, under all the circumstances,' to apprise all class members of the proposed settlement, because the 'circumstances' included the district court's and parties' belief that class members were 'transient' and thus might be difficult to reach by mail, and the posters also were not reasonably calculated to reach all of the absent class members who could not be notified by mail or to serve as a reminder to those who did receive the single mailed notice." Id.

While only providing notice by U.S. mail, there are additional factors that show this method is not insufficient as found in Roes. See Roes, 944 F.3d at 1046-47. First, there is no indication that the former employees will be significantly difficult to locate addresses for, where in Roes the former employees were described as transient. Id. Second, prior to initially mailing the Notice Packets, Simpluris will attempt to locate updated addresses by a search of the

National Change of Address Database or other similar service.  If a Notice Packet is returned as undeliverable, Simpluris will promptly re-mail it to a forwarding address, if provided, or to an updated address obtained from a skip-trace search.  Additionally, Simpluris will mail a reminder postcard to all Class Members and/or Proposed FLSA Collective Members who have not yet submitted both a Class Claim Form and FLSA Opt-In Form.  Also, if a defective Class Claim Form and/or FLSA Opt-In Form is submitted, Simpluris will notify the Class Member and/or Proposed FLSA Collective Member of the deficiency and the deadlines will be extended accordingly.[26]

Accordingly, the Court finds the notice and the method of delivery by U.S. mail, with an initial check for updated addresses with a national database, follow-up reminders for unreturned Claims Forms, and re-mailing of Notice Packets following return as undeliverable after a further database check for updated addresses, is appropriate, appears to be the "best notice that is practicable under the circumstances," and therefore meets the requirements of Federal Civil Procedure Rule 23(c)(2)(B).

## V.

## CONCLUSION AND RECOMMENDATIONS

Notwithstanding attention to the concerns stated herein that may need to be further addressed at the final approval hearing, including but not limited to the proposed attorney's fees award and valuation of the claims in light of the actual rate of claim forms submitted following notice, the Court recommends granting Plaintiffs' motion for preliminary approval of the

---

[26]  In Roes, the Ninth Circuit also found the notice was not the best notice practicable under the circumstances because, "[f]or example, even if, as defendants suggest, e-mail notice was infeasible, information about the settlement could have been electronically disseminated through social media or postings on any relevant online message boards.  To illustrate this possibility, the Union points out that, in another settlement involving sister entities of some of the defendants in this case, the parties disseminated notice not only via U.S. Mail and email, but also through ads targeting class members on social media, and by posting on StripperWeb.com, a website that has 117,000 members and has forums dedicated to the exotic dancer community.  Particularly here, where the parties knew the names and other identifying information of the class members—even if not all of their current addresses—these types of supplemental notice methods appear practicable."  Roes, 944 F.3d at 1047.  The Court does not feel the Ninth Circuit intended its holding to dictate that notice by U.S. mail without additional electronic notice is never sufficient, as this would eclipse the plain meaning of the Rule which states that "notice may be by *one* or more of the following: United States Mail, electronic means, or other appropriate means."  Fed. R. Civ. P. 23(c)(2)(B) (emphasis added).

settlement. Considering the risks the plaintiffs would face in taking this case to trial, together with the value of all of the claims being released and the value of the proposed settlement to the class members in light of the apparent strengths and weakness of the claims and defenses, the Court concludes that the proposed settlement, on the current record, is "fair, reasonable, and adequate" within the meaning of Rule 23(e)(2).

Accordingly, IT IS HEREBY RECOMMENDED that:

1.  The motion for preliminary approval of the proposed settlement be GRANTED;

2.  The following Class and Proposed FLSA Collective be CERTIFIED for settlement purposes only:

    All current and former Property Employees of Defendant within the State of California from August 8, 2010 to the date this Order is signed by the Court ("Settled Period"). "Property Employees" means non-exempt employees with the following job positions during the Settled Period: Area Relief Manager, Assistant Community Manager, Community Manager, Contact Assistant Manager, Grounds Keeper, Janitor, Maintenance Technician, Porter, Residential Service Coordinator, and Security.

3.  The Court find that, for purposes of the settlement, the above-defined Class meets all of the requirements for class certification. For purposes of the settlement, the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) are satisfied;

4.  Plaintiffs Cheryl Baker and Kevin Ferrell be appointed as the Class Representatives for the Class and Proposed FLSA Collective;

5.  Edwin Aiwazian, Arby Aiwazian, and Joanna Ghosh of Lawyers *for* Justice, PC, and Amir Nayebdadash and Heather Davis of Protection Law Group LLP, be appointed as counsel for the Class and Proposed FLSA Collective;

6.  The proposed language and manner of distributing the notice of settlement be approved as the best notice practicable under the circumstances;

7.  Simpluris, Inc., be appointed as the Settlement Administrator to administer the settlement pursuant to the terms of the settlement agreement; and

8.  The Court set a final approval and fairness hearing and schedule based upon the

schedule set forth in the motion for preliminary approval.[27]

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within fourteen (14) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __**January 17, 2020**__ _____

UNITED STATES MAGISTRATE JUDGE

---

[27] Plaintiffs request that a final approval hearing be scheduled approximately six (6) months after the motion for preliminary approval is granted. (Mot. 33.)