1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN FERRELL, et al., | Case No.  1:19 -cv-00332-NONE-SAB |
| Plaintiffs, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND GRANTING MOTION FOR ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARDS |
| v. | |
| BUCKINGHAM PROPERTY MANAGEMENT, | |
| Defendant. | (ECF Nos. 32, 33) |
| | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

**I.**

**INTRODUCTION**

Plaintiffs Kevin Ferrell and Cheryl Baker bring this action on behalf of themselves and others similarly situated against Defendant Buckingham Property Management, alleging various wage and hour violations under California state law, and claims under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").  Currently before the Court is Plaintiffs' motions for final approval of a class and collective action settlement, and Plaintiffs' motion for attorneys' fees, costs, and incentive awards.  (ECF Nos. 32, 33.)  The Court held a hearing on the motion on February 3, 2021.  Having considered the moving papers, the declarations and exhibits attached thereto, the arguments presented at the February 3, 2021 hearing, the supplemental briefing filed

following the hearing, as well as the Court's file, the Court issues the following findings and recommendations recommending granting Plaintiffs' motion for final approval of the class and collective action settlement, and granting Plaintiffs' motion for fees, costs, and incentive awards.

## II.

## BACKGROUND

### A.   Factual Background

Defendant specializes in property management of residential real estate and manages thousands of units in the State of California.  (Pls.' Mem. P. & A. Supp. Mot. Final Approval ("Mot.") 5, ECF No. 32-1; Decl. Rosemary Lynch Supp. Mot. Prelim. Approval ("Lynch Decl.") ¶¶ 2, 4, ECF No. 19-5, Ex. A.)[1]  Plaintiff Kevin Ferrell ("Ferrell") was employed by Defendant as a non-exempt Maintenance/Painting Technician, and Plaintiff Cheryl Baker ("Baker") was employed by Defendant as a non-exempt Community Manager.  (Mot. 5; Decl. Kevin Ferrell Supp. Mot. Prelim. Approval ("Ferrell Decl."), ¶ 2, ECF No. 19-4; Decl. Cheryl Baker Supp. Mot. Prelim. Approval ("Baker Decl.") ¶ 2, ECF No. 19-3.)  Plaintiffs' principal allegations are that Defendant violated the California Labor Code and the FLSA by, *inter alia*, failing to properly pay minimum and overtime wages, failing to provide compliant meal and rest periods or pay associated premiums, failing to timely pay wages upon termination, failing to provide compliant wage statements, failing to maintain requisite payroll records, and failing to reimburse necessary business-related expenses.  (Mot. 6.)  Plaintiffs contend that Defendant's conduct constitutes unfair business practices under the California Business and Professions Code and gives rise to penalties under the Private Attorneys General Act of 2004, California Labor Code § 2698, *et seq.* ("PAGA").  (Id.)  As a result, Plaintiffs contend that they, class members, and proposed FLSA collective members are entitled to, *inter alia*, unpaid wages, penalties including but not limited to those available under the PAGA, and attorneys' fees.  (Id.)

Defendant denies any liability of any kind associated with the claims and allegations, and further denies that Plaintiffs, the class members, or proposed FLSA collective members are

---

[1]  All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

entitled to any relief.  (Id.)  Defendant denies that this case is appropriate for class or representative treatment for any other purpose other than the proposed settlement, and maintains that it has complied with federal and California law in all respects.  (Mot. 6-7.)  Although not referenced in the motion for final approval, Defendant has obtained release agreements for several putative class members, and arbitration agreements exist between many of the class members and Defendant.  (Lynch Decl. ¶¶ 7-8, Exs. B, C.)

This action proceeds on Plaintiffs' first amended complaint filed with the state court on March 5, 2019.  (First Am. Compl. ("FAC"), ECF No. 1-17.)  The FAC brings the following causes of actions: (1) violation of California Labor Code §§ 510 & 1198 for unpaid overtime; (2) violation of California Labor Code §§ 226.7 & 512(a) for unpaid meal premiums; (3) violation of California Labor Code § 226.7 for unpaid rest period premiums; (4) violation of California Labor Code §§ 1194, 1197, & 1197.1 for unpaid minimum wages; (5) violation of California Labor Code §§ 201 & 202 for final wages not timely paid; (6) violation of California Labor Code § 204 for wages not timely paid during employment; (7) violation of California Labor Code § 226(a) for non-compliant wage statements; (8) violation of California Labor Code § 1174(d) for failure to keep requisite payroll records; (9) violation of California Labor Code § 1198 for unpaid reporting time pay; (10) violation of California Labor Code §§ 2800 & 2802 for unreimbursed business expenses; (11) violation of California Business and Professions Code §§ 17200, *et seq.*; (12) violation of the Fair Labor Standards Act, 29 U.S.C. § 207 for unpaid overtime; (13) violation of the Fair Labor Standards Act, 29 U.S.C. § 207 for unpaid minimum wages; and (14) violation of the California Labor Code Private Attorneys General Act of 2004.  (Id.)

**B.     Procedural History**

On August 8, 2014, Plaintiff Ferrell filed a putative class action against Defendant in the Los Angeles Superior Court, on behalf of himself and all current and former California-based non-exempt individuals employed by Defendant since August 8, 2011.  (Mot. 5.)  On December 4, 2014, the Los Angeles Superior Court entered an order approving the parties' stipulation to transfer venue to Fresno County and the action was transferred to the Superior Court for the County of Fresno.  (Mot. 5-6.)  After engaging in discovery and investigation of the claims and

defenses, on January 27, 2016, the parties engaged in a private mediation with Paul Grossman, "a well-respected mediator experienced in handling complex wage-and-hour matters." (Mot. 6.) The parties reached a settlement with the aid of the mediator's evaluations and proposal. (Id.)

On February 22, 2017, Plaintiffs filed a motion for preliminary approval of settlement, that was denied without prejudice by the Fresno County Superior Court. (Mot. 11; Decl. Edwin Aiwazian Supp. Prelim. Approval ("Aiwazian Prelim. Decl.") ¶ 11, ECF No. 19-1.) On May 18, 2018, Plaintiffs filed a renewed motion for preliminary approval of settlement that was also denied without prejudice by the Fresno County Superior Court. (Id.)

On March 5, 2019, pursuant to the stipulation of the parties and an order granting leave thereon, Plaintiff filed the first amended and operative complaint in this action. (Mot. 6.) On March 11, 2019, Defendant removed this action to this court, the United States District Court for the Eastern District of California, under 28 U.S.C. §§ 1331, 1441, and 1446. (Mot. 7; ECF No. 1.)

The parties engaged in additional negotiations regarding settlement, and ultimately reached a settlement to address the points of concern raised by the Fresno County Superior Court. (Mot. 7; Aiwazian Prelim. Decl. ¶ 11.) The changes included, but were not limited to: (1) narrowing the class to property employees only, who like the named Plaintiffs, predominately worked on properties managed by Defendant and thus had more common experiences and claims; (2) adding a claim under the FLSA and allocating separate settlement amounts for FLSA and class claims; and (3) guaranteeing a higher minimum distribution floor for the class settlement amount. (Id.)

On November 25, 2019, Plaintiffs filed a motion for preliminary approval of the proposed class settlement agreement and for certification of the class for purposes of settlement. (ECF No. 19.) On January 21, 2020, the undersigned issued findings and recommendations recommending granting Plaintiffs' motion for preliminary approval of settlement and conditionally certifying the class for purposes of settlement. (ECF No. 24.) Thereafter, on May 5, 2020, District Judge Dale A. Drozd entered an order requiring the filing of supplemental briefing and documentation in support of Plaintiffs' motion for preliminary approval. (ECF No.

26.)   On June 4, 2020, the parties filed supplemental papers in support of the motion for preliminary approval.  (ECF No. 27.)  On July 30, 2020, District Judge Drozd entered an order adopting the findings and recommendations granting Plaintiffs' motion for preliminary approval of the class and collective settlement and conditionally certifying the class.  (ECF No 28.)

On January 6, 2021, Plaintiffs filed a motion for final approval of the class and collective settlement, as well as a motion for the attorneys' fees, costs, and incentive awards.  (ECF No. 33.)  The Court held a hearing on the motion on February 3, 2021.  (ECF No. 34.)  Counsel Melissa Huether appeared on behalf of Plaintiffs, and counsel Ellen Cohen appeared on behalf of Defendant.  Due to the COVID-19 pandemic, the hearing was held remotely via video and telephone.  Counsel appeared through the videoconference software Zoom, while the Court provided a public access telephone number, made available on the Court's website under the Court's public calendar information, for any member of the public to call in to the hearing.  No class members appeared on the public telephone line to submit any objections or statements.  At the February 3, 2021 hearing, the Court requested supplemental briefing from the parties.  On February 5, 2021, the parties filed supplemental declarations.  (ECF No. 35.)

### III.

### LEGAL STANDARD

Class actions require the approval of the district court prior to settlement.  Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval.").  The Ninth Circuit has repeatedly affirmed that a strong judicial policy favors settlement of class actions.  Allen v. Bedolla, 787 F.3d 1218, 1223 (9th Cir. 2015).  Nevertheless, courts have long recognized that the settlement of class actions presents unique due process concerns for the absent class members.  Id.; In re Bluetooth Headset Products Liability Litigation ("In re Bluetooth"), 654 F.3d 935, 946 (9th Cir. 2011).  Thus, "the district court has a fiduciary duty to look after the interests of the absent class members."  Allen, 787 F.3d at 1223.

Review of the proposed settlement of the parties generally proceeds in two phases.  True v. American Honda Motor Co., 749 F.Supp.2d 1052, 1062 (C.D. Cal. 2010).  At the preliminary

approval stage, the court determines whether the proposed agreement is within the range of possible approval and whether or not notice should be sent to class members.  True, 749 F.Supp.2d at 1063.  "[I]f the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing."  In re Tableware Antitrust Litigation, 484 F.Supp.2d 1078, 1079 (N.D. Cal. 2007) (quoting Manual for Complex Litigation, Second § 30.44 (1985)).

At the final approval stage, the court takes a closer look at the settlement, taking into consideration objections and other further developments in order to make the final fairness determination.  True, 749 F.Supp.2d at 1063.  The primary inquiry is whether the proposed settlement "is fundamentally fair, adequate, and reasonable."  Lane v. Facebook, Inc., 696 F.3d 811, 818 (9th Cir. 2012) (citing Fed. R. Civ. P. 23(e); Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026–27 (9th Cir. 1998)).  "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness."  Hanlon, 150 F.3d at 1026 (citing Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco, 688 F.2d 615, 628 (9th Cir. 1982)); see also Lane v. Facebook, Inc., 696 F.3d at 818–19.  In determining whether a settlement is fair, reasonable, and adequate, district courts are to consider several factors, including: (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of future litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.  Staton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003) (citations omitted); Hanlon, 150 F.3d at 1026.

When the settlement takes place before formal class certification, as it has in this instance, settlement approval requires a "higher standard of fairness."  Lane v. Facebook, Inc., 696 F.3d at 819 (quoting Hanlon, 150 F.3d at 1026).  This more exacting review of class settlements reached before formal class certification is required to ensure that the class

representatives and their counsel do not receive a disproportionate benefit "at the expense of the unnamed plaintiffs who class counsel had a duty to represent." Id. As recently emphasized by the Ninth Circuit, this requires courts to apply "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)." Roes, 1-2 v. SFBSC Mgmt., LLC, 944 F.3d 1035, 1043 (9th Cir. 2019) (quoting In re Bluetooth, 654 F.3d at 946). When reviewing a district court's final approval of a settlement negotiated prior to certification, the Ninth Circuit ensures the district court: (1) comprehensively explored all factors; (2) has given a reasoned response to all non-frivolous objections; (3) adequately developed the record to support its final approval decision; and (4) "looked for and scrutinized any subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." Roes, 944 F.3d at 1043 (quoting Allen, 787 F.3d at 1223).

Having already completed a preliminary examination of the settlement agreement, the court reviews it again, mindful that the law favors the compromise and settlement of class action suits. See, e.g., In re Syncor ERISA Litig., 516 F.3d 1095, 1101 (9th Cir. 2008); Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 576 (9th Cir. 2004). Ultimately, "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because [they are] exposed to the litigants and their strategies, positions, and proof." Staton, 327 F.3d at 953 (quoting Hanlon, 150 F.3d at 1026).

**IV.**

**DISCUSSION**

Plaintiffs move for final approval of the class action settlement, the FLSA collective action settlement, and the PAGA claims settlement (collectively, the "Settlement," "Agreement," or "Settlement Agreement"), entered into by and between Plaintiffs and Defendant. (Mot. 4; Joint Stipulation of Settlement and Release of Class, Collective, and PAGA Claims, ECF No. 19-1 at 28 .) Plaintiffs seek approval of all payments allocated and provided for by the Settlement, to be paid from the Maximum Settlement Amount, including: (1) incentive awards in the amount of $3,000 to Plaintiffs Baker and Ferrell; (2) attorneys' fees in the amount of $210,000, and reimbursement of litigation costs and expenses in the amount of $22,612.07 to Class/Collective Counsel; (3) a PAGA

settlement in the amount of $5,000, of which, seventy-five percent (75%) will be distributed to the Labor Workforce and Development Agency ("LWDA"), and the remaining twenty-five percent (25%) will be part of the net settlement amount to be distributed to class members who submit a claim form; and (4) settlement administration costs in the amount of $16,000 to the settlement administrator, Simpluris, Inc. ("Simpluris").  (Mot. 4.)

Plaintiffs argue the Settlement Agreement is fair, adequate, and reasonable, is the product of good-faith negotiations by experienced counsel presided over by a highly regarded mediator experienced in handling complex wage-and-hour class action lawsuits, and emphasize it was seemingly well-received by the class given no objections were filed.  (Mot. 5.)

### A.   The Settlement Agreement as Preliminary Approved With Updated Estimated Figures Following Claims Process

The Court will now outline the relevant terms of the Settlement Agreement as preliminarily approved by this Court, and incorporate the updated costs, number of claimants, estimated amounts to be dispersed, and estimated reversion back to Defendant following the claims process.

### 1.   The Class and Proposed FLSA Collective Conditionally Certified

When moving for preliminary approval, the parties agreed to certification of the following class consisting of approximately 803 individuals, for purposes of settlement: "All current and former non-exempt Property Employees of Defendant within the State of California from August 10, 2010 to the date the Settlement is preliminarily approved by the Court ('Class Members' or 'Class')."  (ECF No. 19 at 12.)  Class Members who submit a timely and valid "Class Claim Form" are bound by the Settlement Agreement and receive a share of the "Class Settlement."  (Id.)

When moving for preliminary approval, Plaintiffs proffered the parties agreed to conditional certification of the "Proposed FLSA Collective" consisting of: "all current and former Property Employees of Defendant within the State of California during the period from August 8, 2010 to the date on which the Settlement is preliminarily approved by the Court ('Settled Period')."  (Id.)  Proposed FLSA Collective Members who submit a timely and valid "FLSA Opt-In Form" are bound by the "FLSA Settlement" and receive their share of the FLSA

1  Settlement.  (Id.)

2      When issuing the recommendation to grant preliminary approval, the undersigned noted

3  the Agreement's definition of "Class" incorporates the term "Settled Period," reading: "all

4  current and former Property Employees of Defendant within the State of California during the

5  Settled Period."  (Agreement ¶ 3; ECF No. 24 at 7.)  The Agreement's definition of "Proposed

6  FLSA Collective Members" also incorporates the term: "all current and former Property

7  Employees of Defendant within the State of California during the Settled Period."  (Agreement ¶

8  49.)  The Agreement provides a definition of "Property Employee(s)" defined as: "non-exempt

9  employees with the following job positions during the Settled Period: Area Relief Manager,

10  Assistant Community Manager, Community Manager, Contact Assistant Manager, Grounds

11  Keeper, Janitor, Maintenance Technician, Porter, Residential Service Coordinator, and Security."

12  (Agreement ¶ 48.)

13      The Court certified the following Class and Proposed FLSA Collective for purposes of

14  settlement:

15      All current and former Property Employees of Defendant within the State of
       California from August 8, 2010 to the date this Order is signed by the Court
16      ("Settled Period").  "Property Employees" means non-exempt employees with the
       following job positions during the Settled Period: Area Relief Manager, Assistant
17      Community Manager, Community Manager, Contact Assistant Manager, Grounds
       Keeper, Janitor, Maintenance Technician, Porter, Residential Service Coordinator,
18      and Security.

19  (ECF No. 19-6 at 3; ECF No. 24 at 7-8.)

20      2.    The Monetary Settlement Amounts Preliminarily Approved

21      Defendant will pay a "Maximum Settlement Amount" of up to $600,000 on a claims-

22  made basis.  (Mot 8; Agreement ¶¶ 34, 62.)  The "Net Settlement Amount" is the amount

23  remaining after deducting the following from the Maximum Settlement Amount: (1) attorneys'

24  fees of up to thirty-five percent (35%) of the Maximum Settlement Amount, for a total of

25  $210,000.00, plus reimbursement of litigation costs and expenses up to $35,000.00, for a total of

26  up to $245,000.00 (the "Fees and Costs Award") to "Class/Collective Counsel"[2]; (2) "Incentive

27

28  _____
    [2]  The total costs sought is now less, totaling only $22,612.07.  (Mot. 4.)

Awards" of up to $3,000.00 each to Plaintiffs Kevin Ferrell and Cheryl Baker for a total of $6,000.00; (3) $3,750.00 to the LWDA for its share of the "PAGA Settlement Amount"; and (4) "Settlement Administration Costs," currently estimated to be $16,000.00. (Mot. 4; Agreement ¶¶ 19, 28, 33, 34, 36, 58.) A twenty-five percent (25%) portion of the PAGA Settlement Amount allocated to aggrieved employees ($1,250.00 of a total $5,000.00), will remain part of the Net Settlement Amount. (Mot. 4; Agreement ¶ 15.)

At preliminary approval, the Net Settlement Amount available for distribution to Class Members who submit timely and valid Class Claim Forms ("Claimants"), and Proposed FLSA Collective Members who submit timely and valid FLSA Opt-In Forms ("FLSA Collective Members"), was estimated to be $329,250.00. (ECF No. 19 at 13; Aiwazian Prelim. Decl. ¶ 17.) Given the costs sought by counsel are only $22,612.07, the current Net Settlement Amount at final approval is estimated to be $341,637.93. (Mot. 8; Suppl. Decl. Cassandra Cita Final Approval ("Suppl. Simpluris Decl.") ¶ 16, ECF No. 35-2.) Ninety-five percent (95%) of the Net Settlement Amount, inclusive of the Employee's PAGA portion, is to be allocated to the Class Settlement and available to be distributed to Claimants ("Class Settlement Amount"), and the remaining five percent (5%) of the Net Settlement Amount is to be allocated to the FLSA Settlement and distributed to FLSA Collective Members ("FLSA Settlement Amount"). (Mot. 5; Agreement ¶¶ 10, 26.)

The Class Settlement Amount, estimated to be $312,787.50 at preliminary approval, is now estimated to be $324,556.03, and is to be distributed to Claimants based upon the number of weeks they worked as Property Employees during the Settled Period ("Workweeks"). (Mot. 8; Agreement ¶ 44; Suppl. Simpluris Decl. ¶ 19; ECF No. 19 at 13.) At least sixty-three percent (63%) of the Class Settlement Amount is to be distributed to Claimants (the "Minimum Distribution Floor"). (Mot. 8; Agreement ¶¶ 35, 67.) If less than sixty-three percent (63%) of the Class Settlement Amount is claimed by Claimants, each Claimant's share is to be proportionately increased on a *pro rata* basis based on their number of Workweeks. (Mot. 8; Agreement ¶¶ 67, 69(a).) Any amount of the Class Settlement Amount over the Minimum Distribution Floor that is not claimed by the Claimants ("Remainder") will be used to pay

1  Defendant's share of payroll taxes and contributions in connection with the wages portion of the

2  "Estimated Class Settlement Shares" and "Estimated FLSA Settlement Shares" ("Employers

3  Taxes"), and the remaining amount (if any) is to be retained by Defendant.   (Mot. 8-9;

4  Agreement ¶¶ 16, 67.)

5       As of the date of the final approval hearing, one hundred forty-seven (147) Claim Forms

6  have been received from Class Members, and one hundred thirty-one (131) FLSA Opt-in forms

7  have been received from FLSA Collective Members.  (Suppl. Simpluris Decl. ¶¶ 14-15, Ex. D.)

8  The aggregate total Workweeks of all of the Class Members is 90,342, while the one hundred

9  forty-seven (147) Claimants are credited with approximately 21,816 Workweeks, representing

10  24.15% of the total Workweeks.  (Suppl. Simpluris Decl. ¶ 17.)  Thus, Claimants have claimed

11  approximately $78,374.56, or 24.15% of the Class Settlement Amount.  (Id.)  Because the 63%

12  Minimum Distribution Floor was not met by the number of Claimants, Simpluris proportionately

13  increased the Estimated Class Settlement Shares for each Claimant on a *pro rata* basis so that

14  63% of the Class Settlement Amount, or $204,470.30 of the total $324,556.03, will be

15  distributed to the Claimants.  (Suppl. Simpluris Decl. ¶ 19.)

16       The FLSA Settlement Amount, representing five percent (5%) of the Net Settlement

17  Amount, was estimated to be $16,462.50 at preliminary approval, and is now estimated to be

18  $17,081.90.  (Id. at ¶ 18; Mot. 9; ECF No. 24 at 9.)  It will be distributed to FLSA Collective

19  Members based upon their respective Workweeks compared to the number of Workweeks of all

20  FLSA Collective Members.  The entire FLSA Settlement Amount will be paid out to FLSA

21  Collective Members.   The aggregate total Workweeks of the Proposed FLSA Collective

22  Members is 90,342.  (Suppl. Simpluris Decl. ¶ 18.)  The one hundred thirty-one (131) Collective

23  Members are credited with approximately 19,509 Workweeks, representing 21.59% of the

24  Workweeks.  The entire FLSA portion of $17,081.90 will be distributed on a *pro rata* basis.  (Id.;

25  Mot. 9; Agreement ¶ 69(b).)

26       3.    Calculation of Class Settlement Shares

27       The Settlement Administrator calculates each Class Member's Estimated Class

28  Settlement Share by: (1) calculating the total number of Workweeks worked by each Class

Member (Agreement ¶¶ 59, 71, 76); (2) dividing the Class Settlement Amount by the total number of Workweeks worked by all Class Members to yield the "Initial Class Workweek Amount" (Agreement ¶ 69(a)(i)); (3) multiplying the Initial Class Workweek Amount by each Class Member's total number of individual Workweeks to determine their Estimated Class Settlement Share (Agreement ¶ 69(a)(ii)); (4) if the Estimated Class Settlement Shares that are actually claimed by Claimants equal less than the Minimum Distribution Floor, the Estimated Class Settlement Shares will be proportionately increased for each Claimant so that the total of all Estimated Class Settlement Shares equals no less than the Minimum Distribution Floor (Agreement ¶ 69(a)(iii)); and (5) Estimated Class Settlement Shares will be subject to reduction for the employee's share of taxes and withholdings with respect to the portion of the payment that is deemed wages, and the payment to a Claimant that is the net of these taxes and withholdings is the "Individual Class Payment" (Agreement ¶ 69(a)(iii)-(iv)). (ECF No. 24 at 9-10.)

As of the time of the final approval hearing, after adjusting each Claimants' Estimated Class Settlement Share so that the Minimum Distribution Floor is reached, the highest gross Estimated Class Settlement Share is estimated to be approximately $4,883.07, the lowest gross Estimated Class Settlement Share is estimated to be approximately $84.35, and the average gross Estimated Class Settlement Share is estimated to be $1,390.95. (Suppl. Simpluris Decl. ¶ 20.)

4.    Calculation of FLSA Settlement Shares

The Settlement Administrator calculates each Proposed FLSA Collective's Estimated FLSA Settlement Share and each "Individual FLSA Payment" by: (1) dividing the FLSA Settlement Amount by the total number of Workweeks worked by the Proposed FLSA Collective to yield the "Initial FLSA Workweek Amount" (Agreement ¶ 69(b)(i)); (2) multiplying the Initial FLSA Workweek Amount by each FLSA Collective Member's individual number of Workweeks to determine their Estimated FLSA Settlement Share (Agreement ¶ 69(b)(ii)); (3) if the amount claimed by the FLSA Collective Members is less than the FLSA Settlement Amount, the Settlement Administrator will increase each Estimated FLSA Settlement Share proportionally so that the sum of all Estimated FLSA Settlement Shares equals the FLSA Settlement Amount,

1    and the final amount distributable to each FLSA Collective Member is the "Individual FLSA

2    Payment" (Agreement ¶ 69(b)(iii)).  (ECF No. 24 at 10.)

3           As of the time of the final approval hearing, the highest gross Estimated FLSA

4    Settlement Share is estimated to be approximately $456.18, the lowest gross Estimated FLSA

5    Settlement Share is estimated to be approximately $5.25, and the average gross Estimated FLSA

6    Settlement Share is estimated to be $130.40.  (Suppl. Simpluris Decl. ¶ 21.)

7           5.      Taxes and Reversion to Defendant

8           Individual Class Payments will be allocated as one-third wages and two-thirds penalties,

9    interest, and non-wage damages.  (Mot. 9; Agreement ¶ 85; ECF No. 24 at 10.)  Individual FLSA

10   Payments will be allocated as one-third (1/3) wages and two-thirds (2/3) penalties and non-wage

11   damages.  (Id.)  The wages portion of these payments will be reported on an IRS From W-2, and

12   the portions allocated to interest and penalties will be reported on an IRS Form-1099.  (Id.)  The

13   Individual Settlement Payments will be reduced by the employee's share of payroll taxes and

14   withholding on the wages portion of the Settlement Payments.  (Mot. 9; Agreement ¶ 17.)

15          The Employer Taxes will be paid from the Remainder, and if the Remainder is not

16   sufficient to cover all the Employer Taxes, Defendant will pay an additional amount sufficient to

17   cover the Employer Taxes.  (Mot. 9; Agreement ¶¶ 16, 31, 52, 62(a).)  As of the date of the final

18   approval hearing, the estimated Employer Taxes that will be paid out of the unclaimed funds is

19   approximately $14,674.33, and the estimated amount of unclaimed funds that will revert back to

20   Defendant is approximately $105, 411.40.  (Suppl. Simpluris Decl. ¶ 22.)

21          6.      Settlement Opt-Out and Objection Procedures

22          Class Members who wished to opt out from the Class Settlement were required to submit

23   a written letter to the Settlement Administrator requesting to be excluded from the Class

24   Settlement ("Request for Exclusion").  (ECF No. 24 at 11; Agreement ¶¶ 53, 77.)  In the event of

25   a re-mailed Notice Packet, the Response Deadline was to be extended ten (10) calendar days.

26   (Agreement ¶ 54.)  Class Members who did not opt out of the Class Settlement ("Participating

27   Class Member(s)"), could object to the Class Settlement by filing a "Notice of Objection" with

28   the Court and serving copies upon counsel for the parties no later than the Response Deadline.

(ECF No. 24 at 12; Agreement ¶ 81.)

As of the final approval hearing date, there was only one request for exclusion filed, and no objections filed.  (Suppl. Simpluris Decl. ¶ 12, 13.)

7.     Scope of the Class Release

The "Class Released Claims" that are the subject of the Settlement are "Released Claims" which do not arise under the FLSA.  The Released Claims are:

> Any and all claims, charges, complaints, obligations, promises, agreements, suits, rights, costs, losses, liens, penalties, fines, wages, liquidated damages, restitutionary amounts, interest, punitive damages, controversies, liabilities, debts, demands, money owed, guarantees, expenses, back wages, attorneys' fees and costs, damages, actions or causes of action, of any nature, under state, federal, or local law, that were made or could have been made based on the facts alleged in the pleadings filed in the Action, which includes claims for failure to pay minimum, overtime, regular, and reporting time wages (California Labor Code, §§ 510, 1194, and 1198, and the Fair Labor Standards Act, 29 U.S.C. § 207), failure to provide compliant meal periods and associated premium pay (California Labor Code §§ 512 and 226.7), failure to provide compliant rest periods and associated premiums (California Labor Code § 226.7), failure to timely pay wages upon termination (California Labor Code §§ 201-203), failure to timely pay wages during employment (California Labor Code § 204), failure to provide accurate, itemized wage statements (California Labor Code § 226), failure to keep requisite payroll records (California Labor Code § 1174(d)), failure to reimburse business expenses (California Labor Code § 2800 and 2802), civil penalties under the Private Attorneys General Act (California Labor Code § 2698, *et seq.*) based on the aforementioned, and unfair business practices (California Business & Professions Code § 17200, *et. seq.*) based on the aforementioned, arising during the Settled Period, excluding claims for workers' compensation benefits or any of claims that may not be released by law.

(ECF No. 24 at 12-13; Agreement ¶¶ 8, 50.)

Upon the "Effective Date,"[3] Plaintiffs and all Participating Class Members will release all Class Released Claims with respect to all of the "Released Parties."   (ECF No. 24 at 13; Agreement ¶¶ 8, 50, 51, 79.)  Plaintiffs have also provided a general release of all claims with a waiver of California Civil Code § 1542.  (Agreement ¶ 90.)

8.     The FLSA Released Claims

Proposed FLSA Collective Members who submit a valid FLSA Opt-In Form (i.e., FLSA Collective Members), will be bound by the FLSA Settlement.  (ECF No. 24 at 13; Agreement ¶¶

---

[3]  The Effective Date is defined as: "the later of: (a) if no appeal is filed, the date that is thirty-five (35) calendar days after the date of entry of the Final Order, or (b) if the Final Order is appealed, the date on which any reviewing court issues a decision, the time for further appeal has expired, and the trial court has regained jurisdiction." (Agreement ¶ 14.)

23, 78.)  As of the Effective Date, Plaintiffs and all FLSA Collective Members will be deemed to have released any and all FLSA Released Claims with respect to all of the Released Parties. (Agreement ¶¶ 78, 80.)

### B.     Final Approval of the Class Action Settlement

The Court next addresses Federal Rule of Civil Procedure 23(e)(2)'s requirement that any settlement in a class action be approved by the court as fair, reasonable, and adequate.  At the final approval stage, the court takes a closer look at the settlement, taking into consideration objections and other further developments in order to make the final fairness determination.  True, 749 F.Supp.2d at 1063.  The settlement agreement in this action was previously filed on the Court's docket (ECF No. 19-1 at 25-66), and class members have been given an opportunity to object thereto.  The Court now turns to the adequacy of notice, certification of the class on final approval, and review of the settlement following the final fairness hearing.

### 1.     Adequate Notice to the Class

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); see also Hanlon, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e)."). For a "class certified under Rule 23(b)(3)— or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)—the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The notice may be by one or more of the following methods: United States mail, electronic means, or other appropriate means. Id. The "notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Id.

A class action settlement notice "is satisfactory if it generally describes the terms of the

1  settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

2  forward and be heard." Churchill Vill., LLC, 361 F.3d at 575 (internal quotations and citations

3  omitted).  Any notice of the settlement sent to the class should alert class members of "the

4  opportunity to opt-out and individually pursue any state law remedies that might provide a

5  better opportunity for recovery." Hanlon, 150 F.3d at 1025.  It is important for class notice to

6  include information concerning the attorneys' fees to be awarded from the settlement because it

7  serves as "adequate notice of class counsel's interest in the settlement." Staton, 327 F.3d at 963

8  n.15 (Where the class was informed of the amount of fees only indirectly and where the failure

9  to give more explicit notice could itself be the result of counsel's self-interest, the courts must

10 be all the more vigilant in protecting the interests of class members with regard to the fee

11 award.") (quoting Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1375 (9th Cir. 1993)).

12         The Court reviewed the class notice that was proposed when the parties sought

13 preliminary approval of the settlement and found the proposed form of notice to be satisfactory.

14 (ECF Nos. 24 at 42-46; 28 at 11.)  The Court's findings and recommendations discussed the

15 applicable notice standards in greater detail, and specifically highlighted recent developments

16 within the Ninth Circuit concerning the best notice practicable, Roes, 1-2 v. SFBSC Mgmt.,

17 LLC, 944 F.3d at 1043.  (ECF No. 24 at 45-46 n.26.)

18         On August 2, 2020, Simpluris received the Court-approved text for the Notice Packet

19 from Class/Collective Counsel.  (Mot. 10; Decl. Cassandra Cita Re. Notice & Settlement Admin.

20 ("Simpluris Decl.") ¶ 5, ECF No. 32-2.)   On August 14, 2020, Simpluris received a data

21 spreadsheet from Defendant's counsel containing each Class Member and Proposed FLSA

22 Collective Member's full name, last known mailing address, telephone number, Social Security

23 number, dates of employment with Defendant as a Property Employee in California during the

24 period from August 9, 2010, through July 29, 2020, and number of Workweeks (the "Class

25 List").  (Id.)  The Class List contained information for nine hundred twenty (920) individuals.

26 (Id.)

27         On August 21, 2020, after conducting a National Change of Address ("NCOA") search to

28 update the addresses in the Class List, Simpluris mailed the Notice Packet to the nine hundred

1    twenty (920) individuals identified on the Class List via First-Class U.S. Mail.  (Mot. 11;

2    Simpluris Decl. ¶ 7.)   Two hundred thirteen (213) Notice Packets have been returned to

3    Simpluris as undeliverable, of which none had forwarding addresses.  (Simpluris Decl. ¶ 8;

4    Suppl. Simpluris Decl. ¶ 8.)  Simpluris performed a skip-trace search on the two hundred thirteen

5    (213) Notice Packets returned as undeliverable without forwarding addresses, located one

6    hundred ninety (190) updated addresses, and re-mailed the Notice Packets to the updated

7    addresses.  (Id.)   Twenty-two (22) Notice Packets were returned a second time without a

8    forwarding address.  One (1) Class Member whose Notice Packet was returned to Simpluris by

9    the Post Office, contacted Simpluris to provide an updated address, and Simpluris re-mailed the

10   Notice Packet to the updated address.  (Simpluris Decl. ¶ 8.)  Ultimately,  twenty-two (22)

11   Notice Packets remained undeliverable.  (Id.; Suppl. Simpluris Decl. ¶ 8.)

12          On September 18, 2020, eight hundred thirty-four (834) reminder postcards were mailed

13   to individuals who had not yet submitted a Class Claim Form and/or FLSA Opt-in Form as of

14   such date.  (Suppl. Simpluris Decl. ¶ 9.)  On December 28, 2020, seven hundred ninety-seven

15   (797) reminder postcards were mailed to those individuals who had not yet submitted a Class

16   Claim Form and/or FLSA Opt-in Form as of such date, and advised the Class Members that the

17   deadline to submit a Class Form and FLSA Form had been extended to January 27, 2021.  (Id. at

18   ¶ 10.)

19          Based on these facts presented by the Settlement Administrator, it appears that

20   approximately 2.39% of the class did not receive the mailed Notice Packets, and approximately

21   97.61% of the class received the mailed Notice Packets.  The Court accepts the declaration and

22   report of the Settlement Administrator, and finds that sufficient notice has been provided.  See

23   Silber v. Mabon, 18 F.3d 1449, 1453–54 (9th Cir. 1994) (courts need not ensure all class

24   members receive actual notice, only that "best practicable notice" is given); Winans v. Emeritus

25   Corp., No. 13-cv-03962-HSG, 2016 WL 107574, at *3 (N.D. Cal. Jan. 11, 2016) ("While Rule

26   23 requires that 'reasonable effort' be made to reach all class members, it does not require that

27   each individual actually receive notice.").

28   / / /

1        2.      Certification of Class, Representatives, and Counsel on Final Approval

2        To certify a class, a plaintiff must demonstrate that all of the prerequisites of Rule 23(a),

3   and at least one of the requirements of Rule 23(b) of the Federal Rules of Civil Procedure have

4   been met.  Wang v. Chinese Daily News, Inc., 737 F.3d 538, 542 (9th Cir. 2013).  The Court

5   previously found the class meets the prerequisites of numerosity, commonality, typicality, and

6   adequacy of representation.  (ECF Nos. 24 at 14-20; 28 at 11.)  The Court also found that common

7   questions predominate and allowing this action to proceed as a class action is the superior method

8   of adjudicating the controversy of these employment related claims.  (ECF Nos. 24 at 21-22; 28 at

9   11.)  The Court found that the putative class members were similarly situated such that the FLSA

10  collective should be conditionally certified.  (ECF Nos. 24 at 22-24; 28 at 11.)

11       As of the filing of the motion for final approval, Simpluris has not received any objections,

12  has received only one (1) Request for Exclusion, and received only two (2) disputes concerning the

13  number of Workweeks, which have been resolved.  (Mot. 10; Simpluris Decl. ¶¶ 9-11.)  The Court

14  is unaware of any changes that would affect the class and FLSA collective certification findings.

15  For the reasons set forth in the January 21, 2020 findings and recommendations on preliminary

16  approval, the Court finds that the settlement classes continue to meet the requirements of Federal

17  Rule of Civil Procedure 23(a) and (b), and the similarly situated requirement of the FLSA.  (ECF

18  No. 24 at 14-24.)

19       Accordingly, the Court finds that final class certification in this case is appropriate and

20  recommends the following Class and proposed FLSA Collective be certified on final approval:

21          All current and former Property Employees of Defendant within the State of
            California from August 8, 2010 to the date this Order is signed by the Court
22          ("Settled Period").  "Property Employees" means non-exempt employees with the
            following job positions during the Settled Period: Area Relief Manager, Assistant
23          Community Manager, Community Manager, Contact Assistant Manager, Grounds
            Keeper, Janitor, Maintenance Technician, Porter, Residential Service Coordinator,
24          and Security.

25  In addition, the Court recommends Plaintiffs Kevin Ferrell and Cheryl Baker be confirmed as

26  class representatives; that Edwin Aiwazian, Arby Aiwazian, and Joanna Ghosh of Lawyers *for*

27  Justice, PC, and Amir Nayebdadash and Heather Davis of Protection Law Group LLP, be

28  confirmed as counsel for the Class and Proposed FLSA Collective; and Simpluris, Inc. be

1  confirmed as the Settlement Administrator.

2      3.      Final Fairness Hearing and Whether Settlement Agreement is Fair, Adequate, and
3              Reasonable

4      On February 3, 2021, the court held a final fairness hearing, at which class counsel and

5  defense counsel appeared.   No class members, objectors, or counsel representing the same

6  appeared at the hearing.   For the reasons explained below, the court now determines that the

7  settlement reached in this case is fair, adequate, and reasonable.   See Fed. R. Civ. P. 23(e)(2).

8      The Court set out the applicable legal standards above, but to restate, in assessing the

9  fairness of a class action settlement, courts balance the following factors:

10     (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely
       duration of further litigation; (3) the risk of maintaining class action status
11     throughout the trial; (4) the amount offered in settlement; (5) the extent of
       discovery completed and the stage of the proceedings; (6) the experience and
12     views of counsel; (7) the presence of a governmental participant; and (8) the
       reaction of the class members to the proposed settlement.
13

14  Churchill Vill., L.L.C., 361 F.3d at 575; see also In re Online DVD-Rental Antitrust Litig., 779

15  F.3d 934, 944 (9th Cir. 2015); Rodriguez v. West Publ'g Corp., 563 F.3d 948, 964–67 (9th Cir.

16  2009).   Further, where the parties have reached a settlement agreement prior to class

17  certification, the Court has an independent duty to be vigilant for any sign of collusion among

18  the negotiating parties.   See In re Bluetooth, 654 F.3d at 946.

19     The Court now turns to consideration of each of these eight factors, before additionally

20  considering whether the pre-certification settlement shows signs of collusion rendering the

21  settlement unfair.

22     a.      Strength of Plaintiffs' Case

23     "An important consideration in judging the reasonableness of a settlement is the strength

24  of the plaintiffs' case on the merits balanced against the amount offered in the settlement."   Nat'l

25  Rural Telecommunications Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 526 (C.D. Cal. 2004)

26  (quoting 5 Moore Federal Practice, § 23.85[2][b] (Matthew Bender 3d. ed.)).   A court's role is

27  not to reach any ultimate conclusion on the facts or law which underly the merits of the dispute,

28  as the very uncertainty of the outcome and the avoidance of expensive and wasteful litigation is

what induces consensual settlements.  <u>Officers for Justice</u>, 688 F.2d at 625.  The court cannot reach such a conclusion because evidence has not been fully presented.  <u>In re Wash. Pub. Power Supply Sys. Sec. Litig.</u>, 720 F. Supp. 1379, 1388 (D. Ariz. 1989).  Instead, a court "evaluate[s] objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." <u>Id.</u>  In reality, the reasonable range of settlement is arrived at by considering the likelihood of a verdict for the plaintiff or defendant, "the potential recovery, and the chances of obtaining it, discounted to a present value." <u>Bellinghausen v. Tractor Supply Co.</u>, 306 F.R.D. 245, 255 (N.D. Cal. 2015) (quoting <u>Rodriguez v. West Publ'g Corp.</u>, 563 F.3d at 965).

While this action was removed to federal court in 2019, this is a protracted class action that was in fact commenced in state court in August of 2014.  (ECF No. 1.)  Plaintiffs contend the parties actively litigated this case since then, and used pre-mediation time to investigate the veracity, strength, and scope of the claims, and counsel actively prepared the matter for class certification.  (Mot. 13; Decl. Edwin Aiwazian Supp. Pls' Mot. Class Counsel Fees & Costs ("Aiwazian Fees Decl.") ¶ 6, ECF No. 33-4.)  Plaintiffs describe the course of investigation, discovery, negotiation, and eventual mediation leading to settlement.  (Mot. 13-14.)

Plaintiffs emphasize the parties reached settlement after reviewing all of the available evidence, participating in arm's-length bargaining, participating in a private mediation conducted by Paul Grossman, Esq., who is experienced in handling complex wage-and-hour matters, and engaging in extensive settlement negotiations following mediation.  (Mot. 14.)  Prior to and during the settlement negotiations, the parties exchanged information and discussed various aspects of the case, including the principal claims by Plaintiffs, the risks and delays of further litigation and of proceeding with class and collective certification, the laws relating to off-the-clock theory, meal and rest periods, wage-and-hour enforcement, the FLSA claims, PAGA representative claims, the evidence produced and analyzed, the possibility of appeals, and the risks of recovery and continued employment of current-employee Class Members in light of Defendant's limited financial resources and precarious financial circumstances, among other

considerations.[4]  (Mot. 14-16; Aiwazian Fees Decl. ¶ 8.)

The briefing before the Court does not provide overly extensive or specific details

---

[4] In issuing the findings and recommendations on preliminary approval, the Court stated the following in regards to the financial condition of Defendant as a proffered reason for the settlement amount:

> The parties here also have used the financial difficulties of the Defendant as an additional reason for the discounted valuations, partially to protect current employees from losing their job, in addition to being a reason for the necessity of funding the settlement in installment payments. (Aiwazian Decl. ¶ 26; Lynch Decl. ¶¶ 10-14.)  Thus, also relevant to the justification given here, the <u>Hunt</u> court rejected the argument that defendant was experiencing financial difficulties noting and finding: "Courts should view such assertions with great caution, as employers tend to make threats about inability to pay more often than they are actually unable to pay.  Therefore, if this sort of assertion is to be the basis for approval of a discounted class settlement, it must be supported with detailed evidence.  Plaintiffs' counsel has not done that here.  There is one conclusory paragraph in a declaration from plaintiffs' counsel, with parallel language in the proposed settlement, stating that VEP claims to be experiencing financial difficulty and that an accountant hired by plaintiffs' counsel agrees with that claim.  [citations]  Such conclusory assertions are not enough—there should be a much stronger showing before a defendant's financial hardship is taken into account."  <u>Hunt</u>, No. 16-CV-04790-VC, 2017 WL 3608297, at *1. The information provided here is more substantial than averred to in <u>Hunt</u>, but the parties are forewarned that more evidence, perhaps with support by an accountant's analysis, may be necessary to address the valuation at the hearing for final approval.

(ECF No. 24 at 32, n.19.)  Given there was no additional information provided in the briefing materials, at the hearing on the motion for final approval, the Court inquired about this issue and requested supplemental briefing. Counsel for Plaintiffs, as well as the President of Defendant, provided supplemental declarations.  (ECF No. 35.) Plaintiffs' counsel proffers that during the negotiations and mediation, Defendant's financial circumstances were key issues of discussion and consideration, and specifically, Defendant's President, and general counsel, provided extensive and crucial information regarding financial data on performance and position, which the mediator as well as Plaintiffs' counsel gave serious consideration to when formulating the structure of the settlement.  (Suppl. Decl. Edwin Aiwazian Supp. Final Approval (Suppl. Final Aiwazian Decl. 6, ECF No. 35 at 1.)  Defendant's President and general counsel provided confidential information regarding these matters, including on the nature of Defendant's property management business, Defendant's cash and non-cash assets, revenue, profit, cash flow, and expenses, as well as information as to why Defendant could only fund a settlement by way of installments.  (<u>Id.</u> at ¶ 7.)  Specifically, Defendant is a fee-based management company lacking significant assets other than operating income; Defendant does not own the properties being managed and instead only provides management services; and among other reasons, Defendant operates on a slim margin, charging a small percentage of rent as a management fee, with little to no scope to increase its management fee.  (<u>Id.</u>)  Ultimately, this information, the mediator's proposal, and the later updated financial information, confirmed for counsel that the terms were appropriate, and Defendant's financial condition was one of many issues considered to reach the settlement amount.  (<u>Id.</u> at ¶ 8.)

Defendant's President's supplementary declaration supports the reasoning in Plaintiffs' counsel's declaration. (Suppl. Decl. Rosemary Lynch Supp. Final Approval ("Suppl. Lynch Decl."), ECF No. 35-1.)  Defendant's President affirms that through mediation and negotiations, confidential financial and business condition information was disclosed to Plaintiffs' counsel, including specifically overall revenue and cash projections; that 98% of the business is in affordable housing with associated regulations setting limits on the amount of money that can be paid for property management service; that there are low profit margins in affordable housing; and the company has no significant hard assets other than operating income because of the nature of the business.  (Suppl. Lynch Decl. ¶¶ 3-8.)

The Court finds the supplemental declarations provide sufficient support for concluding Plaintiffs' counsel performed due diligence and properly considered the financial condition of Defendant when structuring the terms of the Settlement Agreement.

concerning the strengths or weaknesses of the merits of the principal claims. Plaintiffs generally proffer that arriving at settlement that was acceptable to both sides was not easy, as Defendant and its counsel were strongly of the view that Defendant would prevail on the merits and obtain a denial of class certification. (Mot. 15.) After significant investigation of the facts, formal and informal exchange of data and documents, depositions, negotiations, and with the aid of a mediator, the parties agreed the case was well-suited for settlement given the legal issues relating to Plaintiffs' principal claims, as well as the costs and risks to the parties presented by further litigation. (Mot. 15; Aiwazian Fees Decl. ¶ 8.)

Counsel interviewed, and obtained information from Plaintiffs and other Class Members, reviewed and analyzed a large number of documents and data produced by Defendants and obtained through other sources, and performed significant research into the law concerning class and collective certification, off-the-clock theory, meal and rest breaks, wage-and-hour enforcement, Plaintiffs' claims, and Defendant's defenses, as well as facts discovered. (Mot. 15; Aiwazian Fees Decl. ¶¶ 6, 8.) Plaintiffs proffer the settlement takes into account the strengths and weaknesses of each side's position and the uncertainty of how the case might have concluded at certification, trial, and/or appeals. (Mot. 15; Aiwazian Fees Decl. ¶ 8.)

The Court previously weighed the parties' course of negotiation in relation to the merits of the action and amount of settlement, and incorporates such discussion herein. (ECF No. 24 at 27-35.) The Court also expressed significant concerns regarding the amount of settlement in relation to the initial damages analyses, ultimately finding that "[n]onetheless, the Court finds counsel's explanations sufficient for purposes of preliminary approval, taken in the context of the risks of continued litigation and settlement as a whole, with the caveat that more extensive explanation and support for the discounting may be needed to demonstrate fairness at the final approval hearing." (Id. at 30-33.) The Court discusses the amount of settlement in further detail below in considering that separate factor.

Prior to adopting the findings and recommendations on preliminary approval, the District Judge requested supplemental briefing regarding the potentially problematic aspects of the estimated value of the claims, the reversionary clause, as well as the amount of attorneys' fees

requested.  (ECF No. 26.)  The supplemental briefing emphasized and built upon many of the reasons presented in the motion for preliminary approval for the discounting of the valuation in relation to the strengths and weakness of the case and risks of continued litigation.  (ECF No. 27 at 6-7.)  Plaintiffs' counsel filed a supplemental declaration with quantification of the value of the claims and analysis, and why the estimates warranted such reductions.  (Id.; Suppl. Aiwazian Decl. ¶¶ 8-69, ECF No. 27-1.)  In adopting the findings and recommendations on preliminary approval, the District Judge considered the reasons offered for discounting the maximum potential recovery, including: 1) overcoming defendant's arguments and evidence that it properly provided meal and rest breaks, paid for all hours of work, and properly reimbursed business expenses; 2) the obstacles inherent in satisfying the requirements to certify a class, certify a collective, and satisfy manageability requirements; 3) the challenges of proving the elements of each cause of action; 4) the derivative nature of many of the claims; 5) the costs and expenses of further litigation; and 6) the recovery rate, even if plaintiff were to prevail, after years of continued and costly litigation.  (ECF No. 28 at 5.)  The Court noted that while a larger award was theoretically possible, the Court would adopt the findings and recommendations preliminarily approving the settlement amount.  (ECF No. 28 at 6.)  The District Judge also considered the proffered strengths and weaknesses of the Plaintiffs' case in considering the reversionary clause and the attorneys' fees request, as discussed in greater detail below.

Based on the above facts, Plaintiffs' arguments, and supporting declarations regarding the strengths and weaknesses of this action, it appears that while Plaintiffs have potentially meritorious claims, it is far from certain that they would have prevailed on those claims or achieved full recovery on them, particularly on a class-wide basis.  The settlement in this action provides the class members with substantial relief now; and given the uncertainty of ultimate success at trial, the proposed settlement provides the parties with a fair resolution of the issues presented which weighs in favor of settlement.

The court finds that consideration of the strength of Plaintiffs' case weighs in favor of granting final approval of the settlement in this action.

/ / /

1                    **b.       Risk, Expense, Complexity, and Likely Duration of Further Litigation**

2          "[T]here is a strong judicial policy that favors settlements, particularly where complex

3    class action litigation is concerned." In re Syncor ERISA Litig., 516 F.3d at 1101 (citing Class

4    Plaintiffs, 955 F.2d at 1276).  As a result, "[a]pproval of settlement is preferable to lengthy and

5    expensive litigation with uncertain results."   Johnson v. Shaffer, No. 2:12-cv-1059-KJM-AC,

6    2016 WL 3027744, at *4 (E.D. Cal. May 27, 2016) (citing Morales v. Stevco, Inc., No. 1:09-cv-

7    00704-AWI-JLT, 2011 WL 5511767, at *10 (E.D. Cal. Nov. 10, 2011)).  Employment law class

8    actions are, by their nature, time-consuming and expensive to litigate.  Hightower v. JPMorgan

9    Chase Bank, N.A., No. 11-cv-1802-PSG-PLA, 2015 WL 9664959, at *6 (C.D. Cal. Aug. 4,

10   2015).

11         Plaintiffs argue the risks and expenses of further litigation outweighed any benefit that

12   might have been gained otherwise through any continued litigation, as if the case had settled

13   after further litigation, the settlement amount would have taken into account additional costs

14   incurred, and there might have been less money available for the Class Members thereafter.

15   (Mot. 16-17.)  While often present in these types of actions, Plaintiffs proffer there are multiple

16   risks of further litigation, including: a determination that the claims were unsuitable for class

17   and/or collective treatment as Defendant would have vigorously challenged certifiability and

18   liability, and specifically contended that individualized questions of fact predominated over any

19   common issues; class de-certification after certification; the risks and costs of presenting these

20   claims to a jury; and ultimately, the real possibility of no recovery after years of litigation.  (Mot.

21   17.)  Plaintiffs highlight that the parties were moving into the stage of litigation that would

22   necessitate more substantial formal discovery, including additional written discovery requests

23   and depositions of Defendant's Person Most Knowledgeable ("PMK") designees, expert

24   witnesses, and percipient witnesses.  (Mot. 17.)  Plaintiffs note this extensive formal discovery

25   would certain result in discovery disputes that would require additional time and money, in

26   contrast to the fact the Settlement provides significant benefits for the Class Members and

27   Proposed FLSA Collective Members immediately, while avoiding further expenses, risks, and

28   delay of prolonged litigation with only the possibility of a recovery.  (Mot. 17.)  The parties also

1  considered Defendant's limited financial resources and "precarious financial circumstances."

2  (Mot. 16.)

3       Though the parties have been litigating this case for over six years, that timeline would be

4  extended even further by litigating this case to a final resolution through a jury trial.  The parties'

5  expenses would increase as litigation costs continue to accrue, and any recovery of a monetary

6  judgment, which is not guaranteed, would be prolonged.  Further, as discussed in the following

7  subsection, the Court finds there are legitimate issues concerning maintaining class action status

8  throughout trial and the risk of decertification.

9       Accordingly, the Court finds consideration of the risk, expense, complexity, and likely

10  duration of further litigation, weighs in favor of granting final approval.

11       **c.    Risk of Maintaining Class Action Status Throughout Trial**

12       As for the dangers of denying class certification, or potential for decertification, the Court

13  voiced some concerns regarding typicality and commonality in issuing the findings and

14  recommendations recommending conditional certification on preliminary approval.  (ECF No. 24

15  at 15-22.)  As discussed therein, the Court believes there are legitimate issues concerning class

16  certification, and thus is a relevant risk that Plaintiffs face with continued litigation.  Plaintiffs

17  further argue that it would be grossly inefficient for a large class of current and former

18  employees to bring individual actions to recover for alleged violations of wage-and-hour laws,

19  and moreover, the potential individual recovery that could be obtained by a Class Member and

20  FLSA Collective Member would not be significant enough to provide him or her with the

21  incentive to sue, and thus granting final approval of the Settlement would provide these

22  individuals with a resolution that provides certain and substantial recovery.  (Mot. 17.)

23       Accordingly, the Court finds that consideration of this factor weighs in favor of granting

24  final approval of the settlement in this action.

25       **d.    Amount Offered in Settlement**

26       "It is well-settled law that a cash settlement amounting to only a fraction of the potential

27  recovery will not per se render the settlement inadequate or unfair," and "[i]t is the complete

28  package taken as a whole, rather than the individual component parts, that must be examined for

1  overall fairness."  Officers for Justice, 688 F.2d at 628; In re Mego Fin. Corp. Sec. Litig., 213

2  F.3d 454, 459 (9th Cir. 2000) (same); Ontiveros v. Zamora, 303 F.R.D. 356, 370 (E.D. Cal.

3  2014) (same); see also City of Detroit v. Grinnell Corp., 495 F.2d 448, 455 (2d Cir. 1974) ("In

4  fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a

5  hundredth or even a thousandth part of a single percent of the potential recovery."), abrogated by

6  Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000).   "To determine whether a

7  settlement 'falls within the range of possible approval' a court must focus on 'substantive

8  fairness and adequacy,' and 'consider plaintiffs' expected recovery balanced against the value of

9  the settlement offer.' "   Collins v. Cargill Meat Sols. Corp., 274 F.R.D. 294, 302 (E.D. Cal.

10  2011) (quoting In re Tableware Antitrust Litig., 484 F.Supp.2d at 1080).

11        The settlement amounts and current estimated individual distributions, as currently

12  updated through supplemental briefing following the final approval hearing, are described above

13  in greater detail, supra Section IV(A)(2)-(5).  In relevant sum, Defendant has agreed to pay a

14  Maximum Settlement Amount of up to $600,000, with the Net Settlement Amount calculated by

15  deducting the following amounts from the Maximum Settlement Amount: (1) attorneys' fees of

16  $210,000 and reimbursement of litigation costs and expenses of $22,612.07 to Class Counsel; (2)

17  Incentive Awards of up to $6,000 total; (3) $3,750 to the LWDA for its share of the PAGA

18  Settlement Amount; and (4) Settlement Administration Costs of $16,000.  A twenty-five percent

19  (25%) portion of the PAGA Settlement Amount allocated to aggrieved employees ($1,250.00 of

20  a total $5,000.00), will remain part of the Net Settlement Amount.  Ninety-five percent (95%) of

21  the Net Settlement Amount, inclusive of the Employee's PAGA portion, is to be allocated to the

22  Class Settlement and available to be distributed to Claimants ("Class Settlement Amount"), and

23  the remaining five percent (5%) of the Net Settlement Amount is to be allocated to the FLSA

24  Settlement and distributed to FLSA Collective Members ("FLSA Settlement Amount").  The

25  current Net Settlement Amount is now estimated to be $341,637.93.  (Suppl. Simpluris Decl. ¶

26  16.)

27        The Class Settlement Amount, now estimated to be $324,556.03, is to be distributed to

28  Claimants based upon the number of Workweeks they worked as Property Employees during the

Settled Period.  Claimants have claimed approximately $78,374.56, or 21.45% of the Class Settlement Amount.  (Suppl. Simpluris Decl. ¶ 17.)  Because the 63% Minimum Distribution Floor was not met by the number of Claimants, Simpluris proportionately increased the Estimated Class Settlement Shares for each Claimant on a *pro rata* basis so that 63% of the Class Settlement Amount, or $204,470.30 of the total $324,556.03, will be distributed to the Claimants.  (Id. at ¶ 19.)  After adjusting each Claimants' Estimated Class Settlement Share so that the Minimum Distribution Floor is reached, the highest gross Estimated Class Settlement Share is approximately $4,883.07, the lowest gross Estimated Class Settlement Share is approximately $84.35, and the average gross Estimated Class Settlement Share is $1,390.95.  (Id. at ¶ 20.)

The FLSA Settlement Amount is now estimated to be $17,081.90, and will be distributed to FLSA Collective Members based upon their respective Workweeks compared to the number of Workweeks of all FLSA Collective Members.  The one hundred thirty-one (131) Collective Members represent 21.59% of the total Workweeks, and the entire FLSA portion of $17,081.90 will be distributed on a *pro rata* basis.  As of the time of the final approval hearing, the highest gross Estimated FLSA Settlement Share is estimated to be approximately $456.18, the lowest gross Estimated FLSA Settlement Share is estimated to be approximately $5.25, and the average gross Estimated FLSA Settlement Share is estimated to be $130.40.  (Id. at ¶ 21.)

Individual Settlement Payments will be allocated as one-third (1/3) wages and two-thirds (2/3) penalties and non-wage damages.  The Individual Settlement Payments will be reduced by the employee's share of payroll taxes and withholding on the wages portion of the Settlement Payments.  (Mot. 9; Agreement ¶ 17.)

The Employer Taxes will be paid from the Remainder, and if the Remainder is not sufficient to cover all the Employer Taxes, Defendant will pay an additional amount sufficient to cover the Employer Taxes.  (Mot. 9; Agreement ¶¶ 16, 31, 52, 62(a).)  As of the date of the final approval hearing, the estimated Employer Taxes that will be paid out of the unclaimed funds is approximately $14,674.33, and the estimated amount of unclaimed funds that will revert back to Defendant is approximately $105, 411.40.  (Suppl. Simpluris Decl. ¶ 22.)

In issuing the findings and recommendations recommending preliminary approval of the settlement, the Court conducted a review of the damages and valuation analysis provided by Class Counsel.  (ECF No. 24 at 29-35.)  The Court incorporates that review herein by way of reference.  Therein, the Court expressed significant concerns regarding the amount of settlement as discounted in relation to the analyses of initial valuations.  (Id.)  The undersigned stated that "[w]hile Plaintiffs put forth various reasoning for these steep discounts . . . counsel has not *exhaustively* explained the reasoning for the discounts, particularly as to the individual claims themselves," and noted that "given the amount the valuation has been discounted, some courts may not find such evidence sufficient, even at the preliminary approval stage [citations]."  (ECF No. 24 at 32.)  The Court determined that "[n]onetheless, the Court finds counsel's explanations sufficient for purposes of preliminary approval, taken in the context of the risks of continued litigation and settlement as a whole, with the caveat that more extensive explanation and support for the discounting may be needed to demonstrated fairness at the final approval hearing."  (ECF No. 24 at 33.)  The undersigned ultimately found that "[w]hile on the lower end of approved settlements, the amount is not, on its face, outside the bounds or range of reasonableness."  (ECF No. 24 at 33.)  In support of this finding, the Court provided a survey of nearly two dozen cases where courts approved settlements with deep discounts from originally proffered damages valuations, many of which where preliminary approval was granted with a warning to the parties that additional evidentiary support may be required at the final fairness hearing.  (ECF No. 24 at 33-35 n.20.)

As discussed above, prior to adopting the findings and recommendations on preliminary approval, the District Judge requested supplemental briefing regarding the potentially problematic aspects of the settlement agreement, including the estimated value of the claims, the reversionary clause, payment of payroll taxes out of individual settlement amounts, as well as the amount of attorneys' fees requested.   (ECF No. 26.)   Plaintiffs' supplemental briefing emphasized and built upon many of the reasons presented in the motion for preliminary approval for the discounting of the valuation in relation to the strengths and weakness of the case and risks of continued litigation.  (ECF No. 27 at 6-7.)  Plaintiffs' counsel filed a supplemental declaration

with quantification of the value of the claims and analysis, and why the estimates warranted such reductions.  (Id.; Suppl. Decl. Edwin Aiwazian Supp. Pls.' Mot. Prelim. Approval ("Aiwazian Suppl. Decl.") ¶¶ 8-69, ECF No. 27-1.)   In adopting the findings and recommendations on preliminary approval, the District Judge considered the reasons offered for discounting the maximum potential recovery, including: 1) overcoming Defendant's arguments and evidence that it properly provided meal and rest breaks, paid for all hours of work, and properly reimbursed business expenses; 2) the obstacles inherent in satisfying the requirements to certify a class, certify a collective, and satisfy manageability requirements; 3) the challenges of proving the elements of each cause of action; 4) the derivative nature of many of the claims; 5) the costs and expenses of further litigation; and 6) the recovery rate, even if Plaintiff were to prevail, after years of continued and costly litigation.  (ECF No. 28 at 5.)  The Court noted that while a larger award was theoretically possible, the Court would adopt the findings and recommendations recommending preliminary approval.  (ECF No. 28 at 6.)[5]

---

[5]  In the order granting preliminary approval following supplemental briefing, the District Judge noted the Court's calculations differed slightly than those provided in supplemental briefing, stating it appeared "particularly because plaintiffs used a different figure for the FLSA minimum wages claim in their supplemental briefing."  (ECF No. 28 at 3 n.1.)  The District Judge directed Plaintiffs to address this discrepancy in advance of the final approval hearing.  (Id.)  In the declaration attached to the motion for attorneys' fees, Plaintiffs' counsel states the "discrepancy in the value of the minimum wage claim under FLSA in the declarations filed in support of the Motion for Preliminary Approval was due to an inadvertent typographical error in the formula when the numbers were transferred over from the valuation/damages models to the declaration that was filed on November 25, 2019.  The correct estimated value of the liquidated damages of the minimum wage claim under the FLSA is $232,957, as state[d] in the declaration filed on June 4, 2020."  Thus, Plaintiffs proffer the original calculations were based on a typographical error that showed an original valuation for the failure to pay minimum wages under the FLSA claim of $601,189.72 (Aiwazian Prel. Decl. ¶ 26(d)), when the correct original valuation the claim should have been $232,957.

As set forth in the findings and recommendations on preliminary approval (ECF No. 24 at 31), the original discounted valuation calculation for the FLSA claim was calculated by cutting the valuation by 50%, then 75%, and again 75% ($601,189.72 × 0.5 x .25 x .25 = $18,787.18).  Thus, the discounted valuation was approximately 3.1% of the original ($18,787.18 ÷ $601,189.72 = 0.03125).  The grand total valuation based on these earlier numbers was discounted from $11,353,147.53 to $591,798.32, and thus the previous discounted total valuation was approximately 5.21% of the of the original ($591,798.32 ÷ $11,353,147.53 = 0.0521).

The updated discounted valuation for the FLSA minimum wage claim was discounted in the same manner ($232,957.00 × 0.5 × 0.25 × 0.25 = $7,279.91), and thus the new discounted valuation on the FLSA minimum wage claim represents the same proportion ($7,279.90625 ÷ $232,957.00 = 0.03125).  The new grand total valuation based on the supplemental briefing's numbers was discounted from $10,984,917.81 to $580,291.05, and thus the new discounted total valuation is approximately 5.28% of the original ($580,291.05 ÷ $10,984,917.81 = 0.0528).  Thus, the valuation discount based on the corrected numbers appears to slightly show a more favorable reduction to Plaintiffs in percentage terms.  The total $600,000 settlement is also now a larger proportion of the lowered total: ($600,000.00 ÷ $11,353,147.53 = 0.0528)  vs.  ($600,000.00 ÷ $10,984,917.81 = 0.05462).

Below, in applying the required stricter level of scrutiny for pre-certification settlements and reviewing the agreement for the presence of potential signs of collusion, the Court addresses the reversionary aspect of the settlement agreement. The Court also further addresses the amount of attorneys' fees in relation to the sufficiency of the settlement.

For all of the reasons discussed herein pertaining to the course of litigation since 2014, the risks of continued litigation, the strengths and weaknesses of Plaintiffs' case, the fact that the settlement was reached with the use of an experienced mediator in this field, the supporting declarations and analyses provided regarding damages valuations throughout settlement negotiations provided to the Court at preliminary approval and supplemental briefing, the Court finds the amount of the settlement weighs in favor of final approval. The Court again references the survey of cases pertaining to discounted settlement amounts cited in the findings and recommendations on preliminary approval. (ECF No. 24 at 33-35 n.20.) And again, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." Adoma v. Univ. of Phoenix, Inc., 913 F. Supp. 2d 964, 976 (E.D. Cal. 2012) (quoting Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998)). "[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements [and a] proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." Linney, 151 F.3d at 1242 (quoting Officers for Justice, 688 F.2d at 625). As the Ninth Circuit explained:

> We are not persuaded otherwise by Objectors' further submission that the court should have specifically weighed the merits of the class's case against the settlement amount and quantified the expected value of fully litigating the matter. For this they rely on the Seventh Circuit's opinion in *Synfuel Tech., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646 (7th Cir.2006), which follows that circuit's precedent requiring district courts to determine the strength of the plaintiff's case on the merits balanced against the amount offered in settlement by " 'quantifying the net expected value of continued litigation to the class.' " *Id.* at 653 (quoting *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 284–85 (7th Cir.2002)). To do this, the Seventh Circuit directs courts to " 'estimate the range of possible outcomes and ascrib [e] a probability to each point on the range.' " *Id.* However, our approach, and the factors we identify, are somewhat different. We put a good deal of stock in the product of an arms-length, non-collusive, negotiated

resolution, *Hanlon,* 150 F.3d at 1027; *Officers for Justice,* 688 F.2d at 625, and have never prescribed a particular formula by which that outcome must be tested. As we explained in *Officers for Justice,* "[u]ltimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." 688 F.2d at 625 (internal quotation marks and citation omitted). The Seventh Circuit also recognizes that precision is impossible, and that even its more structured approach is apt to produce only a "ballpark valuation." *Synfuel,* 463 F.3d at 653.

In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value.

Rodriguez v. West Publ'g Corp., 563 F.3d at 965; see also Ontiveros, 303 F.R.D. at 371 ("The court finds no reason to doubt class counsel's assertion that a $3,680.19 average payout is a good result in a wage and hour case involving blue collar workers . . . Additionally, class counsel's proposed formula for apportioning the settlement to class members appears to be well-researched . . . Although the court is ill equipped to conclude how the $3,680.19 average payout compares to actual damages recoverable at trial, the overall terms of the settlement appear fair.").

Consistent with the reasons stated in the findings and recommendations recommending preliminary approval, as strengthened by the supplementary materials filed by counsel regarding the valuation of the claims considered by the Court in adopting the findings and recommendations on preliminary approval, and the reasons discussed above, the Court finds that the settlement amount in this case is appropriate and fair. Thus, consideration of this factor also weighs in favor of final approval.

       i.    PAGA Penalty Claims

The Court briefly and separately addresses the PAGA penalty claims.

Civil penalties recoverable under the California Labor Code Private Attorneys General Act of 2004, Labor Code section 2698, *et seq.* ("PAGA"), are being settled here for $5,000.00, of which seventy-five percent (75%), or $3,750.00, will be paid to the California Labor Workforce Development Agency ("LWDA"), and twenty-five percent (25%), or $1,250.00, will be part of the Net Settlement Amount for distribution to the Class Members. (ECF No. 32 at 2-3; Mot. 4, 8.)

1    In the class action context, where PAGA claims are also often brought, a district court

2  must independently determine that a proposed settlement agreement is "fundamentally fair,

3  adequate and reasonable" before granting approval.  See Officers for Justice, 688 F.2d at 625;

4  see also In re Heritage Bond Litigation, 546 F.3d 667, 674–75 (9th Cir. 2008).  The LWDA has

5  provided some guidance regarding court approval of PAGA settlements.  See Gutilla v. Aerotek,

6  Inc., No. 115CV00191DADBAM, 2017 WL 2729864, at *2 (E.D. Cal. Mar. 22, 2017)

7  (discussing California Labor and Workforce Development Agency's Comments on Proposed

8  PAGA Settlement ("LWDA Comments") (citing O'Connor v. Uber Techs., Inc., 201 F. Supp. 3d

9  1110, 1133 (N.D. Cal. 2016)).

10    In O'Connor, where both class action and PAGA claims were covered by a proposed

11  settlement, the LWDA stated that:

12       It is [] important that when a PAGA claim is settled, the relief provided for under
         the PAGA be genuine and meaningful, consistent with the underlying purpose of
13       the statute to benefit the public and, in the context of a class action, [it is
         important that] the court evaluate whether the settlement meets the standards of
14       being "fundamentally fair, reasonable, and adequate" with reference to the public
         policies underlying the PAGA.
15

16  Id.

17    The proposed $5,000.00 penalty payment in this case represents less than one percent

18  (0.83%) of the estimated $600,000.00 gross settlement amount.  This amount falls within the

19  range of previously approved comparable PAGA penalties in other class actions, in this court

20  and others.  See Wise v. Ulta Salon, Cosmetics & Fragrance, Inc., No. 117CV00853DADEPG,

21  2020 WL 1492672, at *5 (E.D. Cal. Mar. 27, 2020) (approving $75,000 PAGA penalty, or

22  approximately 2% of $3.4 million gross settlement); Garcia v. Gordon Trucking, Inc., No. 1:10-

23  cv-0324-AWI-SKO, 2012 WL 5364575, at *7 (E.D. Cal. Oct. 31, 2012) (approving $10,000

24  PAGA penalty, or approximately 0.27% of 3.7 million gross settlement); Chu v. Wells Fargo

25  Investments, LLC, No. C-05-4526-MHP, 2011 WL 672645, at *1 (N.D. Cal. Feb. 16, 2011)

26  (approving $10,000 PAGA penalty, or approximately 0.14% of $6.9 million gross settlement).

27    Having reviewed the parties' submission and the terms of the proposed settlement, the

28  Court finds that the settlement amount related to Plaintiffs' PAGA claims is fair, reasonable, and

1  adequate in light of the public policy goals of PAGA.  Because of the risks associated with the

2  pursuit of further litigation in this action articulated above, the Court finds that the amount

3  offered in settlement of the PAGA claims here weighs in favor of final approval of the

4  settlement.

5          **e.      Extent of Discovery Completed and Stage of the Proceedings**

6          It is appropriate for the Court to consider whether the process by which the parties

7  arrived at their settlement is truly the product of arm's length bargaining, rather than collusion or

8  fraud.  Millan v. Cascade Water Servs., Inc., 310 F.R.D. 593, 613 (E.D. Cal. 2015)  "A

9  settlement following sufficient discovery and genuine arms-length negotiation is presumed fair."

10  Adoma, 913 F. Supp. 2d at 977 (quoting DIRECTV, Inc., 221 F.R.D. at 528).[6]  A settlement that

11  occurs in an advanced stage of the proceedings indicates that the parties have carefully

12  investigated the claims before resolving the action.  Ontiveros, 303 F.R.D. at 371 (citing Alberto

13  v. GMRI, Inc., Civ. No. 07–1895 WBS DAD, 2008 WL 4891201, at *9 (E.D.Cal. Nov. 12,

14  2008)).  "In the context of class action settlement, 'formal discovery is not a necessary ticket to

15  the bargaining table' where the parties have sufficient information to make an informed decision

16  about settlement."  Linney, 151 F.3d at 1239 (quoting In re Chicken Antitrust Litig., 669 F.2d

17  228, 241 (5th Cir. 1982)).  Approval of a class action settlement thus "is proper as long as

18  [formal or informal] discovery allowed the parties to form a clear view of the strength and

19  weaknesses of their case."  Monterrubio v. Best Buy Stores, L.P., 291 F.R.D. 443, 454 (E.D. Cal.

20  2013).

21          Here the settlement was reached prior to class certification but after significant discovery

22  and after attending mediation.  At preliminary approval, the Court discussed and reviewed the

23  extent of discovery, negotiations, mediation, and other information concerning the stage of

24

---

25  [6]  However, as noted above, when the settlement takes place before formal class certification, as it has in this
instance, settlement approval requires a "higher standard of fairness."  Lane v. Facebook, Inc., 696 F.3d at 819

26  (quoting Hanlon, 150 F.3d at 1026).  This more exacting review of class settlements reached before formal class
certification is required to ensure that the class representatives and their counsel do not receive a disproportionate

27  benefit "at the expense of the unnamed plaintiffs who class counsel had a duty to represent."  Id.  As recently
emphasized by the Ninth Circuit, this requires courts to apply "an even higher level of scrutiny for evidence of

28  collusion or other conflicts of interest than is ordinarily required under Rule 23(e)."  Roes, 1-2 v. SFBSC Mgmt.,
LLC, 944 F.3d at 1043 (quoting In re Bluetooth, 654 F.3d at 946).

proceedings prior to reaching settlement.  (ECF No. 24 at 26-28.)  In the present motion, Plaintiffs again largely emphasize the same facts.  (Mot. 13.)  The parties engaged in significant formal and informal discovery since this action was instituted in state court in 2014, filed multiple motions in the state court, and participated in a mediation prior to reaching settlement. Plaintiffs proffer that in addition to interviews of Plaintiffs and class members, they reviewed and analyzed thousands of pages of data and documents, including: (1) Plaintiffs' and Class Members' employment records, including detailed time and pay records; (2) Defendant's Employee Handbook which contains policies and procedures pertaining to meal and rest periods, timekeeping requirements, dress code standards, overtime, and reimbursements; (3) class-wide data regarding class-size, number of workweeks, pay periods, and terminations; (4) Defendant's arbitration agreement; (5) Defendant's standard employment agreement; (6) Defendant's new employee checklist; (7) job descriptions for various positions; (8) Defendant's memorandum pertaining to cell phones; (9) Defendant's mileage expense report form; (10) Defendant's Employee Handbook Acknowledgement form; (11) Defendant's Business Mileage Reimbursement Policy; (12) a list of all current and former properties managed by Defendant; (13) agendas from internal meetings; (14) emails and internal memoranda; and (15) numerous other documents regarding Defendant's employment policies, practices, and procedures.  (Mot. 13-14; Aiwazian Fees Decl. ¶ 6.)  Plaintiffs state that these documents provided Class/Collective Counsel with a critical understanding of the nature of the work performed by Class Members and Defendant's written and unwritten policies, practices and procedures, and this information was utilized in analyzing liability and damages in various stages of litigation, and ultimately in mediation and settlement negotiations thereafter.  (Mot. 14.)

Further, depositions of Defendant's President as person most knowledgeable, Defendant's Regional Director, as well as a Class Member, were completed.  (Mot. 14; Aiwazian Fees Decl. ¶ 6.)  The deposition of the Defendant's President lasted two days.  (Id.)  Plaintiffs and Defendant both propounded and responded to multiple sets of written discovery requests.

(Id.)  The parties engaged in a <u>Belaire-West</u> notice administration,[7] by which Class/Collective Counsel obtained the contact information of Class Members who did not opt-out of the disclosure of their information.  (Id.)  Significantly, the parties reached settlement after reviewing the above discussed evidence and then participating in a mediation conducted by Paul Grossman, "a well-respected mediator experienced in handling complex wage-and-hour matters, and extensive negotiations thereafter."  (Mot. 14; Aiwazian Fees Decl. ¶ 8.)  Prior to and during the negotiations, the parties exchanged information and discussed various factors, including the risks and delays of further litigation, proceeding with class and collective certification, the law relating to off-the-clock theory, meal and rest periods, wage-and-hour enforcement, FLSA claims, and PAGA representative claims, the evidence and analysis thereof, the possibility of appeals, the risks to recovery, and the "continued employment of current-employee Class Members in light of Defendant's limited financial resources and precarious financial circumstances."  (Mot. 14-15; Aiwazian Fees Decl. ¶ 8.)

The fact that the parties believe they engaged in sufficient discovery to evaluate the merits of the action weighs in favor of approving the class action settlement.  Based on that discovery, the parties engaged in a private mediation with an experienced mediator, which aided in forming the settlement agreement now pending before the Court for final approval.  The course of litigation leading to the mediation and the use of mediation to reach settlement weigh in favor of approving the settlement.  See <u>Ontiveros</u>, 303 F.R.D. at 371 ("The parties use of mediation, which took place after significant discovery, and their reliance on the mediator's proposal in settling demonstrates the parties considered a neutral opinion in evaluating the strength of their arguments [and] [a]ccordingly, the parties' apparent careful investigation of the claims and their resolution in consideration of the views of a third party mediator weigh in favor of settlement."); <u>Millan</u>, 310 F.R.D. at 613 ("Participation in mediation prior to a settlement 'tends to support the conclusion that the settlement process was not collusive.' ") (quoting

---

[7]  A <u>Belaire-West</u> notice is where putative class members are provided with a written notice informing them of the lawsuit and giving them an opportunity to opt-out of contact by plaintiffs' counsel.  See <u>Austin v. Foodliner, Inc.</u>, No. 16CV07185HSGDMR, 2018 WL 1168694, at *1 (N.D. Cal. Mar. 6, 2018); <u>Belaire-W. Landscape, Inc. v. Superior Court</u>, 149 Cal. App. 4th 554, 557-58 (2007).

1  Palacios v. Penny Newman Grain, Inc., 2015 WL 4078135 (E.D.Cal. July 6, 2015)) (quotation
2  marks omitted).

3       Based on the facts reiterated above, the reasons discussed in the Court's findings and
4  recommendations recommending granting preliminary approval, and the applicable legal
5  standards, the Court finds the extent of discovery and the stage of proceedings weigh in favor of
6  final approval of the settlement.  These facts, particularly the protracted nature of the litigation in
7  combination with the attendance of mediation and tenor of settlement negotiations also indicate
8  that the parties' negotiations constituted genuine and informed arm's length bargaining, though the
9  Court further scrutinizes whether aspects of the Agreement indicate any collusion below as
10  required for pre-certification settlements.

11       Accordingly, the Court concludes that consideration of this factor also weighs in favor of
12  granting final approval.

13       **f.    Experience and Views of Counsel**

14       The Court is to accord great weight to the recommendation of counsel because they are
15  aware of the facts of the litigation and in a better position than the court to produce a settlement
16  that fairly reflects the parties' expected outcome in the litigation.  DIRECTV, 221 F.R.D. at 528.

17       Class/Collective Counsel proffer they have extensive experience in handling complex
18  wage-and-hour matters, including significant experience in employment class action litigation.
19  (Mot. 16, 22; Aiwazian Fees Decl. ¶¶ 15-18; Decl. Heather Davis Supp. Mot. Final Approval
20  ("Davis Decl.") ¶¶ 7-10, ECF No. 33-5.)  Specifically, the two law firms representing Plaintiffs
21  have been appointed class counsel in numerous complex wage-and-hour cases, and have
22  recovered millions of dollars for individuals in California, and overall, argue that both sides'
23  counsel were capable of assessing the strengths and weaknesses of the Class Members' claims
24  against Defendant, and determining the benefits of the settlement under the circumstances of this
25  case and in the context of the settlement negotiations.  (Id.)  The Court previously found the
26  same when conditionally certifying the class and determining the adequacy of representation.
27  (ECF No. 24 at 20.)

28       Based on their experience and qualifications, investigation of the disputed factual and

1   legal issues involved in this case, and evaluation of the risks of continued litigation, each of these

2   attorneys have concluded that this settlement is fair and reasonable.  (Mot. 22.)  Consideration of

3   class counsel's experience and expressed opinions in this regard also weighs in favor of final

4   approval of the settlement.

5          **g.      Presence of a Governmental Participant**

6          While there is no direct governmental party in this action, above, the Court discussed the

7   sufficiency of the PAGA portion of the settlement and payment of to the California LWDA.  At

8   least one court has found such aspect of the settlement weighs in favor of approval.  See Adoma,

9   913 F. Supp. 2d at 977 ("Plaintiffs sought to enforce claims under California's Private Attorney

10  General Act of 2004 . . . on behalf of the state and affected employees . . . settlement will result

11  in a $50,000 payment to the California Labor and Workforce Development Agency [and thus]

12  [t]his factor weighs in favor of approval.").

13         Accordingly, this factor either weighs in favor of approval or is not at issue.

14         **h.      Reaction of the Class Members**

15         "It is established that the absence of a large number of objections to a proposed class

16  action settlement raises a strong presumption that the terms of a proposed class settlement action

17  are favorable to the class members."  DIRECTV, 221 F.R.D. at 529 (citations omitted).

18         Above, the Court described the process by which the Settlement Administrator mailed

19  Notice Packets to the Class Members, the successful additional efforts to locate addresses for

20  Notice Packets that were returned undeliverable, as well as the Court approved stipulation to

21  mail out additional Notice Packets to increase the rate of claims.

22         As of the date of the hearing on the motion for final approval, following the return of

23  Claim Forms, the Rule 23 class here consists of one hundred forty-seven (147) members, and

24  one hundred thirty-one (131) members opted into the FLSA collective action.  (Suppl. Simpluris

25  Decl. ¶¶ 11-13.)  The Settlement Administrator has not received any objections to the Class

26  Settlement, has received only one request for exclusion, and received two (2) Workweeks

27  dispute forms from Class Members, which have been resolved.  (Id.; Mot. 11, 22-23; Simpluris

28  Decl. ¶¶ 10-11.)  Additionally, no class members appeared at the final fairness hearing to raise

1   any objections to the settlement.  The absence of any objections is compelling evidence that the

2   settlement is fair, adequate and reasonable.  DIRECTV, 221 F.R.D. at 529 ("The absence of a

3   single objection to the Proposed Settlement provides further support for final approval of the

4   Proposed Settlement."); Barcia v. Contain-A-Way, Inc., No. 07-cv-938-IEG-JMA, 2009 WL

5   587844, at *4 (S.D. Cal. Mar. 6, 2009) ("The absence of any objector strongly supports the

6   fairness, reasonableness, and adequacy of the settlement.").

7          Accordingly, consideration of this factor weighs in favor of granting final approval.  In

8   sum, after considering all of the above eight factors, the court finds on balance that the settlement

9   is fair, reasonable, and adequate.  See Fed. R. Civ. P. 23(e); Staton, 327 F.3d at 953; Hanlon, 150

10  F.3d at 1026.  The Court now turns to determine to what extent any of the "more subtle signs" of

11  collusion recognized by the Ninth Circuit are present here.

12         **j.     Signs of Collusion**

13         Where a class action is settled prior to class certification, the Court must also consider

14  whether there is evidence of collusion or other conflicts of interest before approving the

15  settlement.  In re Bluetooth, 654 F.3d at 946.  The Ninth Circuit has provided examples of signs

16  that a settlement is the product of collusion between the parties, such as "(1) when counsel

17  receive a disproportionate distribution of the settlement, or when the class receives no monetary

18  distribution but class counsel are amply rewarded; (2) when the parties negotiate a 'clear sailing'

19  arrangement providing for the payment of attorneys' fees separate and apart from class funds . .

20  .; and (3) when the parties arrange for fees not awarded to revert to defendants rather than be

21  added to the class fund."  Id. at 947.

22         Here, the settlement agreement does contain a reversion clause that allows for funds to

23  revert back to Defendant.  Class Counsel is seeking an award of attorneys' fees above the typical

24  benchmark in the Ninth Circuit, however, the agreement no longer contains an express "clear

25  sailing" provision, and as the Court finds below in reviewing the concurrently filed motion for

26  attorneys' fees, the fee request is not unreasonable under the relevant factors and standards to the

27  point where it appears to be a result of collusion.

28         In recommending granting the motion for preliminary approval, the Court stated the

38

1   following as to the undersigned's inclination toward reducing the requested attorneys' fees, and

2   the fact there was no longer an express clear sailing agreement in the Settlement Agreement,

3   following the state court's disapproval of such provision:

> First, counsel seeks an award of attorneys' fees in the amount of thirty-five percent (35%) of the Maximum Settlement Amount. This amount is not *per se* excessive, and as the Court discusses in the next section, the Court is not likely to approve an amount over the Ninth Circuit's benchmark of twenty-five percent (25%) absent a showing that counsel achieved extraordinary results or otherwise prove they are entitled to such an amount. Given the Court's inclination to reduce the fee award, the Court finds it significant that the Agreement explicitly provides that should the Court approve a fee award of less than thirty-five percent, the difference "shall become part of the Net Settlement Amount." (Agreement ¶ 63(d).) Of further significance, the Agreement no longer contains an express clear sailing agreement. The state court previously voiced concerns with the previous settlement agreement's fee provision which expressly stated that "Defendant will not oppose" an award of up to thirty-five percent (35%). (ECF No. 1-10 at 62, 213.) The Agreement now does not contain such language. (Agreement ¶¶ 19; 63.)

12   (ECF No. 24 at 36.) While the agreement no longer contains an express clear sailing agreement,

13   it is not clear what practical effect the absence has on the inclination of a defendant to oppose the

14   attorneys' fee award.

15      The Court then made the following findings regarding the reversionary aspect of the

16   settlement agreement:

> Turning to the reversionary aspect of the Agreement, Plaintiffs argue that the reversion to employer is fair in this case because this is not the case where there is a risk that Defendant will retain funds that correspond to an injury suffered by a Class Member, as the claims process allows all employees who claim an injury to recovery, and only those amounts that do not correspond to any injuries (i.e. unclaimed amounts) will revert to Defendant. Plaintiffs also argue the reversion is fair because: (1) there is a high Minimum Distribution Floor of 63% of the Class Settlement Amount; [Footnote 22 here reads: "The Court notes that following denial of the proposed settlement by the state court, the parties have now raised the minimum distribution floor from 50% to 63%. (ECF No. 1-16 at 8; 1-10 at 61-62.) The Court finds this enhancement to be a significant change in favor of the Class Members."] (2) the parties have agreed to take steps to increase participation in the settlement, including by causing Notice Packets to be mailed to each Class Member and then following up with those who do not respond by sending reminder post cards; (3) the Class Notice fully informs Class Members about the potential for unclaimed Class Settlement Amounts to be retained by Defendant; (4) reversion was a factor during mediation and settlement negotiations which was the product of arms' length non-collusive negotiations agreed upon by Plaintiffs and Class/Collective Counsel. (Mot. 23.)

> Weighing these considerations, the Court finds the reversion provision to be within the bounds of reasonableness. See Glass v. UBS Fin. Servs., Inc., 331 F. App'x 452, 456 (9th Cir. 2009) (approving reversion clause that allowed any

reduction in attorney's fees to revert to defendant) [Footnote 23 here reads: "Again, of significance here, the Agreement provides that in "the event the Court approves a lesser Fees and Costs Award than Class/Collective Counsel request, the difference between (i) the amount requested by Class/Collective Counsel and (ii) the amount actually awarded by the Court shall become part of the Net Settlement Amount." (Agreement ¶ 63(d).)  While such reduction in attorney's fees may ultimately revert back to Defendant, it will not if sufficient claim forms are returned."]; Hightower v. JPMorgan Chase Bank, N.A., No. CV111802PSGPLAX, 2015 WL 9664959, at *2, 6 (C.D. Cal. Aug. 4, 2015) (approving final approval of settlement agreement with reversion clause and 65% minimum distribution floor with amounts not awarded as attorney's fees funneling back to net settlement amount and noting that while the "reversion clause certainly makes the Court suspicious, but in this instance, after reviewing the respective positions of the Parties, and considering the many weaknesses of Plaintiffs' case, the Court is persuaded that the reversion clause does not make the Settlement Agreement unfair nor does it show collusion among the parties."); Davis v. Brown Shoe Co., Inc., No. 113CV01211LJOBAM, 2015 WL 6697929, at *6 (E.D. Cal. Nov. 3, 2015) (recommending final approval where defendant retained approximately 58% of the unclaimed funds as class members were adequately notified of retention of unclaimed funds and had opportunity to participate, and no objections were filed, citing four cases in the Eastern District of California where reversions were approved in amounts ranging from 45% to 75% of the net settlement funds); Garcia v. City of King City, No. 14-CV-01126-BLF, 2017 WL 363257, at *9 (N.D. Cal. Jan. 25, 2017) (reversion approved in part because product of arm's length, non-collusive negotiations and assistance of magistrate judge in settlement negotiations); Minor v. FedEx Office & Print Servs., Inc., No. C09-1375 TEH, 2013 WL 503268, at *4 (N.D. Cal. Feb. 8, 2013) (finding reversion clause not "inherently inadequate" for purposes of preliminary approval where there was a minimum distribution floor of 45%, a contention that reversion was essential for defendant to agree to settlement, and parties anticipated a relatively high claim rate). [Footnote 24 here reads: "Plaintiffs cite Dyer v. Wells Fargo Bank, N.A., 303 F.R.D. 326, 330 (N.D. Cal. 2014), in support of their argument that the reversion clause is fair. However, in Dyer, the court was unconcerned with the reversion because it was not a typical reversion clause "in which money allocated to a class member, but unclaimed by her, reverts to the Defendant," but rather was one where the funds reverted back to defendant corresponding to those members who opted out of the class.  303 F.R.D. at 331 n.1.  Therefore, the case does not strengthen Plaintiffs' position here where the reversion corresponds to funds unclaimed by Class Members."]

Significantly as well, courts have voiced concern where portions of settlement funds relating to FLSA claims revert back to the defendant.  See Millan, 310 F.R.D. at 612 (noting "that where a statute's objectives include deterrence, as does the FLSA's, it would contradict these goals to permit the defendant to retain unclaimed funds," and denying preliminary approval in part because the settlement agreement failed to separate the settlement fund based on the FLSA claims and because the unclaimed FLSA portion was part of the reversion to defendant) (internal quotations and citations omitted).  Here, although the portion of the settlement allocated to the FLSA claim is relatively small compared to the total portion (5%), it does not revert back to Defendant.  (Mot. 13; Agreement ¶ 69(b).)

Considering all of the factors discussed above, the Court finds the claims-made process is fair, reasonable and adequate.  See Nur v. Tatitlek Support Servs., Inc., No. 15CV00094SVWJPRX, 2016 WL 3039573, at *3 (C.D. Cal. Apr. 25,

2016) (approving claims-made settlement with reversion of funds to the employer, and listing sixteen (16) cases wherein courts approved claims-made settlements with reversion of the unclaimed funds to the employer, described as "only a small sample" of such cases).

(ECF No. 24 at 36-38.)

Prior to adopting the findings and recommendations on preliminary approval, the District Judge requested supplemental briefing regarding the reversionary aspect of this settlement. As explained in the order adopting, the District Judge "had, and continues to have, serious concerns regarding the reasonableness of that reversion clause," and "directed the parties to submit supplemental briefing addressing the fairness and reasonableness of reverting unclaimed amounts above the Minimum Distribution Floor to defendant's share of payroll taxes and contributions (Employer Taxes), and the remaining amount to be retained by defendant (the Remainder) [and] further directed submission of supplemental documentation regarding the estimate of the Employer Taxes with respect to the wages portion of the settlement." (ECF No. 28 at 7.)[8]

In supplemental briefing, Plaintiffs asserted the reversionary component of the settlement is fair and reasonable for the following reasons: 1) the Class Notice fully informs Class Members about the structure of the Settlement (including the reversionary clause) in clear terms, and therefore, are able to make informed decisions on whether to participate; 2) the parties are working to enhance participation; 3) the reversion clause is the product of an arm's-length negotiation facilitated by a mediator; and 4) the "Minimum Distribution Floor (63% of the Class Settlement Amount) guarantees that Class Members will receive significant percentages of settlement funds." (ECF No. 27 at 22–23.)

In adopting the recommendation to preliminarily approve the settlement, the District Judge acknowledged that reversionary clauses are disfavored, but are reasonable "under some

---

[8] On June 4, 2020, Plaintiffs provided the Court with supplemental documentation estimating its employer payroll taxes and contributions as approximately $21,895.13, (ECF No. 27 at 24; Suppl. Aiwazian Decl. ¶ 4), and as noted by the District Judge, the supplemental briefing's projections of expected taxes assumed a 100% claims rate. Based on the 100% claims rate, the Maximum Settlement Amount of $600,000, with $329,250 available as the Net Settlement Amount for distribution to Claimants and FLSA Collective Members, the employer taxes represent approximately 3.7% of the Maximum Settlement Amount and 6.7% of the Net Settlement Amount. (ECF No. 28 at 8.)

1  unique circumstances." (ECF No. 28 at 9.)   The District Judge accepted the terms of the

2  settlement at preliminary approval, however, forewarned the parties of the need to demonstrate

3  Defendant would not receive an unwarranted windfall in order for the Court to grant final

4  approval:

> In light of the reasons cited in the supplemental submissions, as well as the parties' assertions regarding the weaknesses of plaintiffs' case, the court will at this time adopt the magistrate judge's finding that the reversion provision is arguably within the bounds of reasonableness, but will do so only for purposes of granting preliminary approval. At the final approval stage, the parties must be prepared to more fully develop their justifications for the court's permitting defendant to, in effect, retain unclaimed funds, clearly addressing whether defendants will likely enjoy a windfall as a result and, if so, demonstrating the fairness of the provision under the circumstances of this case. The parties are forewarned that if it appears defendants are likely to receive an unwarranted windfall from the reversion, the court is unlikely to grant final approval of the settlement. *See Wilson v. Metals USA, Inc*., No. 2:12-cv-00568-KJM-DB, 2019 WL 1129117, at *7 (E.D. Cal. Mar. 12, 2019).

12  (ECF No. 28 at 9.)   In their motion for final approval, Plaintiffs largely elaborate on the

13  arguments made in supplemental briefing.   (Mot. 19.)   In sum, Plaintiffs argue: the claims

14  process here allows any employee who claims an injury to recover, and thus only those amounts

15  not corresponding to any injury, the unclaimed funds, revert to Defendant; to lessen the concern

16  of a potential windfall to Defendant, the parties undertook additional "exceptional" efforts to

17  increase the claims rate, including negotiating an additional reminder mailing and extension of

18  the deadline to submit claims; caselaw finds such reversions can be proper, and that here, the

19  Parties have agreed to terms where less than 40% of the unclaimed funds revert to Defendant, a

20  proportion smaller than approved by this and other courts; and the reversionary aspect was the

21  product of arms'-length settlement negotiations facilitated by a well-respected mediator,

22  "allaying any concerns of potential collusion." (Mot. 20-1.)

23       First, while it does not allay all concerns of potential collusion, the course of negotiation

24  through a well-respected mediator in this field does weigh in favor finding the settlement fair.

25  See In re Bluetooth, 654 F.3d at 948 ("[The mere presence of a neutral mediator, though a factor

26  weighing in favor of a finding of non-collusiveness, is not on its own dispositive of whether the

27  end product is a fair, adequate, and reasonable settlement agreement.").

28       Plaintiffs proffer that perhaps most significant are the efforts to notify and increase claim

42

rates, emphasizing the parties provided a Notice Packet with a full explanation of the possibility of reversion, and engaged in repeated and robust efforts to reach Class Members and Proposed FLSA Collective Members and remind them of their opportunity to participate in the Settlement, including: (1) the Settlement Administrator processed the Class List by utilizing the National Change of Address Database ("NCOA") to ensure the Notice Packets were sent to the most up-to-date addresses; (2) the notice sent on August 21, 2020, explained "Defendant will pay no less than sixty-three (63%) of the Class Settlement Amount ('Minimum Distribution Floor')"; (3) the Settlement Administrator conducted skip traces to locate updated addresses for Notice Packets returned as undeliverable, located one hundred ninety (190) updated addresses, re-mailed the Notice Packets to the newfound addresses, and ultimately, only twenty-two (22) out of nine hundred twenty (920) Notice Packets remained undeliverable (Simpluris Decl. ¶ 8); (4) on September 18, 2020, the Settlement Administrator sent a reminder postcard to all Class Members/Proposed FLSA Collective Members who had not yet submitted a Class Claim Form (Simpluris Decl. ¶ 9, Reminder Postcard, Ex. E); (5) Defendant's counsel represented that Defendant engaged in informal internal efforts to encourage current employees to exercise their right to participate in the Settlement; and (6) in December of 2020, in an effort to boost participation, the Parties stipulated to send an additional reminder to non-participating Class Members to provide them an additional 30 days to participate in the Settlement (ECF No. 31), and the reminder postcard was sent on December 28, 2020, extending the deadline to submit Claim Forms until January 27, 2021 (Simpluris Decl. ¶ 15).  Based on these actions the parties have undertaken to ensure that Class Members are fully informed and have had multiple opportunities to participate in the Settlement, Plaintiffs argue it cannot be said that Defendant stands to realize an improper "windfall."

The Court finds the minimum distribution floor of 63% along with the notice's substantive format and the procedure for ensuring adequate notice, the initial reminder postcards, the negotiated extension of the deadline with additional reminder notices, and the absence of objections, weighs in favor of finding the settlement, the reversion clause, and the attorneys' fees aspects, to be fair and reasonable.  See, e.g., Davis v. Brown Shoe Co., Inc., Case No. 1:13-cv-

1    01211 (LJO) (BAM), 2015 WL 6697929 (E.D. Cal. 2015) (recommending final approval where

2    class members were adequately notified of retention of any unclaimed net settlement funds by

3    defendant and had the opportunity to participate)[9]; Hightower v. JPMorgan Chase Bank, N.A.,

4    No. CV111802PSGPLAX, 2015 WL 9664959 (C.D. Cal. Aug. 4, 2015) (reversion approved

5    where parties took steps to increase participation such as sending reminder postcards).[10]   These

6

7    [9]  In Davis, in approving the reversion, the court considered the notification provided to the class members, the
     absence of objections, and other cases within the Eastern District where the court approved other significant
8    reversion amounts:

9         Initially, the Court questioned Defendant's retention of unclaimed net settlement funds, which in this
          instance amounts to $552,250 ($952,250 - $400,000). The Court extensively questioned the parties
10        regarding this retention amount at oral argument and requested supplemental briefing. (Doc. 77, 78.)
          Considering the briefs and the parties' arguments, the Court finds that the total amount offered in
11        settlement favors final approval. In this instance, class members were notified not only of the gross
          settlement amount ($1,500,000), but also of the net settlement amount available for individual
12        payments to class members to claim ($952,250), the minimum amount of the net settlement fund to be
          paid by Defendant ($400,000), and the retention of any unclaimed net settlement funds by Defendant.
13        As discussed below, no class members objected to the proposed structure of the settlement agreement,
          which included Defendant's retention of funds, and only two class members opted out of the
14        agreement. And, as discussed above, nearly 4,000 class members were adequately notified of this
          action and had the opportunity to participate. A higher participation rate would have increased the
15        amount claimed by the class and paid by Defendant. Further, courts in this district have approved
          similar potential reversions (or retention) of class action settlement funds. See, e.g., Schiller v. David's
16        Bridal, No. 1:10-cv-00616-AWI-SKO (E.D. Cal. Jun. 28, 2012) (approving a reversion of 45% of the
          net settlement fund); Mendez v. Tween Brands, Inc., No. 2:10-cv-00072-MCE-DAD (E.D. Cal. Aug. 8,
17        2011) (approving a reversion of 50% of the net settlement fund); Enabnit v. Petsmart, Inc., No. 2:07-
          cv-00165-JAM-DAD (E.D. Cal. Apr. 23, 2009) (approving a reversion of 70% of the amount set aside
18        for payment to the class members); Lewis v. Starbucks, 2:07-cv-00490-MCE-DAD (E.D. Cal. Dec. 10,
          2008) (approving 75% reversion of the net settlement fund).

19   Davis, 2015 WL 6697929, at *6.

20   [10]  In Hightower, the settlement had a 65% minimum distribution floor with the remainder potentially reverting back
     to Defendant. 2015 WL 9664959, at *5.  Significantly there were seven objectors to the settlement agreement, who
21   argued in part that the reversion clause rendered the agreement inadequate, and the attorneys' fee portion of 30%
     was unreasonable. Id.  Like here, the court ordered supplemental briefing prior to preliminary approval, and court
22   found the course of negotiation, weaknesses in the case, and efforts to increase participation indicated the agreement
     was fair and reasonable:

23        The Rosario Objectors argue that the reversion clause described above renders this settlement
24        agreement unfair and indicates that the settlement agreement "was not a product of arms-length
          negotiations in which the class's interests were considered a priority." See Rosario Objections 9:17–
25        10:15. The Court is sensitive to these concerns and, in fact, ordered the Parties to address this clause
          before preliminarily approving the settlement agreement. Dkt. # 179. A reversion clause certainly
26        makes the Court suspicious, but in this instance, after reviewing the respective positions of the Parties,
          and considering the many weaknesses of Plaintiffs' case, the Court is persuaded that the reversion
27        clause does not make the Settlement Agreement unfair nor does it show collusion among the
          parties. See Pffs.' Supp. Mem.; Def.'s Supp. Mem. Plaintiffs would likely not have been able to
28        negotiate a maximum amount of even $12 million without this clause and have taken methods to
          increase participation in the Settlement Agreement. For example, Plaintiffs caused Notice Packets to

1  facts, combined with the protracted nature of the litigation, attendance of mediation, and tenor of

2  settlement negotiations, indicate that the parties' negotiations constituted genuine and informed

3  arm's length bargaining in agreeing to the reversionary aspect of this settlement agreement.

4      Consistent with the concerns and standards discussed in the findings and

5  recommendations recommending preliminary approval, as further addressed by the

6  supplementary materials filed by counsel and considered by the District Judge in adopting the

7  findings and recommendations on preliminary approval, and the facts and legal standards

8  discussed above, the Court finds that the reversion clause does not render the agreement

9  unreasonable or unfair.   Additionally, in the next section, the Court finds the amount of

10 attorneys' fees requested is reasonable and thus does not render the agreement unfair.

11     In sum, after considering the foregoing factors, the Court finds that the settlement is fair,

12 adequate, and reasonable pursuant to Rule 23(e).   Further, the Court finds no evidence that the

13 settlement is the result of any collusion between the parties.   In re Bluetooth, 654 F.3d at 946–47.

14 The Court now turns to consideration of the concurrently filed motion for attorneys' fees, costs,

15 and incentive awards.

16     **C.     Motion for Attorneys' Fees, Expenses, and Incentive Payments**

17     In addition to the motion for final approval of the class action settlement, Plaintiffs also

18 concurrently filed a motion for attorneys' fees, litigation expenses, and incentive payment

19 awards for the named Plaintiffs.   (ECF No. 33.)   Lawyers *for* Justice, PC, and Protection Law

20 Group, LLP, ("Class/Collective Counsel"), seek attorneys' fees in the amount of $210,000,

21 representing thirty-five percent (35%) of the Maximum Settlement Amount, in addition to

22 $22,612.07 in litigation costs.   Plaintiffs also move for incentive payments in the amount of

23 $3,000 each to Plaintiffs Kevin Ferrell and Cheryl Baker.

24     The attorneys' fees, reimbursement of litigation costs and expenses, as well as the

25 incentive awards sought through the motion were fully disclosed in the Notice Packet mailed to

26     be mailed to over 145,000 putative class members and then reminder post cards a month later to those
27     putative class members who had not responded. *Morales Decl.* ¶¶ 7–8.

Id. at *7.

28

1  the Class Members and Proposed FLSA Collective Members.  (Mot. Atty. Fees 6.)  No class

2  members have submitted objections to these amounts.

3        1.    Attorneys' Fees

4        This court has an "independent obligation to ensure that the award [of attorneys' fees],

5  like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  In

6  re Bluetooth, 654 F.3d 935, 941 (9th Cir. 2011).  This is because, when fees are to be paid from a

7  common fund, the relationship between the class members and class counsel "turns adversarial."

8  In re Mercury Interactive Corp. Secs. Litig., 618 F.3d 988, 994 (9th Cir. 2010); In re Wash. Pub.

9  Power Supply Sys. Secs. Litig., 19 F.3d 1291, 1302 (9th Cir. 1994).  As such, the district court

10  assumes a fiduciary role for the class members in evaluating a request for an award of attorneys'

11  fees from the common fund.  In re Mercury, 618 F.3d at 994; see also Rodriguez v. Disner, 688

12  F.3d 645, 655 (9th Cir. 2012); Rodriguez v. West Publ'g Corp., 563 F.3d at 968.

13        The Ninth Circuit has approved two methods for determining attorneys' fees in such

14  cases where the attorneys' fee award is taken from the common fund set aside for the entire

15  settlement: the "percentage of the fund" method and the "lodestar" method.  Vizcaino v.

16  Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted).  The district court

17  retains discretion in common fund cases to choose either method.  Id.; Vu v. Fashion Inst. of

18  Design & Merch., No. 14-cv-08822-SJO-EX, 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22,

19  2016).  Under either approach, "[r]easonableness is the goal, and mechanical or formulaic

20  application of method, where it yields an unreasonable result, can be an abuse of discretion."

21  Fischel v. Equitable Life Assurance Soc'y of U.S., 307 F.3d 997, 1007 (9th Cir. 2002).  The

22  Ninth Circuit has generally set a twenty-five percent (25%) benchmark for the award of

23  attorneys' fees in common fund cases.  Id. at 1047–48; see also In re Bluetooth, 654 F.3d at 942

24  ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award,

25  providing adequate explanation in the record of any 'special circumstances' justifying a

26  departure.").

27        Reasons to vary the benchmark award may be found when counsel achieves exceptional

28  results for the class, undertakes "extremely risky" litigation, generates benefits for the class

beyond simply the cash settlement fund, or handles the case on a contingency basis.  Vizcaino, 290 F.3d at 1048–50; see also In re Online DVD-Rental, 779 F.3d at 954–55.  Ultimately, however, "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case."  Vizcaino, 290 F.3d at 1048.  The Ninth Circuit has approved the use of lodestar cross-checks as a way of determining the reasonableness of a particular percentage recovery of a common fund.  Id. at 1050 ("Where such investment is minimal, as in the case of an early settlement, the lodestar calculation may convince a court that a lower percentage is reasonable.  Similarly, the lodestar calculation can be helpful in suggesting a higher percentage when litigation has been protracted."); see also In re Online DVD-Rental, 779 F.3d at 955.

### a. Findings Re Preliminary Approval

Here, while the Court approved Plaintiffs' request for attorneys' fees on a preliminary basis, finding that the requested fee amount of $210,000 was fair and reasonable for purposes of preliminary approval, the Court specifically "forewarned" Plaintiffs that the Court would not be inclined to grant an upward departure from the 25% benchmark absent presentation of "compelling evidence supporting such a departure" at the time of final approval.  (ECF No. 24 at 40.)  The Court noted the litigation appeared to be a "relatively straight forward case and lack[ed] a complexity which may justify a higher than benchmark rate, and presently counsel have not demonstrated the achievement of exceptional results that would justify a departure, particularly in light of the steep discounts from the original valuations discussed above. However, counsel can and should show otherwise at the final settlement proceeding if a greater rate is sought."  (Id.)  In support of preliminary approval, the Court favorably considered the fact that there was no longer an express clear sailing agreement, and the fact that any reduction in the award would revert back to the funds available for Class Members, specifically noting:

> As discussed in the previous section, given the Court is disinclined to approve an amount over the Ninth Circuit's benchmark of twenty-five percent (25%), the Court finds it significant that the Agreement explicitly provides that should the Court approve a fee award of less than thirty-five percent, the difference "shall become part of the Net Settlement Amount."  (Agreement ¶ 63(d).)  Of further significance, the Agreement no longer contains an express clear sailing agreement after the state court previously voiced concerns with the previous settlement

1

2

agreement's fee provision which expressly stated that "Defendant will not oppose" an award of up to thirty-five percent (35%).  (ECF No. 1-10 at 62, 213.)  The Agreement now does not contain such language.  (Agreement ¶¶ 19; 63.)

3

(ECF No. 24 at 40 n.25.)

4

5

### b.    Percentage of the Fund Review

6

Here, Class/Collective Counsel seek an award of attorneys' fees equal to 35% of the common fund, or $210,000.  Counsel argue numerous factors support this requested award.

7

8

9

10

11

12

13

14

15

Counsel emphasizes this litigation was pursued purely on a contingency-fee basis, with the resultant risk and bearing of the investment of time, effort, and monetary costs with no guarantee of recovery.  (Mot. Fees 17.)  Class/Collective Counsel proffer that they devoted approximately 690.90 hours and $22,612.07 in out-of-pocket expenses to litigating the case for almost four years.  (Mot. 23; Aiwazian Fees Decl. ¶ 19.)  Absent successful resolution, none of this attorney time or incurred expenses would have been compensated.  See Vizcaino, 290 F.3d at 1048 ("Risk is a relevant circumstance.").  The Court finds the fact that the case was based on contingency along with the specific risks of this litigation given its protracted nature, weigh in favor of granting the fee request.

16

17

18

19

20

21

22

23

24

25

26

However, the Court is particularly troubled that the billing spreadsheets provided by counsel contain large portions that do not specify the precise date that attorney time was expended.  For example, counsel describe pre-lawsuit investigation or meeting with a named Plaintiff, but do not provide the individual dates such research or meetings occurred, only providing the total hours instead.  (ECF No. 33-5 at 14-16, 35-40.)  Other entries aver to general dates for the tasks, such as noting the date that the deposition occurred, or the date that interrogatories were served, however, not a precise breakdown of the individual time entries.  (ECF No. 33-5 at 27-34.)  At least as presented to the Court, the form of the spreadsheet appears to border on block billing, making the task of approving the attorneys' fees requested a significantly more treacherous task.[11]  At the hearing on the motion for final approval, counsel

27

28

---

[11]  As a judge in this district has explained:

> Block billing is a practice where the amount of time spent by an attorney on each discrete task is not identified, but instead all hours spent during the course of a day on multiple tasks are billed together.

1  for Plaintiffs appeared to concede as much, though explained that while the presentation of the

2  time spreadsheet is akin to block billing, the information in the spreadsheet is compiled through

3  use of attorneys' own handwritten notes and other records pertaining to specific tasks.  Counsel

4  stated that given the firm operates almost entirely on a contingency fee basis, they do not employ

5  an electronic timekeeping software program that tracks and compiles the entries

6  contemporaneously.

---

The California State Bar's Committee on Mandatory Fee Arbitration has concluded that block billing "hides accountability" and may "increase time by 10% to 30%" by lumping together tasks. *See* The State Bar of California Committee on Mandatory Fee Arbitration, Arbitration Advisory 03–01 (2003).

More importantly, the usage of block billing is fundamentally inconsistent with the lodestar method because it "render[s] it virtually impossible to break down hours," leaving the court without the ability to accurately determine whether a reasonable amount of time was spent by counsel on a discrete task. *Bell v. Vista Unified Sch. Dist.,* 82 Cal.App.4th 672, 689, 98 Cal.Rptr.2d 263 (2000); *see Welch v. Metro. Life Ins. Co.,* 480 F.3d 942, 948 (9th Cir.2007) ("[B]lock billing makes it more difficult to determine how much time was spent on particular activities."); *Bonner,* 2008 WL 410260, at *3. Without an itemization of the amount of time spent by the fee applicant on each discrete task in the case, the court cannot accurately determine whether the rates charged or hours spent by lawyers in a matter are reasonable. An excessive amount of block billing thereby forces the court to take a "shot in the dark" and guess whether the hours expended were reasonable, which is precisely the opposite of the methodical calculations the lodestar method requires. *See Hensley,* 461 U.S. at 434.

California courts have held that a trial court may "exercise its discretion in assigning a reasonable percentage to the [block billed] entries, or simply cast them aside." *Bell,* Cal.App. 4th at 689. Under federal law, however, when a court is faced with block billing, it may not simply make across the board reductions in fees or toss block billed hours aside. Rather, a district court must "provide a clear explanation" for why any reduction in fees "properly compensate[s] for ... overbilling or duplication." *Sorenson v. Mink,* 39 F.3d 1140, 1146 (9th Cir.2001); *see also Welch,* 480 F.3d at 948 (rejecting an across the board reduction for block billed fees because the court failed to adequately explain a rationale for its percentage reduction).

Block billing makes it virtually impossible for a court to comply with its requirement to give a clear, reasoned explanation for any fee reductions because those reductions would ultimately be nothing more than guesswork based on an imprecise billing statement. Given block billing's inherent inconsistency with the lodestar method, this court will not award fees for any blocked billed entries. However, the court will give defendants an opportunity to submit an amended billing statement that will allow the court to determine the reasonableness of defendants' fee request.

Yeager v. Bowlin, No. CIV 2:08-102 WBS JFM, 2010 WL 1689225, at *1–2 (E.D. Cal. Apr. 26, 2010); see also Moshir v. Automobili Lamborghini Am. LLC, 927 F. Supp. 2d 789, 799 (D. Ariz. 2013) ("While not forbidden by case law, block-billing makes it nearly impossible for the Court to determine the reasonableness of the hours spent on each task. Where the Court cannot distinguish between the time claimed for the various tasks, the Court will reduce the award accordingly."); Banas v. Volcano Corp., 47 F. Supp. 3d 957, 967 (N.D. Cal. 2014) ("Without specifying how much spent was spent on each distinct task (most of which were also performed on additional days), there is no way for me to determine whether the time spent on any of these tasks—e.g., trial preparation, summary judgment briefing, opposition to sanctions motion, preparations of jury instructions and verdict form—was reasonable. Nor can I determine that the total amount of time spent on all the tasks, in combination, was reasonable, given the amount of time at issue and because most of Volcano's tasks were performed on several days by various attorneys.").

1    This practice is clearly problematic when a large attorneys' fee request is presented to the

2    Court for approval, and the Court must protect the interests of the class members and determine

3    whether the hours expended are reasonable.  Nonetheless, the entries are at least largely broken

4    down by specific overarching task or court filing, even if they are not further delineated by

5    individual components or dates leading up to the filing or event.  Overall, the tasks described in

6    the entries are supported by the declarations of counsel and the course of litigation since 2014,

7    and appear facially reasonable.  (Mot. Fees 17-19; Aiwazian Fees Decl. ¶¶ 6, 11; Ex. A, ECF No.

8    33-4 at 17; Davis Decl. ¶ 17, Ex A, ECF No. 33-5 at 13.)  "Although it is true that the fee

9    applicant bears the burden of submitting evidence supporting the hours worked and rates claimed

10   . . . the Supreme Court has also stated that plaintiff's counsel is not required to record in great

11   detail how each minute of his time was expended [and] [i]nstead, plaintiff's counsel can meet his

12   burden—although just barely—by simply listing his hours and identify[ing] the general subject

13   matter of his time expenditures."  <u>Fischer v. SJB-P.D. Inc.</u>, 214 F.3d 1115, 1121 (9th Cir. 2000)

14   (finding the fee application met this basic requirement as "[t]he application provided a summary

15   of the time spent on a broad category of tasks such as pleadings and pretrial motions  . . . the

16   application specifically states that it was a 'summary compiled from time slips[,]' and

17   [p]resumably, then, more detailed records were readily available.") (internal citations and

18   quotation marks omitted).  Based on the discussion and assurances at the hearing on the motion

19   for final approval concerning the manner of keeping notes and records supporting the

20   spreadsheet of time expended, the Court found it unnecessary to order supplemental briefing or

21   presentation of these notes and additional records.  Accordingly, the Court finds the significant

22   number of hours expended by counsel prior to reaching settlement weighs in favor of approving

23   the fee request.

24    Counsel argues they have achieved significant relief for the class.  (Mot. Fees 19-20.)

25   Above, the Court has voiced its concerns regarding whether the settlement amount is sufficient

26   given the initial valuations, the fact this is a claim-based settlement fund, and the reversionary

27   clause.  Nonetheless, given the protracted nature of this action, extent of investigation and

28   discovery completed, completion of mediation, motion practice in state court with resultant

1    multiple modifications of the settlement agreement to align with court concerns, and extensive

2    negotiations, it appears counsel ultimately did achieve significant relief for the class.   As

3    discussed above, the highest gross Estimated Class Settlement Share is estimated to be

4    $4,883.07; the average gross Estimated Class Settlement Share is estimated to be $1,390.95; the

5    highest gross Estimated FLSA Settlement Share is estimated to be $446.18; and the average

6    gross Estimated FLSA Settlement Share is estimated to be $130.40.   (Suppl. Simpluris Decl. ¶¶

7    20, 21.)   Based on the totality of these circumstances, the Court agrees with Counsel that

8    settlement at this stage is preferable to facing the risks and expenses of further litigation, and will

9    provide immediate recovery as opposed to uncertain result through continued litigation and trial.

10   Although steeply discounted through protracted litigation and negotiations, these amounts to be

11   allocated to individuals do appear significant.

12         Further, counsel for Plaintiffs, are seasoned and experienced litigators of wage-and-hour

13   class actions.   Specifically, counsel have provided declarations attesting to their years of

14   experience with complex and class action litigation, recovery of millions of dollars on behalf of

15   thousands of individual class members in California, and have detailed the wage-and-hour class

16   action cases they have been involved with.   (Mot. Fees 20-21; Aiwazian Fees Decl. ¶ 18; Davis

17   Decl. ¶¶ 8-9.)   Relatedly, counsel argues that Defendant retained well-respected counsel, and the

18   ability to obtain a settlement in the face of formidable legal opposition confirms the quality of

19   representation on behalf of the class.   (Mot. Fees 21.)   The Court does not disagree with movants

20   that it appears Defendant retained well-respected counsel that vigorously defended this action

21   since its inception in 2014, and courts have noted that the "quality of opposing counsel is also

22   important in evaluating the quality of Class Counsel's work."   In re KeySpan Corp. Sec. Litig.,

23   No. 01 CV 5852(ARR), 2005 WL 3093399, at *11 (E.D.N.Y. Sept. 30, 2005).   The Court finds

24   the experience of counsel in litigating complex wage and hour class actions weighs in favor of

25   the fee award.

26         Moreover, the Court notes that the absence of any objections to the settlement and only

27   one (1) request for exclusion, also supports the award of the attorneys' fees sought in this case.

28   The attorneys' fees sought in the amount of $210,000 were fully disclosed in the Notice Packet

1   that were mailed to the Class Members and Proposed FLSA Collective Members.  (Mot. Fees 6,

2   24.)  Therefore, Class Counsel's request for attorneys' fees appears to have the support of the

3   class and that support weighs in favor of the requested award.

4        Following the filing of required supplemental briefing on the issue of attorneys' fees

5   prior to the adoption of the findings and recommendations on preliminary approval, the District

6   Judge found for purposes of preliminary approval, that counsel had presented sufficient

7   justification to depart from the 25% benchmark, with the caveat regarding the undersigned's

8   forewarning regarding such departure.  (ECF No. 28 at 7 (noting 35% is "higher than the 25%

9   benchmark for the Ninth Circuit . . . but not a significant departure from several wage-and-hour

10  class actions brought in the Eastern District of California.").)  Given the issues of valuation and

11  amount of settlement discussed above and the typical benchmark in the Ninth Circuit, the Court

12  finds the relevant factors do not overwhelmingly persuade the Court that the 35% amount is

13  reasonable, and the Court will perform a lodestar cross-check to determine whether an upward

14  adjustment is warranted, particularly given the protracted nature of this case, as it has been

15  ongoing since 2014.  Vizcaino, 290 F.3d at 1050 ("Where such investment is minimal, as in the

16  case of an early settlement, the lodestar calculation may convince a court that a lower percentage

17  is reasonable.  Similarly, the lodestar calculation can be helpful in suggesting a higher percentage

18  when litigation has been protracted.").

19        c.    **Lodestar Cross-Check of Reasonableness**

20        The Court now performs a lodestar analysis in order to cross-check the reasonableness of

21  the requested attorneys' fee award.  Since the benefit to the class is easily calculated in a

22  common find case, courts may award a percentage of the common fund rather than engaging in a

23  "lodestar" analysis to determine the reasonableness of the fee request.  In re Bluetooth, 654 F.3d

24  at 942.  When applying the percentage of the common fund method in calculating attorney fees,

25  courts use the "lodestar" method as a crosscheck to determine the reasonableness of the fee

26  request.  See Vizcaino, 290 F.3d at 1050.  "This amount may be increased or decreased by a

27  multiplier that reflects any factors not subsumed within the calculation, such as 'the quality of

28  representation, the benefit obtained for the class, the complexity and novelty of the issues

1  presented, and the risk of nonpayment.' " Adoma, 913 F. Supp. 2d at 981 (quoting In re

2  Bluetooth, 654 F.3d at 942).

3      Where a lodestar is used as a cross-check, the court "may use a 'rough calculation of the

4  lodestar.' " Bond v. Ferguson Enters., Inc., No. 1:09-cv-1662-OWW-MJS, 2011 WL 2648879,

5  at *12 (E.D. Cal. June 30, 2011) (quoting Fernandez v. Victoria Secret Stores, LLC, No. 06-cv-

6  04149-MMM-SHx, 2008 WL 8150856 (C.D. Cal. July 21, 2008)).  Moreover, beyond simply the

7  multiplication of a reasonable hourly rate by the number of hours worked, a lodestar multiplier is

8  often applied.  "Multipliers in the 3–4 range are common in lodestar awards for lengthy and

9  complex class action litigation." Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 298

10  (N.D. Cal. 1995) (citing Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 549 (S.D. Fla.

11  1988)); see also 4 Newberg on Class Actions § 14.7 (stating courts typically approve percentage

12  awards based on lodestar cross-checks of 1.9 to 5.1 or even higher, and "the multiplier of 1.9 is

13  comparable to multipliers used by the courts"); In re Prudential Ins. Co. Am. Sales Practice Litig.

14  Agent Actions, 148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from one to four are

15  frequently awarded in common fund cases when the lodestar method is applied.") (quoting 4

16  Newberg on Class Actions § 14.7).  In Vizcaino, the Ninth Circuit noted that 83% of courts in

17  the common fund cases it surveyed assessed a multiplier between 1.0 and 4.0, and 54% applied a

18  multiplier in the range of 1.5 to 3.0.  Vizcaino, 290 F.3d at 1051 n.6.

19      Here, Class Counsel assert that 690.90 hours of attorney were expended in litigating this

20  case.  (Mot. Fees 22; Aiwazian Fees Decl. ¶ 11; Ex. A, ECF No. 33-4 at 17-44; Davis Decl. ¶ 17,

21  Ex. A, ECF No. 33-5 at 13-40.)  The Court expressed its concerns regarding the presentation of

22  the billing timesheets above.

23      Counsel contends that the professional backgrounds and experience of counsel supports a

24  reasonable blended hourly rate of compensation of at least $780 per hour for services provided

25  by Lawyers *for* Justice, PC, and at least $685 per hour for services provided by Protection Law

26  Group, LLC, and specifically proffer that Lawyers *for* Justice has been awarded fees at the rate

27  of at least $780 per hour by California courts.  (Mot. Fees 22; Aiwazian Fees Decl. ¶ 12; Davis

28  Decl. ¶ 21.)  Protection Law Group calculated the blended rate by utilizing the hourly rates for

each attorney, multiplied by their number of respective of hours to reach total lodestar fee for the firm based on these rates and hours, and then arriving at an average hourly rate based thereon. (ECF No. 33-5 at 11.)  The following rates and number of hours were used:

| Attorney | Title | Admission | Hourly Rate | Hours | Lodestar |
|---|---|---|---|---|---|
| Heather Davis | Partner | 2005 | $750 | 129.30 | $96,975 |
| Amir Nayebdadash | Partner | 2004 | $650 | 28.50 | $18,525 |
| Eric Boyajian | Associate[12] | 2005 | $500 | 24.50 | $12,250 |
| Luke Clapp | Associate | 2015 | $350 | 8.50 | $2,975 |
| | | | **TOTAL:** | 190.8 | $130,725 |
| | | | **Blended Hourly Rate:** | $685.14 | |

Details regarding each attorneys' experience is laid out in the declaration of counsel. (Davis Decl. ¶ 19.)

Lawyers *for* Justice calculated the blended rate by utilizing the hourly rates for each attorney, multiplied by their number of respective of hours to reach total Lodestar fee for the firm based on these rates and hours, and then arriving at an average hourly rate based thereon. (ECF No. 33-4 at 7-8.)  The following rates and number of hours were used:

| Attorney | Title | Admission | Hourly Rate | Hours | Lodestar |
|---|---|---|---|---|---|
| Edwin Aiwazian | Managing Member | 2004 | $975 | 148.6 | $144,885 |
| Arby Aiwazian | Sole Shareholder | 2010 | $850 | 42.50 | $36,125 |
| Joanna Ghosh | Senior Member | 2010 | $775 | 71.75 | $55,606.25 |
| Danielle Perry | Member | 2013 | $675 | 125 | $84,375 |

---

[12]  Although not expressly stated, it appears Eric Boyajian worked in the capacity of an associate, and was admitted to practice in 2005.

| D. Elliot Gonzalez | Member | 2012 | $700 | 13 | $9,100 |
|---|---|---|---|---|---|
| Elizabeth Parker-Fawley | Member | 2014 | $675 | 27.75 | $18,731.25 |
| Stephanie S. Ponek | Member | 2015 | $675 | 35.50 | $23,962.50 |
| Henna Choi | Member | 2015 | $500 | 1 | $500 |
| Julia Z. Wells | Member | 2016 | $500 | 6 | $3,000 |
| Melissa A. Huether | Member | 2017 | $500 | 29 | $14,500 |
| | | | **TOTAL:** | 500.10 | $390,785 |
| | | | **Blended Hourly Rate:** | $781.41 | |

While Edwin Aiwazian describes the breadth of his own experience specifically, and the law firm generally, counsel does not describe the individual experience of the other members of the firm.  (Aiwazian Fees Decl. ¶ 11-18.)  Further, it is not clear what member means in relation to senior member, but it appears Joanna Ghosh, Arby Aiwazian, and Edwin Aiwazian would be considered at the partner level, while the "Members" would be considered at the associate or senior associate level.

In calculating their lodestar, Class Counsel applied the rate of $780 per hour to the 500.10 hours expended by Lawyers *for* Justice, and the rate of $685 per hour to the 190.80 hours expended by the Protection Law Group, to arrive at a base lodestar value of $520,776.  (Mot. Fees 22.)  Counsel further demonstrates that even applying a significantly lower blended hourly rate of $500 per hour for the 690.10 total ours of work performed would result in a lodestar of $345,450.  (Id.)  Thus, even without a lodestar multiplier, a lodestar calculation falls well above the requested $210,000 in fees, representing 35% of the total settlement amount.

These rates are higher than those previously accepted by this Court as reasonable.  See, e.g., Emmons v. Quest Diagnostics Clinical Labs., Inc., No. 1:13-cv-00474-DAD-BAM, 2017 WL 749018, at *8 (E.D. Cal. Feb. 27, 2017) (adopting as reasonable rates between $370 and

1   $495 for associates and $545 and $695 for senior counsel and partners); Englert v. City of

2   Merced, No. 118CV01239NONESAB, 2020 WL 2215749, at *13 (E.D. Cal. May 7, 2020)

3   (approving attorneys' fees in an FLSA action that totaled approximately thirty-one percent (31%)

4   of the common fund, and in performing a lodestar cross-check, finding the corresponding rates of

5   $450.00 per hour for a partner with nineteen years of experience, $400.00 per hour for a senior

6   associate attorney with an unspecified amount of years of experience, and a rate of $325.00 per

7   hour for an associate with eight years of experience, to be reasonable.); In re Taco Bell Wage &

8   Hour Actions, 222 F.Supp.3d 813, 839 (E.D. Cal. 2016) (noting attorneys in Fresno Division

9   with twenty or more years of experience are awarded $350.00 to $400.00 per hour, and attorneys

10   with less than fifteen years of experience are awarded $250.00 to $350.00 per hour).

11      Since hourly rates will be used solely for the purpose of cross-checking the percentage of

12   the common fund awarded as attorneys' fees, the Court will not define precisely the appropriate

13   rates for this district here.  Even if the Court were to cut the requested rates by 50% thus making

14   the rates fall within or below a rate somewhere in the range previously approved, the lodestar

15   cross-check would result in a calculation of $260,388 ($520,776 ÷ 2).  As noted above, block

16   billing has been found to increase time entries by 10% to 30%.  See Yeager, 2010 WL 1689225,

17   at *1 ("The California State Bar's Committee on Mandatory Fee Arbitration has concluded that

18   block billing 'hides accountability' and may 'increase time by 10% to 30%' by lumping together

19   tasks.").  Given the concerns expressed above regarding block billing, if the Court were then to

20   perform a further reduction of the hours expended by the middle figure of 20%, the lodestar

21   would result in a calculation of $208,310.40 ($260,388 x 0.80).  Thus using a rough calculation

22   employing this significant reduction, the resultant baseline lodestar with no multiplier would still

23   remain very close to the requested award of $210,000 in attorneys' fees.  Further, given the

24   protracted nature of the litigation and factors discussed above, a modest multiplier would not be

25   unreasonable.

26      Thus, the Court finds a lodestar cross-check supports the requested award of $210,000 in

27   attorneys' fees, an amount equal to 35% of the total fund in this case.

28

1          2.      Expenses of Class Counsel

2          Additionally, class counsel seeks to recover the costs expended on this litigation.  (Mot.

3   Fees 23.)  Expense awards "should be limited to typical out-of-pocket expenses that are charged

4   to a fee paying client and should be reasonable and necessary."  In re Immune Response Secs.

5   Litig., 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007).  These can include reimbursements for:

6   "(1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing

7   fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8)

8   experts, consultants, and investigators; and (9) mediation fees."  Id.

9          The Settlement Agreement provides for reimbursement of litigation costs and expenses

10  up to $35.000.  Here, class counsel requests reimbursement of their actual expenses in the

11  amount of $22,612.07.  (Mot. 23; Aiwazian Fees Decl. ¶ 19, Ex. B, ECF No. 33-4 at 45-47;

12  Davis Decl. ¶ 15, Ex. B, ECF No. 33-5 at 41-42.)  The difference between the allocated costs and

13  the incurred costs, $12,387.93, will remain part of the Net Settlement Amount.   (Id.)

14  Specifically, the costs reimbursement is to be allocated as $22,227.07 to Lawyers *for* Justice, PC,

15  and $385 to Protection Law Group, LLP.  (Id.)

16         The Court has reviewed counsels' declarations, which attest to the costs they incurred, as

17  well as the exhibits attached thereto, and finds the expenses incurred to be reasonable.

18  Accordingly, the Court recommends reimbursement of expenses in the amount requested.

19         3.      Class Representative Enhancement Payments

20         The Settlement Agreement provides for incentive payments in the amount of $3,000

21  each to Plaintiffs Kevin Ferrell and Cheryl Baker, to compensate them for the time and effort

22  they expended on behalf of the Class Members and Proposed FLSA Collective Members.  (Mot.

23  Fees 23.)

24         "Incentive awards are fairly typical in class action cases."  Rodriguez v. West Publ'g

25  Corp., 563 F.3d at 958–59.  However, the decision to approve such an award is a matter within

26  the court's discretion.  In re Mego Fin. Corp. Sec. Litig., 213 F.3d at 463.  Generally speaking,

27  incentive awards are meant to "compensate class representatives for work done on behalf of the

28  class, to make up for financial or reputational risk undertaken in bringing the action, and,

sometimes, to recognize their willingness to act as a private attorney general." Rodriguez v. West Publ'g Corp., 563 F.3d at 958–59. The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives . . . . [C]oncerns over potential conflicts may be especially pressing where, as here, the proposed service fees greatly exceed the payments to absent class members." Radcliffe v. Experian Info. Sols., Inc., 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted). A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [her] award and those of the unnamed plaintiffs." Alberto, 252 F.R.D. at 669.

In assessing the appropriateness of class representative enhancements or incentive payments, the Court must consider factors such as the actions the plaintiffs took to protect the interests of the class, the degree to which the class has benefitted, the amount of time and effort the plaintiff expended in pursuing litigation, and any notoriety or personal difficulties encountered by the representative plaintiff. Khanna v. Intercon Sec. Systems, Inc., No. 2:09-cv-2214 KJM EFB, 2014 WL 1379861, at *10 (E.D. Cal. Apr. 8, 2014); Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 257 (E.D. Penn. 2011); see also Staton, 327 F.3d at 975-77. "Incentive awards are particularly appropriate in wage-and-hour actions where plaintiffs undertake a significant 'reputational risk' by bringing suit against their former employers." Bellinghausen, 306 F.R.D. at 267 (citation omitted).

The Court finds that $3,000.00 each is reasonable compensation for the services provided by the class representatives in this action given the risks that they took in representing the class and the time spent adjudicating this action. On preliminary approval, the Court reviewed the declarations of Plaintiffs and noted the "extensive declared amount of time and work the class representatives have put forth in in assisting with this litigation." (ECF No. 24 at 28, 40-41.) At the time of preliminary approval, Baker and Ferrell each declared they spent over thirty hours working on the litigation. (Id.) The requested incentive awards were fully disclosed in the Notice Packet and no objections have been made.

1   Accordingly, the Court recommends awarding the named class representatives Kevin
2   Ferrell and Cheryl Baker incentive awards of $3,000.00 each.

3   4.   Settlement Administrator Costs

4   The court previously approved the appointment of Simpluris, Inc. as the settlement
5   administrator.  (ECF No. 28 at 12.)  The settlement agreement provides for the payment of
6   $16,000 to the settlement administrator and Plaintiffs request final approval of such payment.
7   (Mot. 24.)[13]   The costs incurred and to be incurred include expenses for preparing and mailing
8   the Notice Packet; conducting change of address database searches and skip-trace searches;
9   calculating individual class payments and FSLA payments; receiving and processing requests for
10   exclusion, notices of objection, and workweek disputes; distributing individual settlement
11   payments after tax reductions; and performing other associated required duties set forth in the
12   settlement agreement.  (Mot. 23-24; Suppl. Simpluris Decl. ¶ 25, Ex. E, ECF No. 35-2 at 305.)
13   The Court finds these administration costs reasonable and will grant approval of this aspect of
14   the settlement agreement.

15   **V.**

16   **CONCLUSION AND RECOMMENDATIONS**

17   For all of the above reasons, the Court finds the settlement is fundamentally fair,
18   adequate, and reasonable. Fed. R. Civ. P. 23(e); Lane v. Facebook, Inc., 696 at 818; Hanlon, 150
19   F.3d at 1026–27.  The Court also finds the requested amount of attorneys' fees and costs,
20   incentive awards, and administrative costs, to be reasonable and appropriate.

21   Accordingly, IT IS HEREBY RECOMMENDED that:

22   1.   Plaintiffs' motion for final approval of the class action settlement (ECF No. 32)
23   be GRANTED and the Court approve the settlement as fair, reasonable, and
24   adequate;

25   2.   Plaintiffs' motion for attorneys' fees and costs and incentive awards (ECF No. 33)
26   be GRANTED, and the following amounts be awarded:

27

28   [13]  Plaintiffs do not move for these amounts in the motion for attorneys' fees (ECF No. 33), but request it in the motion for final approval.  (ECF No. 32 at 23-24.)

a.   Class counsel shall receive $210,000.00 in attorneys' fees and $$22,612.07 in expenses;

b.   Plaintiff Ferrell shall receive $3,000.00 as an incentive payment;

c.   Plaintiff Baker shall receive $3,000.00 as an incentive payment;

3.   Simpluris, Inc., shall receive $16,000.00 in settlement administration costs and expenses;

4.   The parties be directed to effectuate all terms of the settlement agreement and any deadlines or procedures for distribution set forth therein;

5.   This action be dismissed with prejudice in accordance with the terms of the parties' settlement agreement, with the court specifically retaining jurisdiction over this action for the purpose of enforcing the parties' settlement agreement; and

6.   The Clerk of the Court be directed to close this case.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within fourteen (14) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **February 10, 2021**

UNITED STATES MAGISTRATE JUDGE